CRAIG CARPENITO
United States Attorney
DAVID V. SIMUNOVICH
MARK C. ORLOWSKI
Assistant United States Attorneys
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2736
david.simunovich@usdoj.gov

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    *Plaintiff*,<br><br>        v.<br><br>CHRISTOPHER NEARY, SHERMAN BARTON, VE SOURCE, LLC, and VERTICAL SOURCE, INC.,<br><br>                    *Defendants*. | Civil Action No. 20-14167<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff United States of America (the "United States" or the "Government"), by its undersigned attorneys, alleges as follows:

## INTRODUCTION

1.      This is an action for damages and civil penalties arising from false claims presented or caused to be presented by Defendants Christopher Neary ("Neary"), Sherman Barton ("Barton"), VE Source, LLC ("VE Source"), and Vertical Source, Inc. ("Vertical Source").  The claims in this case arise from Defendants' role in causing the United States to pay VE Source more than $16 million in contracts that were set-aside for service-disabled, veteran-owned small businesses

("SDVOSBs").  In order to show ownership and control by a service disabled
veteran, which were express and essential preconditions to obtaining these
contracts and payments under these contracts, Defendants falsely claimed VE
Source was owned and controlled by Barton, who is a service-disabled veteran.  In
actuality, the company was controlled by Neary, who is not a service-disabled
veteran.

2.      As described more fully below, Congress established a program to
promote the award of federal contracts to SDVOSBs through procurement actions
that are specifically limited to firms owned and controlled by service-disabled
veterans.  Between 2012 and 2019, Defendants knowingly submitted, caused to be
submitted, or conspired to submit or cause to be submitted, false claims or false
statements material to claims in order to obtain or promote the award of these
federal SDVOSB set-aside contracts from the United States to VE Source.  In
connection with the award of these contracts, Defendants certified or caused
certifications or statements to be made that VE Source met all requirements to be
an SDVOSB with actual knowledge or reckless disregard for the truth of the matter
that VE Source did not, in fact, meet such requirements and was not entitled to the
award of such contracts.  By diverting contracts and benefits intended for service-
disabled veterans towards an ineligible company, Defendants undercut the express
congressional purpose in enacting laws intended to encourage the awards of federal
contracts to SDVOSBs.  Defendants' wrongful conduct deprived the United States of
the intended benefits of a legitimate SDVOSB receiving and performing federal

contracts.  Defendants' fraudulent scheme further induced or resulted in the Government's award of these contracts and its payment of millions of dollars on these federal contracts to an ineligible firm.  Defendants, therefore, are liable to the United States under the False Claims Act for treble damages and civil penalties as permitted by law.

3.     Additionally, Defendants intended to defraud the Government through the submission of these material misrepresentations, and the Government reasonably relied upon these misrepresentations. The Government suffered damage as a result of such reliance in making payments to ineligible contractors and through the diversion of contractual opportunities and the acquisition of profits that were intended for legitimate SDVOSBs.  As a result, Defendants are responsible for common law fraud and are liable to the Government for damages.

4.     Further, as a result of Defendants' misrepresentations and fraudulent conduct, the United States made payments on the contracts by mistake and Defendants were unjustly enriched at the Government's expense. Equity and good conscience preclude Defendants from retaining this enrichment.  Defendants, therefore, are liable to the Government for all moneys unjustly earned and money wrongfully paid.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over the claims brought under the False Claims Act pursuant to 28 U.S.C. §§ 1331, 1345, over the remaining claims pursuant to 28 U.S.C. § 1345, and over all claims pursuant to the Court's

3

general equitable jurisdiction.

6.      This Court has personal jurisdiction over all Defendants pursuant to
31 U.S.C. § 3732(a) because at least one of the Defendants can be found in, resides
in, or transacts business in this District and because acts proscribed by 31 U.S.C.
§ 3729(a) occurred in this District.

7.      Venue is proper in this District under 31 U.S.C. § 3732(a) and 28
U.S.C. §§ 1391(b, c) because one or more Defendants reside in or have transacted
business in this District and because a substantial part of the events or omissions
giving rise to the claims occurred in this District.

## PARTIES

8.      Plaintiff is the United States of America.

9.      Defendant VE Source is a Delaware limited liability company. At all
relevant times, VE Source's principal place of business was in Monmouth County,
New Jersey.

10.     Defendant Vertical Source is a New Jersey corporation. At all relevant
times, Vertical Source's principal place of business was in Monmouth County, New
Jersey.

11.     Defendant Neary is a resident of Monmouth County, New Jersey and
is the 49% owner of VE Source.

12.     Neary is also the 100% owner of Vertical Source, Vertical Brands LLC,
Vertical Protective Apparel LLC, Vertical Design Group LLC, Neve Apparel LLC,
Two River Textiles LLC, and Cloudveil Mountain Works LLC (together, the "Neary

4

Companies").

13.     Neary is not a veteran with a service-connected disability.

14.     Defendant Barton is a resident of Burlington County, New Jersey and is the 51% owner of VE Source. Barton is a veteran with a service-connected disability.

## Statutory and Regulatory Framework

15.     This action concerns VE Source's fraudulent and wrongful inducement of two government contracts and all payments made under those contracts, both of which the Government awarded to VE Source based on the company's false self-certifications that it met the federal statutory, regulatory and contractual standards to qualify as an SDVOSB.

16.     The Small Business Act provides that the Government shall establish an annual goal that not less than three percent of all prime and subcontracts awarded by all federal agencies and departments should be awarded to SDVOSBs. 15 U.S.C. § 644(g)(1)(A)(ii).  At the end of each fiscal year, the Small Business Act requires all federal agencies to report to the U.S. Small Business Administration ("SBA") whether they have accomplished their annual goal for SDVOSB awards, and the SBA will thereafter issue a report to the President and to Congress, which is made publicly available on the SBA's website, as to whether the government met the goal to award contracts to firms owned and controlled by service-disabled veterans.  15 U.S.C. § 644(h).  To help accomplish these annual goals, the Small Business Act further authorizes agencies to set aside the awards of certain federal

contracts to eligible SDVOSBs either (1) on a sole-source basis for contracts of $5 million or less for manufacturing contracts, and $3 million or less for other contracts, and (2) through competitions limited to SDVOSBs.  15 U.S.C. § 657f(a-b).

17.     To implement the provisions of the Small Business Act, SBA regulations and the Federal Acquisition Regulations ("FAR") establish regulatory criteria that companies are required to meet to obtain contracts that are expressly reserved for SDVOSBs either on a sole-source basis or through competitions that are limited to SDVOSBs.[1]  Under the FAR and the SBA regulations, to be eligible to obtain a federal contract that is set aside for an SDVOSB, a company must be majority-owned (that is, at least 51% ownership) and controlled on a long-term and day-to-day basis by a service-disabled veteran.  48 C.F.R. §§ 2.101 & 52.212-3 (defining the term "service-disabled veteran-owned small business concern") & 52.219-27(a) (same); 13 C.F.R. § 125.13(a); *see also* 15 U.S.C. § 632(q)(1).[2]

18.     "Control by one or more service-disabled veterans means that both the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans

---

[1]     The FAR, codified in Parts 1 through 53 of Title 48 of the Code of Federal Regulations, establishes "uniform policies and procedures for acquisition by all executive agencies."  48 C.F.R. § 1.101.

[2]     The Government acknowledges that at all relevant times Barton was a service-disabled veteran and he owned 51% of VE Source. However, Barton lacked sufficient control over VE Source to be eligible to bid on SDVOSB set-aside contracts.

. . . ." 13 C.F.R. § 125.13(a) (2016 – present); 13 C.F.R. § 125.10(a) (2004 – 2016).[3]
In the case of a limited liability company, like VE Source, "one or more service-disabled veterans . . . must serve as managing members, with control over all decisions of the limited liability company." 13 C.F.R. § 125.13(d) (2016 – present); 13 C.F.R. § 125.10(d) (2004 – 2016).

19.     The Small Business Act establishes that firms that misrepresent their status as an SDVOSB "shall be subject to" civil prosecution under the False Claims Act.  15 U.S.C. §§ 657f(d), 637(m)(5)(C).

20.     Firms like VE Source that bid on SDVOSB set-aside contracts must "self-certify" that they meet the criteria as an SDVOSB to be eligible for contract award. *See* 13 C.F.R. § 125.18; 48 C.F.R. § 19.1403(b) & § 52.219-1(c)(7). From 2009 to July 2012, firms were required to enter annual certifications as to their eligibility for SDVOSB contracts (as well as other representations and certifications) in a government database known as the Online Representations and Certifications Application ("ORCA"); from July 2012 to the present, firms entered these certifications in the online System for Award Management ("SAM"). 13 C.F.R. § 125.33(a); 48 C.F.R. §§ 4.1201, 4.1202.[4] These "representations and certifications . . . are incorporated by reference into the contract," 48 C.F.R. § 52.204-19; *see also id.* at §§ 4.1201(d), 4.1202(b), and contracting officers verify an offeror's representations

---

[3]     This language originally appeared in section 125.10 beginning in 2004, but was recodified in section 125.13 in 2016.  *See* 69 Fed. Reg. 25262-01 (May 5, 2004) 2004 WL 946665(F.R.); 81 FR 48558-01, 2016 WL 3958838(F.R.) (July 25, 2016).

[4]     The System for Award Management can be accessed through www.sam.gov, a website operated by the General Services Administration (the "GSA").

and certifications at the time of contract award. 48 C.F.R. § 4.1201(b)(2).

21.     If a contract is set aside for an SDVOSB, the FAR provides that provisions must be included in the solicitation and the contract stating that "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered," and that "[a]ny award resulting from this solicitation shall be made to [an SDVOSB]."  48 C.F.R. §§ 19.1408, 52.219-27(c).

## FACTUAL BACKGROUND

### *Neary, Pao and Norton decide to form an SDVOSB; seek out a service-disabled veteran*

22.     In or about the summer of 2009, Robert Pao and Ron Norton were acquaintances who knew each other through a New Jersey auto club. At the time, Norton was a salesman for a company selling outdoor sports products to retailers. Pao, who had a long career in the apparel industry, worked at the time for Neary at Vertical Source. Neary, too, had extensive prior experience working in the apparel industry, including owning several businesses in that industry.

23.     In the wake of a government stimulus package encouraging the use of SDVOSBs, Norton, Pao and Neary discussed options to create a business that could take advantage of government contracting opportunities, in particular those set aside for SDVOSBs. In order to form a SDVOSB, Neary, Norton or Pao needed to identify a service-disabled veteran to join their venture because they were not service-disabled veterans.

24.     To fill the role of service-disabled veteran, Norton proposed Sherman Barton. Norton knew Barton through another auto club.

25.     In or about the summer of 2009, Neary, Norton, and Pao went to Barton's home to discuss their interest in forming an SDVOSB. At the time of that meeting, Barton was employed on a full-time basis at the U.S. Department of Veterans Affairs ("the VA"). Although Neary and Pao came to the venture with long careers in the apparel industry, Barton had none.

26.     At the meeting, Barton stated that he was close to retirement, was getting ready to settle down, and did not want to play an active role in the business. Norton, Neary, and/or Pao told Barton that he (Barton) would not need to have an active role in the business; rather, he would just need to be a 51% owner on paper. Barton agreed to the arrangement.

27.     Barton did not take any steps to form the business. Rather, Norton prepared the paperwork to incorporate the business and registered VE Source as a limited liability company in Delaware.

28.     Norton successfully registered VE Source as an LLC in Delaware on July 28, 2009. At the time, Barton was still a full-time employee at the VA.

29.     When they formed the company, Barton, Neary, Norton and Pao knew that the federal government had guidelines to qualify as an SDVOSB. Indeed, before agreeing to join the VE Source venture, Barton researched the Federal Acquisitions Regulation to understand the rules governing SDVOSB contracting.

30.     When they formed VE Source, Neary was aware that a service-disabled veteran had to own at least 51% of a company and had to be in control of the business to meet the qualifications for the company to be an SDVOSB.

31.     When they formed VE Source, Barton was aware that a service-disabled veteran had to own at least 51% of a company and had to be in control of the business to meet the qualifications for the company to be an SDVOSB.

32.     As originally formed, Barton had a 51% ownership position in VE Source. The remaining 49% of the company was split equally between the other three owners, Neary, Pao, and Norton, with each holding a 16.33% share.

33.     Norton registered VE Source in various government databases in order to begin pursuing SDVOSB set-aside contracts. For instance, on November 5, 2009—again, while Barton was still a full-time VA employee—Norton filed a certification on the ORCA website operated by the GSA.  In ORCA, Norton falsely "attest[ed] to the accuracy of the representations and certifications contained [therein]," including VE Source's SDVOSB status.  That online certification defined an SDVOSB, including the requirement that the service-disabled veteran controlled "[t]he management and daily business operations" of VE Source.

34.     Almost immediately after Neary, Barton, Pao and Norton formed the company, VE Source and Vertical Source began sharing an office and employees. Norton expressed his concern to Neary, Barton, and Pao about these arrangements, and sought more separation from the companies. The other owners opposed the changes Norton was seeking.

35.     In addition to sharing similar names, VE Source and Vertical Source also shared similar corporate logos. Both companies showed their name starting with a large "V" topped by an arrow pointing upwards. For instance, the following

image is taken from a VE Source document dated January 31, 2012:



On January 7, 2012—just weeks before the logo above was used in a VE Source letter—Vertical Source used the following logo:



36.     Before and after VE Source was formed, Pao was a full time employee of one of Neary's other apparel companies, Vertical Source. Pao was responsible for product sourcing, manufacturing and production for both Vertical Source and VE Source. Initially, Pao was also the main point of contact between VE Source and the government.

37.     Pao was responsible for identifying government business opportunities, determining if they were worth bidding, drafting proposals, and submitting them on behalf of VE Source. Before proceeding with a bid, Pao conferred with Neary and Barton and would proceed only if all owners were in agreement.

38.     Neary was heavily involved in VE Source's day-to-day business

operations and controlled the company's books and records. Neary handled all the bills and finances until VE Source began paying a Vertical Source employee, Charles Moran, to serve as VE Source's bookkeeper.

39.     Moran began working for Vertical Source in June 2010 as Controller and Director of Operations.

40.     Moran worked for Vertical Source and/or other Neary Companies from June 2010 through June of 2019.

41.     In addition to working for the Neary Companies, Moran also served as VE Source's Controller between 2012 and June 2019.

### *The VA repeatedly finds that Barton does not control VE Source*

42.     Beginning in 2010, VE Source attempted to obtain SDVOSB set-aside contacts from the VA.

43.     On June 2, 2010, VE Source self-certified as an SDVOSB with the VA. That status was valid for one year.[5]

44.     Beginning in late 2010, the VA changed its process and no longer allowed businesses to self-certify as to SDVOSB status. The VA began requiring (and still requires to this day) entities to submit documentation to show their eligibility for SDVOSB status as part of an application to the VA's Center for Verification and Evaluation ("VA CVE").  38 C.F.R. § 74.2(a) (2010 – 2018).

---

[5]     The letter notifying VE Source of its SDVOSB status was sent to Norton's residence.

45.     The VA CVE reviews a company's submissions to determine whether it meets the VA's requirements for SDVOSB status.  *Id.*  VA regulations in effect between 2011 and 2018 established similar criteria for a company to be eligible as an SDVOSB as the criteria in the FAR and in SBA regulations in that a firm must be 51% owned and the management and daily business operations of the firm must be controlled by one or more service-disabled veterans.  38 C.F.R. § 74.1 (2011 – 2018) (adopting the SBA regulations for purposes of defining what constitutes an SDVOSB).

46.     On or about March 2, 2012, VE Source applied to the VA CVE to be verified as an SDVOSB.  Neary and Barton were primarily involved in submitting documents and information in connection with the application for SDVOSB verification with the VA CVE.

47.     By letter dated May 18, 2012, the VA CVE denied VE Source's application for verification as an SDVOSB.  In that denial, the VA CVE concluded that Barton was a service-disabled veteran, but that he did not control the business.

48.     In its May 18, 2012 denial letter, the VA CVE explained that to control the business, Barton must exert overall control of the company and manage the daily operations. In support of its conclusion that VE Source failed to demonstrate Barton's that control, the VA CVE pointed to five separate findings.

- *First*, the VA CVE observed that VE Source's Operating Agreement imposed restrictions on Barton's ability to freely transfer his ownership interest because Article IV, Section 2 of that agreement required unanimous consent of all other owners of the business in order to effectuate that transfer.

- *Second*, VE Source's 2010 K-1 documents (which sets forth distributions paid by a limited liability company) showed that Barton did not receive 51% of the profits and that, in fact, the four owners received equal distributions.

- *Third*, the VA CVE noted that both Pao and Neary each had extensive experience in the management of clothing businesses, whereas Barton lacked any such experience.

- *Fourth*, the VA CVE noted that VE Source's Operating Agreement required attendance of all owners of the business, meaning that Barton was unable to hold a meeting and take a vote without the consent of the non-veteran minority owners.

- *Fifth*, the VA CVE observed that VE Source was co-located with Vertical Source, and that Neary was both an owner of VE Source and a founder and president of Vertical Source.

49.     Based on these findings, the VA CVE concluded that Barton failed to demonstrate that he controlled VE Source and that VE Source was too dependent upon Neary and Neary's other companies.

50.     Shortly after receiving that denial, Neary called the VA CVE to discuss the matter.  Neary discussed with the VA CVE representative that VE Source had previously held SDVOSB status with the VA.  The CVE representative explained that VE Source's prior verification was completed when the VA allowed for a self-certification process.  The representative further explained that the process had since changed and that the VA CVE reviewed businesses' ownership, control, management, and size to ensure compliance with regulatory requirements.

51.     On June 12, 2012, VE Source submitted a request to the VA CVE for reconsideration of its May 12, 2012 denial of verification.  In its request for reconsideration, VE Source responded to each of the VA CVE's five findings,

14

arguing that: (i) restrictions on Barton in the Operating Agreement placing limitations on Barton's control of the company were standard provisions to protect minority shareholders; (ii) there were errors in the K-1 forms that had been corrected; (iii) although he lacked experience in the apparel industry, Barton did have some additional managerial experience that was not previously disclosed; (iv) the requirement of full attendance at a VE Source shareholder meeting could be overturned by Barton if the other owners skipped two or more meetings; and (v) the VA CVE placed too much weight on the fact that VE Source and Vertical Source shared office space.

52.     On June 14, 2012, Pao called the VA CVE to inquire about VE Source's request for reconsideration.  The VA CVE representative provided Pao with contact information to request status updates in the future.

53.     On December 4, 2012, the VA CVE issued its denial of VE Source's request for reconsideration.  The VA CVE based its denial on "a review and evaluation of the original file, the Request for Reconsideration and accompanying documents submitted to CVE."  The VA CVE found that VE Source's amended operating agreement removed the restrictions that were previously placed on Barton's ability to sell the company and new information about Barton's managerial experience showed that he was capable of managing VE Source.  However, the VA CVE also concluded that VE Source failed to show that Barton was VE Source's "managing member," that he "holds the highest position" in the company, or what his role and responsibility was within the company.  In addition, the VA CVE noted

15

additional provisions in the amended operating agreement that constrained Barton's control over the business (specifically, in paragraphs 12.05(a) and (b)).

54.     On January 2, 2013, VE Source filed a second request for reconsideration.  VE Source explained that it further amended its operating agreement to address the issues identified in the December 4th denial.

55.     On April 3, 2013, the VA CVE denied VE Source's second request for reconsideration, reiterating its conclusion that VE Source was not an SDVOSB. The CVE based its denial on the control that Neary appeared to exert over VE Source, pointing to the fact that VE Source and Vertical Source shared office space; that the two companies were engaged in the same line of business; that both companies used similar logos; and that the two non-service-disabled veteran members of the VE Source (Neary and Pao) were also Vertical Source employees and that those two members possessed far more experience in the textile industry as compared to Barton.  Furthermore, the VA CVE observed that Pao and Neary performed the same functions for Vertical Source as they did for VE Source, and that Pao even listed his positions with Vertical Source and VE Source in a single entry on his resume.

### *Shortly after the VA CVE denies VE Source's application for SDVOSB status, VE Source falsely self-certifies as an SDVOSB with SAM.gov*

56.     In order to bid on set-aside contracts offered by federal agencies other than the VA, VE Source accessed online certification programs and certified that VE Source was an eligible SDVOSB.

57.     From November 2009 through January 23, 2012, VE Source made

these certifications into ORCA.

58.     Norton made those certifications on November 5, 2009 and March 6, 2010; Pao made those certifications on April 25, 2011 and January 23, 2012.

59.     In addition to self-certifying VE Source's SDVOSB status in ORCA on January 23, 2012, Pao also self-certified VE Source as an SDVOSB into SAM, which is accessed through a GSA-operated website, www.sam.gov. Pao self-certified VE Source in both ORCA and SAM.gov because GSA migrated its online certification program from ORCA to SAM in July of that year.

60.     SAM login records show that, on April 9, 2013, Pao logged in to www.sam.gov to certify VE Source's SDVOSB status.  Confirmation of that self-certification went to Pao's email address which ended in "@verticalapparel.com," and was the same email address he used for Vertical Source business. Although Pao logged in to SAM.gov and certified the business as an SDVOSB, he included Barton's name on the certification. Thus, the certification appears as if Barton certified the company's SDVOSB status when, fact, it was Pao who did so. Pao was the only person who, on behalf of VE Source, logged into SAM.gov between 2011 and February 2015 to certify VE Source as an SDVOSB.

61.     Barton was aware of the self-certifications as to VE Source's SDVOSB status in ORCA and SAM prior to 2015.

62.     Neary was aware of the self-certifications as to VE Source's SDVOSB status in ORCA and SAM prior to 2015.

63.     SAM.gov records show that the first time Barton logged on to SAM.gov

17

to self-certify VE Source as an SDVOSB was July 5, 2016. After that, login records show that Barton personally logged into SAM.gov and self-certified VE Source as an SDVOSB.

64.     Pao and Barton falsely certified on SAM.gov that VE Source qualified as a "service-disabled veteran-owned small business concern." The SAM certification form expressly defined the term "service-disabled veteran-owned small business concern" as "a small business concern – (i) [n]ot less than 51% of which is owned by one or more service-disabled veterans . . . and (ii) [t]he management and daily business operations of which are controlled by one or more service-disabled veterans." Barton further certified as to the accuracy of this representation. With the exception of a lapse between December 12, 2019 and January 29, 2020, VE Source continuously maintained its SDVOSB self-certification on SAM.gov.

### *VE Source successfully bids on a USDA set-aside contract*

65.     On June 15, 2012, the U.S. Department of Agriculture ("USDA"), Food Safety and Inspection Service, Procurement Management Branch, in Beltsville, Maryland issued solicitation AG-3A94-S-12-0053 seeking bids for provision of aprons and apron strings. The solicitation expressly provided that the procurement was set aside for award only to SDVOSBs.

66.     Pao was primarily responsible for finding the USDA's. Prior to submitting the response to that solicitation, Pao informed Barton and Neary and received their approval to submit the proposal on behalf of VE Source. On information and belief, Neary prepared the cost analysis—that is, the analysis of

how much it would cost VE Source to deliver the products—for this and other contracts that VE Source bid on.  Pao prepared the rest of the response to the solicitation.

67.     Barton and Neary knew that the USDA contract was set aside for SDVOSB entities and that Pao had represented VE Source to be an SDVOSB in order to obtain the USDA contract.

68.     Notably, VE Source submitted its bid on the USDA Contract as a self-certified SDVOSB in ORCA just weeks after Defendants learned of the VA CVE's May 18, 2012 decision denying SDVOSB status to VE Source based on inadequate evidence of Barton's control.

69.     Barton was aware that the VA CVE had denied VE Source's request to be recognized as an SDVOSB prior to the submission of VE Source's bid for the USDA contract.

70.     Neary was aware that the VA CVE had denied VE Source's request to be recognized as an SDVOSB prior to the submission of VE Source's bid for the USDA contract.

71.     On behalf of VE Source, Pao submitted a bid for the USDA Contract, and after the contracting officer determined that the firm had self-certified its eligibility as an SDVOSB, the USDA awarded the contract as an SDVOSB set-aside to VE Source as USDA Contract No. AG-3A94-C-12-0013 (hereinafter, the "USDA Contract").

72.     The USDA Contract was awarded on or around August 20, 2012. It

was a one-year contract, with 4 one-year renewal options.  USDA exercised its option to extend the contract each year from 2013 to 2016.

73.     With respect to the USDA Contract, Charles Moran, on behalf of VE Source, submitted 14 invoices to the USDA for payment.  In 2012 and 2013, VE Source submitted its invoices for the USDA Contract through USDA's Financial Management Modernization Initiative ("FMMI").  As a result of the invoices submitted through FMMI, the USDA made 8 payments to VE Source between September 28, 2012 and April 10, 2013.  Between 2014 and 2017, VE source submitted its invoices for the USDA Contract through the U.S. Department of Treasury's Invoice Processing Platform ("IPP").  As a result of the invoices submitted through IPP, the USDA made 6 payments to VE Source between February 25, 2014 through October 31, 2017.  In total, as a result of invoices submitted by VE Source, the USDA paid VE Source $227,470 in connection with the USDA Contract.

74.     Barton and Neary were aware that VE Source had submitted these invoices for payment.

75.     The USDA would not have awarded the USDA contract to VE Source, nor would it have made payments to VE Source, had it known that VE Source was not, in fact, a legitimate SDVOSB.  Indeed, the USDA contracting officer could not have awarded the contract to VE Source because the FAR provides that "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered."  48 C.F.R. §§ 19.1408, 52.219-27(c).

20

76.     Because VE Source was not a legitimate SDVOSB, the material misrepresentations made by the company and/or its agents caused the United States to improperly award and make payments to VE Source under the USDA Contract.

77.     Neary, Barton and Pao intended that the USDA rely upon the accuracy of the false representations regarding VE Source's eligibility as an SDVOSB and the USDA, in fact, relied upon the accuracy of the false representations referenced above when it awarded the contract to VE Source and issued payments under that contract to VE Source.

### *VE Source successfully bids on a DLA set-aside contract*

78.     On April 10, 2014, the Defense Logistics Agency Troop Support office ("DLA") issued solicitation number SPE1C1-14-R-0007 seeking bids for provision of flame-retardant coveralls for the U.S. Navy.  The solicitation expressly provided that the procurement was set aside for award only to SDVOSBs.

79.     After obtaining Barton's and Neary's consent to bid on the solicitation, Pao prepared the submission in response to the DLA's solicitation. Neary, Pao, and Sherman communicated with a third party clothing manufacturer to prepare a cost analysis for the coveralls for this solicitation.

80.      Pao submitted VE Source's response to the solicitation on May 14, 2014.  Barton and Neary knew that the DLA solicitation was set aside for SDVOSB entities and that Pao represented VE Source to be an SDVOSB in order to be awarded the contract.

21

81.     After the contracting officer determined that VE Source self-certified its eligibility as an SDVOSB in SAM, DLA awarded the contract to VE Source as an SDVOSB set-aside as Contract No. SPE1C1-14-D-1081 (hereinafter, the "DLA Contract").

82.     VE Source bid on this DLA solicitation on May 14, 2014 despite the fact that the VA CVE had denied VE Source's SDVOSB application to be recognized as an SDVOSB for VA contracts on three separate occasions between May 2012 and April 2013.

83.     Barton was aware that the VA CVE had denied VE Source's requests to be recognized as an SDVOSB on three separate occasions prior to the submission of VE Source's bid for the DLA Contract.

84.     Neary was aware that the VA CVE had denied VE Source's requests to be recognized as an SDVOSB on three separate occasions prior to the submission of VE Source's bid for the DLA Contract.

85.     There were no material changes to VE Source's managerial structure that would have addressed the reasons that the VA CVE denied VE Source's request to be recognized as an SDVOSB between the VA CVE denials (the most recent of which was issued on April 3, 2013) and VE Source's May 14, 2014 bid in response to the DLA solicitation.

86.     The DLA contract was awarded on or around September 19, 2014.  It was a one-year contract, with 4 one-year extensions.  DLA exercised its option to extend the contract each year between 2015 and 2019.

87.     With respect to the DLA Contract, Pao and a VE Source contractor working in Puerto Rico requested payment on behalf of VE Source by presenting 166 invoices through the Department of Defense's "Wide Area Workflow," or WAWF, website.  As a result of those invoices, the Department of Defense made more than 3,000 separate payments to VE Source between February 3, 2015 and October 28, 2019 totaling approximately $16,367,503.15 for work performed in connection with the DLA Contract.

88.     Barton and Neary were aware that VE Source had submitted these invoices for payment.

89.     The DLA would not have awarded the DLA Contract to VE Source, nor would it have made payments to VE Source, had it known that VE Source was not, in fact, a legitimate SDVOSB.  Indeed, the DLA contracting officer could not have awarded the contract to VE Source because the FAR provides that "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered."  48 C.F.R. §§ 19.1408, 52.219-27(c).

90.     Because VE Source was not a legitimate SDVOSB, the material misrepresentations made by the company and/or its agents caused the United States to incorrectly award and make payments under the DLA Contract to VE Source.

91.     Neary, Barton, and Pao intended that the DLA rely upon the accuracy of the false representations regarding VE Source's eligibility as an SDVOSB and the DLA, in fact, relied upon the accuracy of the false representations referenced above

23

when it awarded the contract to VE Source and issued payments under that contract to VE Source.

### *Neary increases his ownership interest in VE Source from 16.33% to 49% without any compensation to Barton*

92.     In or about 2011, Norton exited VE Source and relinquished his ownership interest in the company.  After his departure, Pao and Neary equally split Norton's share, with each increasing their ownership shares from 16.33% to 24.5%.  Norton was not paid anything for his shares in the company when he departed from the business, and Barton did not receive any part of Norton's ownership interest in the company.

93.     Similarly, in 2015, Pao exited the business, leaving Neary and Barton as the two remaining owners.  Pao received $85,000 in compensation from VE Source upon his departure from the company, consisting of $40,000 in debt forgiveness, and $45,000 in affirmative payments.

94.     Upon Pao's departure, Neary's ownership interest increased from 24.5% to 49%.  Barton did not receive any of Pao's ownership interest in VE Source. Despite receiving all of Pao's ownership interest in VE Source, Neary did not pay anything to Barton for those shares upon Pao's departure.

95.     Between 2011 and 2015, Neary's ownership interest in VE Source increased from 16.33% to 49% and Barton's remained fixed at 51%. Neary thus tripled his ownership interest in VE Source without additional investment or payment to Barton.  At no point did Neary compensate Barton for his increase in ownership percentage of VE Source from 16.33% to 49%.

### *Neary "controls" VE Source*

96.     In addition to the facts discussed above regarding Barton's limited

control over VE Source, as set forth in greater detail in subsequent paragraphs,

Neary's excessive control over VE Source is demonstrated in the following ways:

      a.     **Neary earned far more in compensation than Barton and took unreasonable "loans" from VE Source.** Between 2015 and 2019, Neary took substantially more in total compensation from VE Source than Barton.  Furthermore, Neary and Vertical Source took excessive "loans" from VE Source, with the balance of those loans at times approaching $1 million. Neary and Vertical Source took these "loans" from VE Source without any written agreement, security, interest obligations, or defined repayment terms.

      b.     **VE Source co-located with the Neary Companies and then operated out of Neary's home:** Between 2010 and 2017, VE Source was co-located with the Neary Companies.  And between 2017 and 2019, VE Source moved into space at Neary's personal residence.

      c.     **VE Source paid Vertical Source to manage the DLA Contract, shared office equipment, employees and vendors with the Neary Companies, and Neary created a holding company to manage VE Source**: Beginning in 2015, VE Source paid Vertical Source to manage the day-to-day aspects of its work under the DLA Contract.  Employees of the Neary Companies also occasionally performed work for VE Source without being compensated by VE Source.  VE Source and Vertical Source used the same professional services providers and consultants and also shared office equipment.  In or about 2016, Neary created a holding company owned by him, Moran and a third party that was intended to control VE Source as well as the Neary Companies.

      d.     **Neary signed virtually all important corporate documents for VE Source, made other important business decisions, and led substantive communications with manufacturers with little or no input or oversight from Barton:** Neary was responsible for signing virtually all significant, legally binding documents on behalf of VE Source. On at least two occasions, Neary signed written agreements that pledged all or a substantial amount of VE Source's assets without Barton's pre-approval. Representatives from VE Source's most important business partners (*i.e.*, the companies who manufactured the apparel that VE Source sold to the Government) uniformly describe Neary as their primary point of contact and the person they understood to be in control of VE Source.

25

e.     **Neary Placed Limits on Barton's Corporate Spending Power:** Concerned with Barton's potential to spend too much of VE Source's capital, Neary asked Barton to sign an agreement limiting Barton's ability to spend VE Source funds.  This limited Barton's "authority to make unilateral decisions" on behalf of VE Source to issues involving less than $1,000.

### *Neary takes far more in compensation than Barton, and takes excessive, interest-free, unsecured loans from VE Source*

97.     Neary took far more in compensation from VE Source than did Barton from 2015 to 2019.

98.     Much of Neary's compensation was concealed in the form of unreported income. For example, VE Source paid Neary's car payments, even though his car was not used exclusively for business purposes. VE Source also paid for Neary's cell phone and utility bills, home improvements, and personal credit card bills.

99.     At the direction of Neary and Barton, Moran concealed these payments on VE Source's books and records as company expenses, rather than as reported income.

100.     Upon information and belief, factoring in all reported and unreported compensation between 2015 and August of 2019, Neary took at least $600,000 from VE Source.[6] During that same period, Barton took less than $300,000 from the company.

101.     Neary also exerted control over VE Source by taking excessive loans

---

[6]     These calculations do not factor in the value of substantial interest-free, unsecured, and undocumented loans that Neary and his wholly-owned company, Vertical Source, took from VE Source. Furthermore, those calculations do not take into account compensation that Neary earned as a result of payments made by VE Source to Vertical Source for Vertical Source's management of the DLA Contract.

from the company on unreasonable terms. At times between 2016 and 2018, Neary and Vertical Source owed VE Source between $270,000 and almost $900,000.

102.    For instance, at the end of 2016, Neary and Vertical Source together owed VE Source $270,650.  That year, VE Source's profit and loss statement shows that the company ran a net deficit of $38,686.

103.    At the end of 2017, Neary and Vertical Source together owed VE Source $294,729. That year, VE Source's profit and loss statement shows that the company ran a net deficit of $24,301.

104.    At the end of 2018, Neary and Vertical Source together owed VE Source $863,756. That year, VE Source's profit and loss statement shows that the company earned a profit of $549,927.

105.    Neary and Vertical Source took these loans from VE Source without a written agreement, without collateral or security, without interest, and without the expectation of regular repayments.

106.    In October or November of 2019—after Barton and Neary learned of the Government's investigation—Neary and Vertical Source began paying interest on the loans. Even after agreeing to apply an interest rate, Barton lacked knowledge about what rate was, how the rate was derived, whether there was a written agreement memorializing how the interest rate would be applied, whether interest would be retroactive, how future payments would be applied, or even when the rate was agreed upon.

107.    By contrast, Neary knew that the rate was 2.85%, that his accountants

told him to use that rate, and that it was based on what is known as the "Applicable Federal Rate."[7]

108.    Considering the size of the loans extended to Neary and his Vertical Source business, Barton's of knowledge on these issues further demonstrates his lack of control over VE Source.

109.    VE Source made the loans to Neary and Vertical Source because Barton believed that the continued viability of Vertical Source and Neary as business partners was essential to VE Source.

110.    In short, Neary and Vertical Source were extracting interest free "loans" for hundreds of thousands of dollars from VE Source at a time when the company was losing money. Even when VE Source finally reported a profit in 2018, the amount of the outstanding loans to Neary and Vertical Source still far exceeded the VE Source's net profit.

### VE Source co-locates with the Neary Companies; then moves into Neary's home

111.    VE Source originally operated out of the same office suite as the Neary Companies at 812 Broad Street in Shrewsbury, New Jersey.

112.    Then, in or about 2013, VE Source and the Neary Companies together moved from 812 Broad Street to an office suite at 830 Broad Street in Shrewsbury, New Jersey.

---

[7]    The use of the "applicable federal rate" is a minimum interest rate used for calculating income taxes or loans between family members and related companies. The use of that rate is further evidence of the close connection between Vertical Source and Neary, on the one hand, and VE Source, on the other.

113.    Both 812 Broad Street and the 830 Broad Street address are more than 60 miles from Barton's home, but just 6 miles from Neary's.

114.    On or about June 13, 2017, Neary signed a 24-month lease for a personal residence in Rumson (the "Rumson Estate") where he and his family would reside.  The property spanned more than 8 acres and included a main residence and a carriage house.  The lease called for payments of $238,800 over the life of the lease—approximately $10,000 per month.  Neary also took $18,000 from VE Source for renovations to the main residence at the Rumson Estate.

115.    Neary signed the lease for the Rumson Estate under VE Source's corporate name, placing a significant obligation on the company.

116.    Barton never signed the lease for the Rumson Estate.  In fact, despite imposing a substantial financial burden on VE Source, Barton had not reviewed the lease for the Rumson Estate either before or after Neary signed it, and had not seen the property before Neary signed the lease.

117.    VE Source began paying the rent for the Rumson Estate in July 2017.

118.    Before VE Source learned of the Government's investigation, Moran, at the direction of Neary and Barton, recorded the payments for the Rumson Estate in VE Source's books and records as "office rent."  Similarly, Moran, at the direction of Neary and Barton, booked the $18,000 from VE Source spent on renovating Neary's residence as a corporate expense.  Within weeks of learning of the Government's investigation, either Moran or Neary made changes to the way VE Source's payments for the Rumson Estate were recorded in the company's QuickBooks files.

29

119.    At some point after Neary signed the lease for the Rumson Estate, VE Source purportedly moved its operations from 830 Broad Street to the carriage house at the Rumson Estate.  Yet even after VE Source purportedly changed locations to operate out of Neary's carriage house, Barton still showed up at the 830 Broad Street office several times each week.

120.    VE Source purportedly operated from Neary's carriage house at the Rumson Estate despite a provision in the residential lease agreement prohibiting business operations at the premises.  In addition, the Rumson Estate is located in an area of Rumson not zoned for commercial activity.

121.    In or about April 2019, VE Source purportedly moved its operations from Neary's carriage house at the Rumson Estate to Barton's personal residence. Even after VE Source's office location was nominally located at Barton's residence, Barton continued to show up at several days per week at the 830 Broad Street office space.

### Neary and Barton treat VE Source and the Neary Companies as interchangeable parts of a single corporate family

122.    Neary and Barton treated VE Source and the Neary Companies as interchangeable parts of a single corporate family.  For instance, VE Source and the Neary Companies share employees, vendors, and office equipment.

123.    VE Source paid Vertical Source to manage the DLA Contract. After Pao left VE Source in or about 2015, his functions were assumed by Neary and an employee of Vertical Source. Under this arrangement—which was never reduced to writing—VE Source paid Vertical Source so that a Vertical Source employee could

manage the day-to-day aspects of VE Source's obligations under the DLA.  Vertical Source billed VE Source on a per-unit basis, charging VE Source between $1.50 and $2.25 for every coverall accepted by DLA under the DLA Contract.  VE Source paid Vertical Source more than $350,000 under this arrangement.

124.   Several employees of the Neary Companies worked for VE Source without being paid by VE Source.  When Pao was an owner of VE Source, he was initially paid for his work through Vertical Source.  Between January 2017 through at least 2019, Scott Matchett was a full-time Vertical Source employee involved in sales.  During that time, however, he also worked for VE Source without compensation from VE Source.

125.   In 2016, Brad McCann worked for one of the Neary Companies (Vertical Design Group LLC), but he took an international business development trip for VE Source, and was never paid by VE Source for that work.

126.   In 2017, another Vertical Source employee, Jean Dubé, took a trip to Texas to visit VE Source's manufacturer after that manufacturer fell behind in its work for VE Source.  Dubé was not paid by VE Source for that trip.

127.   VE Source and the Neary Companies also used the same accountants (three different accounting firms in five years) and lawyers.

128.   Neary also hired business consultants for the Neary Companies who, in turn, performed work for or on behalf of VE Source without being compensated by VE Source.  For example, Neary hired a company called CFO Consultants to provide financial consulting services to VE Source and the Neary Companies.

129.   VE Source and the Neary Companies also shared office equipment, sharing the cost and use of a Ricoh multifunction copier.

130.   Neary used Vertical Source credit cards to pay for VE Source expenses, and then had Vertical Source invoice VE Source for those expenses.

131.   Neary has also offered to use assets of the Neary Companies to pay VE Source's debts.  For instance, in 2019, VE Source owed in excess of $300,000 to American Apparel, the company who was at the time manufacturing the coveralls for the DLA Contract.  VE Source was unable to pay American Apparel's invoices, and as a result, American Apparel refused to ship any additional coveralls which, in turn, cut off VE Source from its revenue stream (because the DLA paid for coveralls only after they were delivered, inspected, and approved).  In May 2019, Neary proposed to an American Apparel employee via text message that American Apparel should "change the receivable from VE Source to Vertical Source and the payments from Vertical Source will be backed and guaranteed by . . . [a separate Vertical Source contract]."

132.   Neary formed a holding company called Vertical Holdings LLC to control not just the Neary Companies, but also VE Source.  With the help of an outside consultant, Neary developed slide decks to potential investors, seeking money for Vertical Holdings which would, in turn, finance operations for VE Source and the Neary Companies.  Based on slide decks that were presented to investors, Neary created Vertical Holdings to "hold a majority ownership in and manage five separate operating entities," one of which was VE Source.

32

133.    Furthermore, VE Source's only on-the-books employee, hired in or about April 2016, was required to sign an employment contract providing that the CEO of Vertical Holdings—that is, Neary—had the sole discretion to award incentive compensation to that VE Source employee.

### *Neary signs important corporate agreements, leads communications with business partners, and is the primary decision-maker on both strategic and routine issues for VE Source*

134.    Neary's control over VE Source is demonstrated through actions he took to bind VE Source in contracts with third parties. For instance, without a counter-signature from Barton, Neary signed the following documents on behalf of VE Source:

a.      An engagement letter with CFO Consultants, a company retained to provide strategic advice for "Vertical Source, Inc. and its affiliated companies." The engagement letter with CFO Consultants does not define which companies are included in the term "affiliated companies," but email correspondence shows that CFO Consultants performed work on behalf VE Source.

b.      An engagement letter with the accounting firm EisnerAmper. Neary retained EisnerAmper in May 2018 to provide accounting services for VE Source and the Neary Companies.

c.      The lease for the Rumson Estate, which obligated VE Source to pay $238,000 over the course of the 24-month rental.

d.      All of the lease agreements for the office space at 830 Broad Street.

e.      A September 26, 2017 "Addendum to Purchase Order VE1049," which acknowledged that VE Source owed $171,556 to Excel Manufacturing, the company that VE Source hired to manufacture the coveralls for the DLA Contract between 2016 and 2017.

f.      An Escrow Agreement and related Instrument of Assignment between VE Source and Excel Manufacturing.  Neary executed these

documents in an effort to resolve an ongoing dispute with Excel Manufacturing over VE Source's unpaid bills.

g.      A Promissory Note with Confessed Judgment Provisions, signed January 25, 2019, between VE Source and American Apparel.  In signing this agreement, Neary obligated VE Source to pay $307,000 that VE Source owed to American.  In subsequent litigation with American Apparel, Neary submitted a sworn declaration stating that he signed that promissory note without Barton's pre-approval.

h.      An "Agreement for the Purchase and Sale of Future Receipts" signed in or around January 2019, with a third party finance company.  In exchange for eventual payments totaling $278,000, that finance company made an upfront payment of $200,000 to Vertical Source.  The $278,000 debt was secured by Vertical Source's future receivables as well as by VE Source.  Neary signed this agreement without obtaining Barton's pre-approval.

135.    In addition to signing key corporate documents on behalf of VE Source, Neary also exerted control over VE Source by leading communications with VE Source's most important business partners.

136.    Between 2014 and 2019, VE Source worked with three different manufacturers to produce coveralls for the DLA Contract.  Because VE Source only received payment when the Government received and approved of the coveralls, the manufacturers were VE Source's most important business partners.

137.    Employees from each of these manufacturers uniformly state their understanding that Neary, not Barton, controlled VE Source.

138.    Between April 2014 and November 2016, VE Source used Propper International to manufacture the coveralls for the DLA Contract. All substantive communications with Propper employees went through Neary, not Barton. One Propper employee described Barton as a "front" to allow VE Source to obtain its SDVOSB status.

139.    Between February 2016 and December 2017, VE Source used Excel Manufacturing to manufacture the coveralls for the DLA Contract. Nearly all substantive communications between Excel and VE Source were again with Neary, not Barton. When VE Source had difficulty paying Excel's bills, Excel went directly to Neary to resolve the issue, and Neary proceeded to resolve the dispute without any input from Barton.

140.    The payment dispute—which involved approximately $171,000 owed by VE Source to Excel—was eventually resolved when VE Source signed an "Instrument of Assignment," assigning VE Source's right to payment from DLA directly to Excel. Neary alone signed that document on behalf of VE Source.

141.    Between February 2018 and October 2019, VE Source used American Apparel to manufacture the coveralls for the DLA Contract. Nearly all high-level substantive communications between VE Source and American Apparel were with Neary and an American Apparel executive.

142.    Furthermore, although the contract between VE Source and American Apparel was never signed, Neary and American Apparel employees exchanged drafts of the contract, and there is no indication that Barton negotiated any terms of that arrangement, received a copy of the draft contract, or asked that it be signed.

143.    As disputes between American Apparel and VE Source developed over the course of the business relationship, Neary took the lead in resolving them. For instance, when VE Source found itself unable to make timely payments to American

Apparel, Neary took the lead in resolving the issue by leading those discussions and proposing resolutions to the dispute.

144.   Eventually, Neary alone executed a promissory note on behalf of VE Source for more than $300,000 at a 10% interest rate, without getting Barton's pre-approval.

145.   Neary was making decisions regarding when and which vendors should be paid by VE Source, including with respect to the manufacturers producing the coveralls.  Upon information and belief, Barton took no part in deciding which vendors should be paid by VE Source.

146.   Neary made other key personnel decisions without Barton's input, including payroll issues, and handling Norton's contentious exit from VE Source.

147.   Neary signed far more VE Source checks than did Barton.  Between January 2017 and May 2019, Neary signed three times as many checks as Barton (159 to 51, respectively).

148.   Neary would sign the checks whenever Barton was out of the office, suggesting that Neary was in the office far more frequently than Barton.

149.   In communicating with VE Source business partners, Neary used an email address ending in "@verticalsource.com." Neary did not have an email address unique to his work on behalf of VE Source.

### *Neary places limits on Barton's corporate spending power*

150.   Neary also exerted control over VE Source spending by placing constraints on Barton's power to spend VE Source funds.

36

151.   Although Barton purportedly controlled the company, Neary requested that Barton sign an agreement that would limit Barton's ability to spend corporate funds.

152.   In or about October 30, 2016, Barton and Neary signed the "Shared Management Agreement of VE Source, LLC," which limited Barton's ability to make "unilateral decision[s]" for VE Source to matters involving less than $1,000. All other decisions required Neary's consent.  For any obligations over $10,000, Neary's written consent was required.

153.   Neary asked Barton to sign the Shared Management Agreement to control Barton's corporate spending.

### *Misrepresentations to the VA*

154.   In or about 2017, VE Source again applied to the VA CVE to become certified as an SDVOSB with the VA.  On or about July 27, 2017, the VA CVE again denied VE Source's application for certification as an SDVOSB entity because there was an appearance of undue reliance by VE Source on Neary and/or Vertical Source.

155.   VE Source requested reconsideration and submitted additional documentation to the VA CVE. VE Source's submission to the VA CVE gave the misleading appearance of separation between VE Source and the Neary Companies. For instance, Neary wrote a letter to the VE CVE stating that "[t]here is no relationship between VE Source and [the Neary Companies]."  Similarly, Barton submitted a written statement explaining that "VE Source is capable and does operate completely on its own," and that "VE Source has never work[ed] with, for, or

37

received any type of assistance from [the Neary Companies].  They are completely separate from VE Source . . . and do not support VE Source in any way."  At that time, contrary to the affirmations by Neary and Barton, VE Source had hired Vertical Source to manage all aspects of the DLA Contract, employees of the Neary Companies provided services to VE Source free of charge, and Neary had created the Vertical Holdings parent company to sit atop and control VE Source and the other Neary Companies.

156.    As a result of, and in reliance upon the misleading statements of Neary and Barton, the VA CVE certified VE Source as an SDVOSB for purposes of bidding on VA set-aside contracts on or about September 21, 2017.

### Knowledge of the falsity of the SDVOSB certifications, contractual bids and requests for payment under the DLA and USDA Contracts

157.    At all relevant times, Barton, Neary, Pao, Norton, Moran, and other employees and agents of VE Source knew or exhibited reckless disregard as to the truth of the matter as to whether the certifications that were made in the ORCA and on SAM.gov as to VE Source's SDVOSB eligibility were false.  Barton, Neary, Pao, Norton, Moran, and other employees and agents of VE Source further knew or exhibited reckless disregard as to the truth of the matter that in bidding on, and seeking payment under, the DLA and USDA Contracts, which were expressly set aside for SDVOSBs, they submitted or caused to be submitted false claims or created, or caused to be created, false records material to claims because VE Source was not an eligible SDVOSB.

158.   At all relevant times, Barton, Neary, Pao, Norton, Moran, and other employees and agents of VE Source knew or exhibited reckless disregard as to the truth of the matter that Barton did not control the long-term or day-to-day management of VE Source and that Neary controlled these functions of the company.

159.   At all relevant times, Barton, Neary, Pao, Norton, Moran, and other employees and agents of VE Source knew or exhibited reckless disregard as to the truth of the matter as to whether VE Source was an eligible SDVOSB because they knew the federal government required that a service-disabled veteran not just own a majority of the SDVOSB entity, but also control the firm on a long-term and day-to-day basis.

160.   At all relevant times, Barton, Neary, Pao, Norton, Moran, and other employees and agents of VE Source knew or exhibited reckless disregard as to the truth of the matter that the VA CVE had denied VE Source's application to be recognized as an SDVOSB on three occasions between 2012 and 2013 based on CVE's determination that Barton did not exercise sufficient control over the company, his lack of management skills, and the firm's excessive reliance on Vertical Source.

161.   At all relevant times, Barton, Neary, Pao, Norton, Moran, and other employees and agents of VE Source knew or exhibited reckless disregard as to the truth of the matter that the government, including employees of the USDA and DLA, attached importance to the eligibility of companies as meeting all SDVOSB

39

requirements in order to obtain contracts set-aside for SDVOSBs and obtain payments under those contracts.  Among other things, this knowledge or reckless disregard is shown by the following:  the ORCA and SAM certifications specifically identified the requirements that a service-disabled veteran had to own and control a company to be eligible as an SDVOSB; the FAR and SBA regulations specifically required that a service-disabled veteran had to own and control a company to be eligible as an SDVOSB; the solicitations for the USDA and DLA Contracts stated that the contracts were only available to SDVOSBs; the VA denied VE Source's request to be recognized as an SDVOSB on four occasions because Barton did not exercise sufficient control over VE Source and because VE Source was overly-dependent on Neary and Vertical Source; and the Small Business Act provides that firms that misrepresent their status as an SDVOSB "shall be subject to" civil prosecution under the False Claims Act.  15 U.S.C. §§ 657f(d), 637(m)(5)(C).

162.   At all relevant times, Barton and Neary, Pao, Norton, Moran, and other employees and agents of VE Source that contributed to the above-described submission of false claims and creation of false records material to claims, acted within the scope of their employment and with apparent authority such that VE Source is vicariously liable for their actions and such that their knowledge or reckless disregard is imputed to VE Source.

163.   At all relevant times, Barton, Neary, Pao and Moran and other employees and employees of Vertical Source that contributed to the above-described submission of false claims and creation of false records material to claims, acted

within the scope of their employment and with apparent authority such that Vertical Source is vicariously liable for their actions and such that their knowledge or reckless disregard is imputed to Vertical Source.

164.   Despite this knowledge, Barton, Neary, VE Source and Vertical Source submitted or caused to be submitted false certifications as to VE Source's SDVOSB eligibility in order to obtain the DLA and USDA Contracts, and submitted or caused to be submitted false claims and statements in causing VE Source to bid on, and obtain payment under, contracts expressly reserved for eligible SDVOSBs.

165.   As further evidence of the materiality of the false certifications, bids, invoices and statements that VE Source met the requirements to be an SDVOSB, the Government has regularly prosecuted, both criminally and civilly, parties that fraudulently obtain SDVOSB set-aside contracts (including, in particular, contracts awarded by the Department of Defense and the USDA) as reported in federal Office of Inspector General (OIG) reports to Congress:

- USDA OIG Semiannual Report to Congress, Second Half (Apr. 1, 2013-Sept. 30, 2013), at 27, available at https://www.usda.gov/sites/default/files/sarc2018_2nd_half_508.pdf (indictments and administrative penalties against several individuals and companies for, among other things, falsely certifying as an SDVOSB to obtain set-aside contracts from the USDA, Department of Defense, and other federal agencies)

- GSA OIG Semiannual Report to Congress (Oct. 1, 2016-March 31, 2017) at 35, available at https://www.gsaig.gov/sites/default/files/semiannual-reports/GSA-OIG-SAR-05-2017.pdf (contractor sentenced to 30 months' imprisonment and forfeiture of over $6.7 million for fraudulently representing himself and his company as an SDVOSB contractor to obtain contracts from the GSA, the VA, and the Department of Defense);

- SBA OIG Semiannual Report to Congress Fall 2017 (Apr. 1, 2017- Sept. 30, 2017) at 14, available at https://www.sba.gov/sites/default/files/oig/SBA_OIG_Fall_2017_SAR.pdf (over $3 million settlement resolution where SDVOSB served as a pass-through for an ineligible company);

- SBA OIG Semiannual Report to Congress Fall 2016 (Apr. 1, 2016-Sept. 30, 2016) at 12, available at https://www.sba.gov/sites/default/files/oig/SAR_Fall_2016_Publication_Draft_-_508.2.pdf (69 months' imprisonment and forfeiture of nearly $1.3 million against Texas man who used father's identity to qualify for SDVOSB designation);

- VA OIG Semiannual Report to Congress Issue 75 (Oct. 1, 2015-March 31, 2016) at 43, available at https://www.va.gov/oig/pubs/sars/vaoig-sar-2016-1.pdf ($5 million settlement against corporation that misused warehouse manager's status as a disabled veteran to obtain SDVOSB contracts);

- Department of Defense OIG Semiannual Report to the Congress (Oct. 1, 2015 to Mar. 31, 201), at 20, available at https://www.dodig.mil/Portals/48/Documents/SAR/SAR-1-oct-2015-31-mar-2016.pdf?ver=2017-02-02-160851-070 (sentencing, restitution and forfeiture for owners of an SDVOSB, and their co-conspirator employees, for fraudulent claims of SDVOSB status to obtain set-aside contracts);

- VA OIG Semiannual Report Issue 72 (Apr. 1-Sept. 30, 2014) at 56, available at https://www.va.gov/oig/pubs/sars/VAOIG-SAR-2014-2.pdf (discussing multiple SDVOSB cases including one in which $3.9 million was seized and another where a construction company owner received 57 months' sentence and forfeiture order of $1.1 million);

- SBA OIG Semiannual Report to Congress Fall 2014 (April 1, 2014 – Sept. 30, 2014) at 11, available at https://www.sba.gov/oig/semi-annual-report-congress-fall-2014 (guilty plea to fraud for making false statements regarding SDVOSB eligibility to obtain $7.4 million in SDVOSB set-aside contracts from the Department of Defense and the VA);

- USDA OIG Semiannual Report to Congress, Second Half (Apr. 1, 2013-Sept. 30, 2013), at 7, available at https://www.usda.gov/sites/default/files/sarc2013_2nd_half.pdf (sentencing in criminal investigation of company that falsely represented itself as an SDVOSB to obtain more than $1.7 million in SDVOSB set-aside contracts funded by the USDA);

- SBA OIG Semiannual Report to Congress Fall 2013 (Apr.1-Sept. Sept. 30, 2013) at 10, available at https://www.sba.gov/content/semi-annual-report-congress-fall-2013-0 (sentencing in criminal prosecution for fraudulently establishing a firm as an SDVO business and receiving over $13.6 million in SDVO set-aside contracts from the GSA, the VA, and the Army);

- Department of Defense OIG Semiannual Report to the Congress (Oct. 1, 2012 to Mar. 31, 2013), at 6, available at https://media.defense.gov/2019/Dec/11/2002223353/-1/-1/1/SAR-1-OCT-2012-31-MAR-2013.PDF (sentencing and forfeiture for owner of LLC who falsely certified his business as an SDVOSB to obtain more than $5 million in contracts set-aside by the Department of Defense for SDVOSB entities);

- SBA OIG Semiannual Report to Congress Fall 2012 (Apr.1-Sept. Sept. 30, 2012) at 10, available at https://www.sba.gov/content/semi-annual-report-congress-fall-2012 (owner of construction company pled guilty for fraudulently claiming SDVOSB status to obtain 11 federal government contracts from the VA and the Army valued at over $6.8 million, which his company otherwise would not have been entitled to receive); and

- SBA OIG Semiannual Report to Congress Fall 2010 (Apr.1-Sept. Sept. 30, 2010) at 15, available at https://www.sba.gov/content/semiannual-report-congress-fall-2010 (indictment of owner of company for falsely claiming SDVOSB status for his company in obtaining three SDVO set-aside contracts in excess of $10.9 million).

166. Prior to the award of, and during the entire time that the USDA and DLA contracts were being performed and VE Source was being paid under these contracts, employees at USDA and DLA whose duties related to the administration or payment of the contracts did not have knowledge that VE Source had fraudulently certified itself as an SDVOSB.

## CLAIMS FOR RELIEF

## COUNT ONE

### *Defendants Presented or Caused to be Presented False or Fraudulent Claims to the United States in Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A)*

167.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

168.    As set forth above, Defendants presented or caused to be presented to the United States for payment or approval false and fraudulent claims, with knowledge that they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

169.    Plaintiff United States has sustained damages as a result of the false claims of Defendants, in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT TWO

### *Defendants Made or Used, or Caused to be Made or Used, a False Record or Statement in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B)*

170.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

171.    In connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or caused to be made and used, false records and statements material to false and fraudulent claims that were made to the United States.

172.    Alternatively, in connection with the foregoing schemes, Defendants knowingly, or with deliberate ignorance or in reckless disregard for the truth, made, used or cause to be made and used, false records and statements to get false and fraudulent claims paid or approved by the United States.

173.    By reason of the aforementioned false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT THREE

**Neary and Barton Conspired to Present or Cause to Be Presented False or Fraudulent Claims to the United States and Conspired to Make, Use or Cause to be Made or Used False Records and Statements Material to False and Fraudulent Claims to the United States in Violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1)(C)**

174.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

175.    Upon information and belief, Neary and Barton agreed with each other to defraud the Department of Defense and the USDA by obtaining government contracts set-aside for SDVOSBs, and by submitting invoices for payment to those agencies for reimbursement, despite their knowledge that VE Source was not eligible as an SDVOSB to receive those contracts or payments.  Further, upon information and belief, Neary and Barton agreed with each other to conceal evidence relating to the conspiracy by, for instance, concealing the true amount of compensation paid to Neary and Barton and by concealing Barton's lack of control over VE Source as needed to meet the SDVOSB eligibility requirements.

176.   Neary and Barton undertook and caused the undertaking of multiple actions in furtherance of the conspiracy, including but not limited to, (i) false certifications of VE Source's SDVOSB eligibility; (ii) false bids to obtain contracts that were set-aside only for eligible SDVOSBs; (iii) submission of invoices to DLA and USDA that contained express and/or implied representations that VE Source continued to qualify as an SDVOSB or that contained representations but omitted to disclose VE Source's lack of SDVOSB eligibility; and (iv) the structuring of corporate records (i.e., QuickBooks files and tax returns based on those files) to create the appearance that Barton was paid more than Neary.

177.   As set forth above, in connection with the foregoing schemes, Neary and Barton knowingly, or with deliberate ignorance or in reckless disregard for the truth conspired to submit or cause to be submitted, false claims, or conspired to make, use or cause to be made or used false records and statements material to false and fraudulent claims that were made to the United States, and took actions to further these conspiracies.

178.   By reason of these false claims, the United States has sustained damages in an amount to be determined at trial, and is entitled to a civil penalty as required by law for each violation.

## COUNT FOUR

### *Defendants Committed Common Law Fraud*

179.   The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

180.    Defendants made material misrepresentations of fact, with knowledge of, or in reckless disregard of, their truth, in connection with claims for payment submitted by, or on behalf of, Defendants, to the United States.

181.    Defendants intended that the United States rely upon the accuracy of the false representations referenced above.

182.    The United States in fact relied upon the accuracy of the false representations referenced above when it awarded the USDA and DLA contracts and issued payments under those contracts to the Defendants.

183.    The United States made substantial payments of money in justifiable reliance upon Defendants' false representations.

184.    Defendants' actions caused the United States to sustain damages in an amount to be determined at trial.

## COUNT FIVE

### *Defendants Were Unjustly Enriched*

185.    The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

186.    By reason of the payments made to Defendants by the United States, Defendants were unjustly enriched.

187.    The circumstances of Defendants' receipt of contracts as an SDVOSB, and subsequent payments by the United States are such that, in equity and good conscience, Defendants are liable to account for and pay such amounts which were

paid to them that should not have been paid, including the disgorgement of any profits and money that Defendants unjustly received.

## COUNT SIX

### *Defendants Received Payment by Mistake*

188.   The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

189.   This is a claim for the recovery of monies paid by the United States to Defendants by mistake.

190.   The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid Defendants certain sums of money to which it was not entitled, and are thus liable to account and pay such amounts back to the United States.

## COUNT SEVEN

### *VE Source is the Alter Ego and a Mere Instrumentality of Vertical Source*

191.   The United States repeats and re-alleges the allegations set forth in all of the preceding paragraphs as if set forth fully at length herein.

192.   VE Source and Vertical Source are alter egos of one another, by virtue of the fact that, among other things, (1) VE Source and Vertical Source shared some of the same officers and employees, (2) some of Vertical Source's employees performed work for VE Source, for which they were paid by Vertical Source, (3) VE Source and Vertical Source shared a common address and work space, (4) VE Source provided extensive interest free loans to Neary and Vertical Source and/or

gave Neary and Vertical Source money that was not paid back, (5) the bank accounts of VE Source and Vertical Source were electronically linked, (6) Vertical Solutions assumed responsibility for management and performance of the DLA contract awarded to VE Solutions, and (7) vendors and independent contractors hired by Vertical Source worked on behalf of VE Source.

139.    Because VE Source and Vertical Source are alter egos of one another, Vertical Source is liable for the actions taken by VE Source, its officers, directors, and/or employees.

140.    Vertical Source is liable to the United States to the same extent as VE Source, for any of the actions of VE Source, its officers, directors, and/or employees, as set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States demands a jury trial and judgment against the Defendants for damages, civil penalties, attorneys' fees, costs, and any other relief that the Court may deem just and proper.


Dated:        Newark, New Jersey
              October 9, 2020


                              CRAIG CARPENITO
                              United States Attorney

                    By:     _/s/ David V. Simunovich_____
                              DAVID V. SIMUNOVICH
                              MARK C. ORLOWSKI
                              Assistant United States Attorneys
                              *Attorneys for Plaintiff*
                              *United States of America*