RACHAEL A. HONIG
Acting United States Attorney
DAVID V. SIMUNOVICH
MARK C. ORLOWSKI
Assistant United States Attorneys
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2736
david.simunovich@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     *Plaintiff*,<br><br>    v.<br><br>CHRISTOPHER NEARY, SHERMAN BARTON, VE SOURCE, LLC, and VERTICAL SOURCE, INC.,<br><br>     *Defendants*. | Civil Action No. 20-14167 (FLW) (DEA)<br><br>Motion Day: February 16, 2021 |

---

*Plaintiff's Brief in Opposition to Vertical Source's Partial Motion to Dismiss*

---

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
*Attorney for Plaintiff*

*On the brief:*

DAVID V. SIMUNOVICH
MARK C. ORLOWSKI
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ..................................................................... 1

BACKGROUND ............................................................................................ 2

STANDARD OF REVIEW ............................................................................ 9

ARGUMENT ............................................................................................... 10

   I.   The Court Should Deny Vertical Source's Motion to Dismiss
   Because the Complaint Alleges Facts Sufficient to Establish That
   Vertical Source is an Alter Ego of VE Source ........................................ 10

   II.   The Court Should Reject Vertical Source's Attempt to Expand
   the Factual Record on this Motion to Dismiss Beyond the Allegations
   in the Complaint ....................................................................................... 22

   III.   Regardless of the Alter Ego Analysis, Vertical Source Has
   Not Challenged Any of the Remaining Claims Brought Against It ......... 24

CONCLUSION ............................................................................................ 24

## TABLE OF AUTHORITIES

## CASES

*Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*,
    736 F.2d 879 (3d Cir. 1984)................................................................. 13, 14

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*,
    456 U.S. 556 (1982) .................................................................................. 24

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................................................... 9

*Beuff Enters. Florida, Inc. v. Villa Pizza, LLC*, No. 07-2159 (PGS),
    2008 U.S. Dist. LEXIS 50591 (D.N.J. June 25, 2008) ........................... 16

*Bruni v. City of Pittsburgh*,
    824 F.3d 353 (3d Cir. 2016)...................................................................... 23

*Craig v. Lake Asbestos of Quebec, Ltd.*,
    843 F.2d 145 (3d Cir. 1988)...................................................................... 12

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009)........................................................................ 9

*Hunt Constr. Group, Inc. v. Farina*, No. 11-4933 (FSH),
    2012 U.S. Dist. LEXIS 2676 (D.N.J. Jan. 10, 2012) .............................. 15

*Linus Holding Corp. v. Mark Line Indus., LLC*,
    376 F. Supp. 3d 417 (D.N.J. 2019)............................................... 20, 21, 22

*Mayer v. Belichick*,
    605 F.3d 223 (3d Cir. 2010)................................................................ 10, 23

*Melendez v. Colorite Plastics Co.*, No. 15-1931 (SDW),
    2015 U.S. Dist. LEXIS 150899 (D.N.J. Oct. 19, 2015)........................... 23

*N.J. Building Laborers' Statewide Penson Fund v. CID Constr. Servs., LLC*,
    No. 15-3412 (SRC), 2015 U.Sf. Dist. LEXIS 139628
    (D.N.J. Oct. 14, 2015).................................................... 13, 15, 16, 19

*Pearson v. Component Tech. Corp.*,
    247 F.3d 471 (3d Cir. 2001)................................................... 11, 12, 13

*Phillips v. Cnty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)........................................................................ 9

*Prime Capital Group, Inc. v. Klein*, No. 07-414 (JLL),
   2008 U.S. Dist. LEXIS 58771 (D.N.J. July 29, 2008) ........................................14-15

*Recom AG. Recom Corp. v. Miller Brothers*, No. 16-3320 (SRC),
   2018 U.S. Dist. LEXIS 138505, (D.N.J. Aug. 16, 2018).........................................14

*Revell v. Port Auth. of N.Y. & N.J.*,
   598 F.3d 128 (3d Cir. 2010).....................................................................................9

*Ripley v. Eon Labs, Inc.*,
   622 F. Supp. 2d 137 (D.N.J. 2007).........................................................................16

*Rocks v. Philadelphia*,
   868 F.2d 644 (3d Cir. 1989).....................................................................................9

*Rose v. Bartle*,
   871 F.2d 331 (3d Cir. 1989)...................................................................................23

*Stone v. Winter Enters., P.C.*, No. 12-465 (RBK),
   2012 U.S. Dist. LEXIS 175133 (D.N.J. Dec. 11, 2012) .........................................19

*Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ Funds v. Lutyk*,
   332 F.3d 188 (3d Cir. 2003)...............................................................12, 13, 17, 19

*United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, No. 1:12-CV-4020-AT,
   2016 WL 10998850 (N.D. Ga. Oct. 21, 2016) ........................................................12

*United States ex rel. Dekort v. Integrated Coast Guard Sys.*,
   705 F. Supp. 2d 519 (N.D. Tex. 2010)....................................................................13

*United States ex rel. Stepe v. RS Compounding LLC*,
   325 F.R.D. 699 (M.D. Fla. 2017).............................................................................13

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ..................................................................................................11

*United States v. Exec. Health Res., Inc.*,
   196 F. Supp. 3d 477 (E.D. Pa. 2016)......................................................................13

*United States v. Kimball Foods, Inc.*,
   440 U.S. 715 (1979) ................................................................................................12

*United States v. Kindred Healthcare, Inc.*,
   469 F. Supp. 431 (E.D. Pa. 2020)...........................................................................12

*United States v. Mortg. Inv'rs Corp.*, No. 19-12736,
   2021 WL 137739 (11th Cir. Jan. 15, 2021)......................................................13, 14

*United States v. Pisani,*
  646 F.2d 83 (3d Cir. 1981).......................................................................... passim

*Williams v. City of Allentown,*
  804 F. App'x 164 (3d Cir. 2020) .................................................................... 1

*Zubik v. Zubik,*
  384 F.2d 267 (3d Cir. 1967)........................................................................... 11

## **RULES**

Fed. R. Civ. P. 12(d) ............................................................................... 10, 23

Fed. R. Civ. P. 12(b)(6)............................................................................ 15, 23

Fed. R. Civ. P. 56....................................................................................23

## PRELIMINARY STATEMENT

Defendants engaged in a sophisticated, years-long effort to defraud the government of the United States of America. Though Chris Neary, Sherman Barton, and VE Source, LLC were the primary actors in this scheme, Vertical Source, Inc. – a company 100% owned and controlled by Neary – was essential to carrying out that fraud. Among other things, the Complaint expressly alleges that Vertical Source played an indispensable role in providing employees, management and critical resources needed to perform the contracts in question, and siphoned from VE Source substantial funds falsely obtained from the United States Department of Defense and the United States Department of Agriculture. Justice compels that Vertical Source be held to account for its role in perpetuating and profiting from Defendants' scheme to defraud the United States.

On Vertical Source's Rule 12(b)(6) motion to dismiss, this Court accepts the Government's allegations as true, draws all reasonable factual inferences in the Government's favor, and disregards the numerous contentions introduced in Vertical Source's brief that are outside the four corners of the Complaint. *See Williams v. City of Allentown*, 804 F. App'x 164, 167 (3d Cir. 2020). Applying this standard of review, the motion should be denied, and the alter ego claim against Vertical Source should proceed. With respect to the Court's analysis of the alter ego claim, the Complaint alleges that Vertical Source ignored corporate formalities, siphoned funds from VE Source (rendering VE Source insolvent), managed the day-to-day operations of VE Source without input or oversight from VE Source's

nominal majority owner, Barton, and that VE Source served as a mere instrumentality for Vertical Source. Vertical Source undertook these actions to advance Defendants' scheme to defraud the United States out of more than $16 million.

Vertical Source puts forward a litany of factual contentions that are not found in the complaint and are not properly considered on a Rule 12(b)(6) motion (as none of the contentions offered are "integral" to the complaint). Moreover, these contentions would be inappropriate even on a motion for summary judgment because Vertical Source failed to support any of these contentions with competent evidence or witness declarations. Accordingly, the improper and extraneous facts proffered by Vertical Source should be disregarded for the purpose of deciding the motion to dismiss.

Lastly, even if the Court grants Vertical Source's motion, that ruling would only result in the dismissal of Count Seven in the Complaint and does not warrant dismissal of Vertical Source from the case. Contrary to Vertical Source's contention that the alter ego claim is the "lone claim" asserted against it, the United States has asserted multiple claims against Vertical Source, including Counts One, Two, Four, Five, and Six. As Vertical Source did not seek to dismiss any of these claims, it has waived any objections to the additional claims asserted against it for purposes of its pending motion.

## **<u>BACKGROUND</u>**

This False Claims Act action arises out of Defendants' scheme to obtain contracts from the federal government which were set aside for service-disabled

veteran-owned small businesses ("SDVOSBs"). By falsely representing that VE Source qualified as an SDVOSB, and by submitting or causing the submission of false claims for payment, Defendants caused the United States to award contracts and ultimately pay VE Source more than $16 million. Compl. ¶ 1. To obtain these contracts, Defendants falsely certified to the United States that Barton, a service-disabled veteran, was the majority owner of VE Source and was in control of the business. *Id.* In truth, although Barton could claim to own 51% of VE Source on paper, Neary controlled the business and made all of the important decisions for the company, drew significantly more money than Barton from VE Source, and signed nearly all important documents on behalf of VE Source (including some without Barton's knowledge). *See id.* ¶ 96(a-e). He did this both as a partial owner of VE Source and as the 100% owner of Vertical Source, which used its resources to perpetuate the scheme, and which benefitted considerably from the fraudulent scheme through payments and no-interest loans from VE Source.

In addition to his 49% interest in VE Source, Neary owns 100% of Vertical Source and several other related entities, including Vertical Brands LLC and Vertical Protective Apparel LLC. *Id.* ¶ 12. Neary has built a long career in the apparel industry, working for companies in that industry and owning several small businesses in that space. *Id.* ¶ 22.

In or about the summer of 2009, Neary and one of his Vertical Source employees, Robert Pao, along with a third individual, Ron Norton, discussed options to create a business that could take advantage of government contracting

opportunities, in particular those set aside for SDVOSBs. *Id.* ¶¶ 22-23. As neither Neary, Pao, nor Norton were service-disabled veterans, they needed to identify a service-disabled veteran to join their venture to serve as a figurehead of the company. *Id.* ¶ 23. They identified Barton, a service-disabled veteran with no history or experience in the apparel industry, to serve as the nominal owner of VE Source. *Id.* ¶¶ 23-25. VE Source was formed in 2009, with Neary, Barton, Pao, and Norton taking ownership positions in the company. *Id.* ¶¶ 28, 32.

Once VE Source secured a lucrative contract worth more than $16 million from the Department of Defense, Neary and Vertical Source began pilfering VE Source's accounts through undocumented "loans" from VE Source to Vertical Source. *Id.* ¶¶ 96(a), 101-05. By the end of 2016, Neary and Vertical Source together owed VE Source $270,650. *Id.* ¶ 102. That year, VE Source's profit and loss statement shows that the company ran a net deficit of $38,686. *Id.* At the end of 2017, Neary and Vertical Source together owed VE Source $294,729. *Id.* ¶ 103. That year, VE Source's profit and loss statement shows that the company ran a net deficit of $24,301. *Id.* And at the end of 2018, Neary and Vertical Source together owed VE Source $863,756. *Id.* ¶ 104. That year, VE Source's profit and loss statement shows that the company earned a profit of $549,927. *Id.*

Neary and Vertical Source took this money from VE Source, classified as "loans," without any written agreement, without collateral or security, without interest, and without the expectation of regular repayments. *Id.* ¶ 105. Aside from the fact that these terms and conditions were unreasonably favorable to Neary and

Vertical Source, by taking such excessive sums from VE Source, Vertical Source left VE Source insolvent in 2016 and 2017. *See id.* ¶¶ 101-03. And 2019, VE Source owed more than $300,000 to American Apparel, the company manufacturing the fire-retardant coveralls under the contract with the Defense Logistics Agency (the "DLA Contract"). *Id.* ¶ 131. With VE Source short of funds, Neary offered to pay off that VE Source using Vertical Source's assets. *Id.*

VE Source also transferred extensive sums to Vertical Source to manage the very contract that VE Source obtained from the DLA. *See id.* ¶ 123. Beginning in about 2015, VE Source paid Vertical Source so that a Vertical Source employee could manage the day-to-day aspects of VE Source's obligations under the DLA Contract. *Id.* Vertical Source billed VE Source on a per-unit basis, collecting between $1.50 and $2.25 for every coverall accepted by DLA under the DLA Contract. *Id.* Though VE Source transferred to Vertical Source more than $350,000 under this arrangement, the agreement between the two companies was never memorialized. *Id.*

Neary also directed the use of VE Source receivables to improve Vertical Source's ability to obtain third party financing. On behalf of, and for the sole benefit of Vertical Source, Neary signed an "Agreement for the Purchase and Sale of Future Receipts" through which Vertical Source would receive a $200,000 payment by a third-party lender. *Id.* ¶ 134(h). In exchange for that upfront payment, Vertical Source agreed to make payments overtime totaling $278,000. *Id.* Vertical Source's payment was secured by its future receivables, but also by VE Source receivables.

*Id.* Vertical Source, through Neary, agreed to this without Barton's approval on behalf of VE Source, thus using the financial assets of VE Source to benefit Vertical Source. *Id.*

Almost immediately after Neary, Barton, Pao and Norton formed VE Source, Vertical Source and VE Source began sharing an office and office equipment. *Id.* ¶ 34. Between 2010 and 2017, VE Source and Vertical Source both operated out of the suite of offices at 812 Broad Street and then at 830 Broad Street. *Id.* ¶ 96(b). And beginning in July 2017, Neary moved VE Source to a new office space—his own home. *Id.* ¶¶ 114-15. VE Source paid $10,000 per month for that property, a payment that covered both a carriage house from which VE Source ostensibly operated (even though Barton, Moran, and Neary also continued to conduct VE Source business at Vertical Source's Broad Street office) and Neary's personal residence. *Id.* ¶ 119. Neary and Barton directed VE Source's bookkeeper to conceal the true nature of those $10,000 payments by recording them as "office rent" on the company's books and records. *Id.* ¶ 118. Neary also used $18,000 of VE Source funds to pay for renovations to his personal residence and, again, he and Barton directed the VE Source bookkeeper to conceal those payments on VE Source's books and records as office expenses. *Id.*

Aside from Neary owning a portion of VE Source and 100% of Vertical Source, Pao also owned a portion of VE Source and was a full-time Vertical Source employee. *Id.* ¶ 36. For both Vertical Source and VE Source, Pao was responsible for product sourcing, manufacturing and production. *Id.* Indeed, on a resume submitted

to the Government in a connection with VE Source's applications for SDVOSB certification, Pao listed his positions with Vertical Source and VE Source in a single entry on his resume. *Id.* ¶ 55. Pao used the same email address – ending in "@verticalapparel.com" – for his work on behalf of Vertical Source and VE Source. *Id.* ¶ 60. Initially, Pao drew no compensation from VE Source for his work on behalf of that company; rather, Vertical Source paid him for this work on behalf of VE Source. *Id.* ¶ 124.

Between January 2017 through at least 2019, Scott Matchett was a full-time Vertical Source employee involved in sales. *Id.* ¶ 124. During that time, he also worked for VE Source, but was paid only by Vertical Source. *Id.* In 2017, another Vertical Source employee, Jean Dubé, took a trip to Texas to visit VE Source's manufacturer after that manufacturer fell behind in its work for VE Source. *Id.* ¶ 125. Dubé was not paid by VE Source for that trip. *Id.*[1]

VE Source and Vertical Source (and Neary's other companies) also used the same accountants (three different accounting firms in five years) and lawyers. *Id.* ¶ 127. Neary also hired business consultants for his solely-owned companies and those consultants, in turn, performed work for or on behalf of VE Source without being compensated by VE Source. *Id.* ¶ 128. For example, Neary hired a company

---

[1]     The Complaint also alleges that Neary instructed Brad McCann, an employee of another of his 100%-owned companies, Vertical Design Group, to take an international business development trip for VE Source in 2016. Compl. ¶ 125. VE Source did not pay McCann for that work. *Id.* Though not directly relevant to the alter ego claim against Vertical Source, it is at least circumstantial evidence of Neary's willingness to disregard corporate formalities as between VE Source and the other companies he controlled.

called CFO Consultants to provide financial consulting services for his companies, including VE Source, but VE Source never paid CFO Consultants. *Id.* VE Source and Neary's other companies also shared office equipment. *Id.* ¶ 129. And in addition to sharing similar names, VE Source and Vertical Source also shared similar corporate logos. *Id.* ¶ 35. Both companies showed their name starting with a large "V" topped by an arrow pointing upwards. *Id.*

Despite the obvious co-mingling of funds, sharing of office space, equipment, materials, and personnel, and the fact the Vertical Source managed the day-to-day aspects of the VE Source's primary government contract, Neary and Barton tried to create a façade of separateness in seeking SDVOSB certification from the U.S. Department of Veterans Affairs, Center for Verification and Evaluation ("CVE"). *Id.* ¶ 154. The CVE had already denied VE Source's application for SDVOSB status three times based on Barton's inadequate control over the company and his excessive reliance on Neary. *Id.* ¶¶ 47-55. Eager for the ability to bid on more government set-aside contracts, Neary represented to the CVE in 2017 that "[t]here is no relationship between VE Source and [the Neary Companies]." *Id.* ¶¶ 154-55. Similarly, Barton told the CVE that VE Source "operate[s] completely on its own" and that "has never work[ed] with, for, or received any type of assistance from [the Neary Companies]. They are completely separate from VE Source . . . and do not support VE Source in any way." *Id.*

The United States commenced this action on October 9, 2020, asserting seven claims and naming Neary, Barton, VE Source, and Vertical Source as defendants.

The first two claims allege that each of the Defendants are liable for violating the False Claims Act; the third claim, alleging a conspiracy to violate § 3729(a)(1)(C) of the False Claims Act, is brought against Neary and Barton; the fourth, fifth, and sixth claims assert common law fraud, unjust enrichment, and payment by mistake against all Defendants; the seventh claim asserts an alter ego claim against Vertical Source. Compl. ¶¶ 167-94.

On January 8, 2021, Vertical Source timely moved to dismiss only Count 7 of the Complaint, the alter ego claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Moving Br. at 1.

## STANDARD OF REVIEW

When faced with a motion to dismiss under Rule 12(b)(6), the Court accepts the factual allegations in the complaint as true and evaluates whether those allegations "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see also Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). The Court must also accept as true all reasonable inferences that may be drawn from the allegations and view those facts and inferences in the light most favorable to the non-moving party. *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 995 (2011); *Rocks v. Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989).

*Iqbal*'s "plausibility" requirement "does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008).

Finally, in considering the sufficiency of a claim, the Court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Rule 12(d) provides that if a party bringing a motion under Rule 12(b)(6) presents "matters outside the pleadings" in support of the motion, the Court may "exclude[]" those matters or convert the motion to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d).

## **ARGUMENT**

### I.   **The Court Should Deny Vertical Source's Motion to Dismiss Because the Complaint Alleges Facts Sufficient to Establish That Vertical Source is an Alter Ego of VE Source**

The Complaint alleges facts sufficient to state a plausible claim that Vertical Source and VE Source are alter egos of one another. The Complaint alleges that (i) Vertical Source took hundreds of thousands of dollars from VE Source without any written agreement, collateral, security, interest, or repayment terms; (ii) Vertical Source managed all aspects of VE Source's primary contract, again without any sort of written agreement; (iii) Vertical Source employees worked for VE Source while being paid solely by Vertical Source; (iv) Neary offered to use Vertical Source assets to satisfy a substantial VE Source debt, and used VE Source's assets to guarantee Vertical Source's debt; and (v) VE Source and Vertical Source operate in the same line of business while sharing similar names, logos, office space, and equipment. This extensive relationship is all the more notable because VE Source and Vertical

Source are not in a parent-subsidiary relationship and both Barton and Neary have disavowed any relationship between the companies.

As a general principle, the corporate form "allow[s] shareholders to invest without incurring personal liability for the acts of the corporation." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001); *see also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (applying same principle where shareholder is another corporation). But when the corporate form is abused, courts can ignore the corporate form and impose "alter ego" liability in order "to prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Pearson*, 247 F.3d at 484 (quoting *Zubik v. Zubik*, 384 F.2d 267, 272 (3d Cir. 1967)).[2]

In *United States v. Pisani*, the Third Circuit articulated several factors to consider when evaluating an alter ego claim: "whether the corporation is grossly undercapitalized for its purposes," "failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominant stockholder or

---

[2]     Vertical Source relies on *dicta* in *Pearson* for the proposition that "courts have refused to pierce the veil even when subsidiary corporations use the trade name of the parent, accept administrative support from the parent, and have a significant economic relationship with the parent." Moving Br. at 14 (quoting *Pearson*, 247 F.3d at 485). However, the Complaint alleges substantially more than these facts, and are plainly sufficient to show that Vertical Source and VE Source operated with corporate separation as a single entity.

stockholders." 646 F.2d 83, 88 (3d Cir. 1981) (internal quotations omitted); *see also Pearson*, 247 F.3d at 484-85 (citing the *Pisani* factors and holding that alter ego liability may be appropriate if "two corporations actually functioned as a single entity and should be treated as such"). *Pisani* also instructed that the facts alleged "must present an element of injustice or fundamental unfairness." 646 F.2d at 88 (quotation omitted); *accord Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003) (citing *Pisani* for the same proposition).

The *Pisani* court articulated these alter ego factors as federal common law. 646 F.2d at 86 ("'[F]ederal law governs questions involving the rights of the United States arising under nationwide federal programs.'") (quoting *United States v. Kimball Foods, Inc.*, 440 U.S. 715, 726 (1979)); *see also Lutyk*, 332 F.3d at 194 (citing *Pisani* as consistent with federal common law).[3] It is well-established that "[f]ederal common law (rather than the law of the state where a corporation is incorporated), governs the veil-piercing question in a FCA case." *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 431, 454 (E.D. Pa. 2020) (citing, *inter alia*, *Pisani*, 646 F.2d at 86).[4]

---

[3]     Even if New Jersey law applied, this Court should reach the same result, as the Third Circuit and the New Jersey Supreme Court have largely similar standards for piercing the corporate veil. *See Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 149 (3d Cir. 1988) ("New Jersey is thus in line with the [Third Circuit] approach taken generally on this issue.").

[4]     *Accord United States ex rel. Bibby v. Mortg. Inv'rs Corp.*, No. 1:12-CV-4020-AT, 2016 WL 10998850, at *7 (N.D. Ga. Oct. 21, 2016) ("The Court is also satisfied that Relators have met the federal common law standard for pleading a veil-piercing theory of liability [which is] applicable to piercing the veil for liability

The *Pisani* factors are not "elements of a rigid test," but rather illustrate whether "'the debtor corporation is little more than a legal fiction.'" *Lutyk*, 332 F.3d at 194 (quoting *Pearson*, 247 F.3d at 485 and finding sufficient *Pisani* factors to warrant alter ego liability). Further, not all the *Pisani* factors need to be present in order to state a claim under the alter ego doctrine. *Am. Bell Inc. v. Fed'n of Tel. Workers of Pa.*, 736 F.2d 879, 887 (3d Cir. 1984) (listing factors that "must be considered"); *see also Lutyk*, 332 F.3d at 195-96 (affirming alter ego liability based on four of the *Pisani* factors); *Kindred Healthcare, Inc.*, 469 F. Supp. 3d at 455 (noting, in a False Claims Act case, that the alter ego test asks whether companies acted as a "single entity" under *Pearson*, and holding that "allegations of undercapitalization and siphoning of funds are sufficient to allege alter ego liability"). "Furthermore, the list of factors is not exclusive, as a court may find 'a less precise notion that the corporations simply acted interchangeably and in disregard of their corporate separateness.'" *N.J. Building Laborers' Statewide*

---

purposes for FCA claims."), *aff'd sub nom. United States v. Mortg. Inv'rs Corp.*, No. 19-12736, 2021 WL 137739 (11th Cir. Jan. 15, 2021); *see also United States ex rel. Dekort v. Integrated Coast Guard Sys.*, 705 F. Supp. 2d 519, 546 (N.D. Tex. 2010) (holding that federal common law, rather than the law of the state where a corporation is incorporated, governs the veil-piercing question in a False Claims Act case and finding that the plaintiff adequately alleged alter ego liability under the False Claims Act); *United States v. Exec. Health Res., Inc.*, 196 F. Supp. 3d 477, 515 (E.D. Pa. 2016) (applying in False Claims Act case the "federal common law test for piercing the corporate veil outlined by [*Pisani*]); *United States ex rel. Stepe v. RS Compounding LLC*, 325 F.R.D. 699, 707 (M.D. Fla. 2017) (holding, in False Claims Act case, that "the United States' allegations provide an adequate basis for piercing [the] corporate veil" under the "federal common-law test for corporate veil piercing").

*Penson Fund v. CID Constr. Servs., LLC*, No. 15-3412 (SRC), 2015 U.S. Dist. LEXIS 139628, at *9 (D.N.J. Oct. 14, 2015) (citing *Am. Bell Inc.*, 736 F.2d at 886-87).

The alter ego allegations here are consistent with those held to be sufficient in other cases in this District. For instance, in *Recom Corp.*, Judge Chesler held that the Defendant Miller Brothers pleaded facts sufficient to assert a counterclaim for alter ego liability between Recom Corp. and its parent, Recom AG. *Recom Corp. v. Miller Brothers*, No. 16-3320 (SRC), 2018 U.S. Dist. LEXIS 138505, at *20 (D.N.J. Aug. 16, 2018). The Court observed that Miller Brothers alleged that Recom Corp was "[was] unable to meet its financial obligations as they become due and must rely on Recom AG to fulfill its procurement contracts." *Id.* Furthermore, Recom Corp. made extensive payments to its parent, Recom AG, for work ostensibly performed by the parent under an oral agreement that was never reduced to writing. *Id.* at *20-21. The Court also noted the common officers and owners between the two companies and that Recom Corp. had "no sales staff, in-house counsel, or administrative support" of its own. *Id.* at *21. Lastly, the Court observed that Miller Brothers alleged "serious ambiguity about the manner and capacity in which the various corporations and their respective representatives [were] acting," because of a "substantial overlap in responsibilities these individuals held between Recom Corp and Recom AG." *Id.* at *21-22.

Similarly, in *Prime Capital Group, Inc. v. Klein*, Judge Linares denied a motion to dismiss an alter ego claim where the plaintiff alleged the individual defendant "fabricated accounts receivable in order to obtain money," resulting in the

14

company's undercapitalization and insolvency. *Prime Capital Group, Inc. v. Klein*, No. 07-414 (JLL), 2008 U.S. Dist. LEXIS 58771, at *28 (D.N.J. July 29, 2008). The Court also noted that the individual defendant was unable to "'distinguish between his own pocketbook and the corporate pocketbook,' demonstrat[ing] his disregard for the corporate form." *Id.* (alterations in original omitted).

In *CID Constr. Servs., LLC*, Judge Chesler held that the plaintiff pension fund adequately alleged an alter ego claim where the defendant and a related entity "collaborate[d] on labor and employee relationships, and that the companies use the same equipment and machinery." *CID Constr. Servs., LLC*, 2015 U.S. Dist. LEXIS 139628, at *10. Judge Chesler also concluded the plaintiff sufficiently alleged "that the companies [had] common ownership, common business operations, and a common corporate structure, . . . [and] operat[ed] from the same location and operations." *Id.*

Additionally, in *Hunt Construction Group, Inc.*, Judge Hochberg denied a Rule 12(b)(6) motion to dismiss a veil-piercing claim (which is reviewed under the same framework as alter ego claims) where the plaintiff alleged "that all of the corporate defendants were founded with little or no capital and are undercapitalized, that defendants failed to observe corporate formalities, that each of the corporate defendants was formed and managed by a member of the [same] family, and that all of the corporate defendants were operated with funds commingled with [another related company]." *Hunt Constr. Group, Inc. v. Farina*, No. 11-4933 (FSH), 2012 U.S. Dist. LEXIS 2676, at *10-11 (D.N.J. Jan. 10, 2012).

15

The Court also noted that the complaint "provided specific factual allegations indicating that many of the defendants have very limited functions and assets. *Id.* at *11.[5]

Here, the allegations in the Complaint provide even greater factual support for an alter ego claim than the foregoing cases. The United States alleges facts that satisfy several of the *Pisani* factors. For starters, Vertical Source (and Vertical Source's 100% owner, Neary) took so much money from VE Source that VE Source was unable to pay its most important vendor, American Apparel. Compl. ¶ 131. When Vertical Source and Neary took these funds from VE Source, they disguised them as "loans," despite the absence of any written agreement, interest, repayment terms, or collateral. *Id.* ¶ 96(a). Further, VE Source transferred more than $350,000 to Vertical Source to manage the day-to-day aspects of the DLA Contract, again without any written agreement. *Id.* ¶ 123. In addition to rendering VE Source insolvent in multiple years by the sheer scope of the transfers from VE Source to Vertical Source (and Neary), the complete absence of documentation or other standard terms and conditions for a loan evidences a significant failure to observe

---

[5]      *See also Ripley v. Eon Labs, Inc.*, 622 F. Supp. 2d 137, 142-44 (D.N.J. 2007) (holding, on a motion to dismiss, that plaintiff pleaded facts sufficient to pierce the corporate veil between a parent and a subsidiary based on allegations that the parent entity owned 100% of the subsidiary and that the subsidiary "acted in all aspects as agent and alter ego" of the parent entity, and the companies used separate corporate forms in order to sell prescription drugs without disclosing serious side effects); *Beuff Enters. Florida, Inc. v. Villa Pizza, LLC*, No. 07-2159 (PGS), 2008 U.S. Dist. LEXIS 50591, at *39-42 (D.N.J. June 25, 2008) (denying a motion to dismiss an alter ego claim where plaintiffs alleged an "identity of business locations and company executives" between the subject companies).

corporate formalities. *Pisani*, 646 F.2d at 88 (enumerating factors for the alter ego analysis).

The Complaint also alleges facts sufficient to show that Barton—VE Source's majority owner on paper and the person ostensibly holding the title of VE Source's CEO—did not, in fact, function as its CEO. *See id.* Indeed, the primary thrust of the Complaint is that Barton did not control VE Source at all. Compl. ¶¶ 22-156.[6]

The United States also alleges that VE Source was a mere façade for Vertical Source because it adopted a similar logo, operated out of the same office space, shared office equipment, and benefitted from the free labor of Vertical Source employees. Compl. ¶¶ 34, 35, 96(c), 122-31; *see Pisani*, 646 F.2d at 88. This is, of course, in addition to the fact that Neary owns both 100% of Vertical Source and 49% of VE Source, and was funneling money to Vertical Source and himself disproportionate to his ownership interest in VE Source. Compl. ¶¶ 11-12.

In addition to those facts, the Complaint also alleges other unique circumstances that show a lack of corporate separation between Vertical Source and VE Source. *See Lutyk*, 332 F.3d at 194 (noting that the *Pisani* factors are not "elements of a rigid test"). The extensive interrelationship between VE Source and

---

[6]     Subparagraphs (a) through (e) of Paragraph 96 in the Complaint summarizes the allegations showing Neary's control over VE Source, including that (i) Neary earned far more in compensation than Barton; (ii) Neary signed virtually all important corporate documents for VE Source, made other important business decisions, and led substantive communications with manufacturers with little or no input or oversight from Barton; (iii) Neary placed limits on Barton's corporate spending power; (iv) VE Source co-located with the Neary Companies and then operated out of Neary's home; and (v) VE Source paid Vertical Source to manage the DLA Contract, and the companies shared employees, vendors, and office equipment.

Vertical Source is all the more notable because they are *not* alleged to be in a parent-subsidiary relationship. Indeed, Neary and Barton have espoused that there is "no relationship" between the companies and that VE Source operates without "any type of assistance" from Vertical Source. *See* Compl. ¶ 155. Though reliance by a subsidiary on a parent corporation would not, by itself, support alter ego liability, the façade of corporate separateness between VE Source and Vertical Source, while simultaneously passing money back and forth, pledging each others' assets without maintaining any of the corporate formalities associated with such transactions, and paying Vertical Source to manage the DLA Contract, further supports the conclusion that Vertical Source is VE Source's alter ego.

Furthermore, the Complaint satisfies the second part of the federal common law alter ego test by alleging facts sufficient to show "an element of injustice or fundamental unfairness." *Pisani*, 646 F.2d at 88. Indeed, the crux of the Complaint is that VE Source was fraudulently created to obtain government contracts in Neary's line of business that would not otherwise be available to Vertical Source or Neary's other companies, and then to funnel VE Source's revenue back to Neary, both directly and through Vertical Source. Compl. ¶¶ 22-153. This scheme to defraud is exactly the type of fundamental unfairness that justifies imposing alter ego liability.

Without citing any legal authority, Vertical Source asserts that the Complaint contains no allegations that Vertical Source was involved with the formation of VE Source or that Vertical Source owned any equity in VE Source, and

18

that the lack of these allegations, in and of itself, warrants dismissal of Count Seven. Moving Br. at 14-15. This argument is misguided as neither of these factors are among those relied upon by the Third Circuit to determine alter ego liability. *See, e.g., Lutyk*, 332 F.3d at 194; *Pisani*, 646 F.2d at 88. Similarly, Vertical Source's arguments – based upon New Jersey law, rather than federal common law – as to whether Vertical Source dominated VE Source, or vice versa, Moving Br. at 19-20, are not part of the alter ego test articulated by the Third Circuit for the type of claims asserted in this action. *See, e.g., Lutyk*, 332 F.3d at 194; *Pisani*, 646 F.2d at 88. And even if these factors were relevant, the Complaint has adequately alleged that Neary as 100% owner of Vertical Source is indistinguishable from the corporation and that Neary was clearly involved in the formation of VE Source, owned 49% of the firm, and dominated and controlled VE Source's operations and contract performance. Compl. ¶¶ 12, 22-32, 96-153.

Vertical Source's reliance on *Stone v. Winter Enterprises, P.C.* is misplaced. Moving Br. at 16-17 (citing *Stone v. Winter Enters., P.C.*, No. 12-465 (RBK), 2012 U.S. Dist. LEXIS 175133 (D.N.J. Dec. 11, 2012)). In *Stone*, Judge Kugler granted a motion to dismiss an alter ego claim, but declined to make any findings on the sufficiency of the complaint insofar as it related to the *Pisani* factors. 2012 U.S. Dist. LEXIS 175133, at *14-17. Rather, that decision turned on the court's conclusion that the "Plaintiff has failed to allege any 'element of injustice or fundamental unfairness.'" *Id*. at *16 (quoting *Lutyk*, 332 F.3d at 194). *Stone* is, therefore, wholly inapposite because the core theory of the Complaint here is that

VE Source (by, through, and with Barton, Neary, and Vertical Source) violated the False Claims Act by falsely certifying that VE Source was an SDVOSB eligible for set-aside contracts and thus defrauding the United States into awarding it contracts to which it was not entitled. Compl. ¶¶ 22-156. Unlike *Stone*, Vertical Source's abuse of the corporate form goes hand-in-glove with the underlying false claim, and it perpetuated the fraudulent scheme pursuant to which VE Source obtained millions of dollars from federal programs designed to support legitimate businesses owned and controlled by service-disabled veterans, thus denying legitimate, eligible businesses those opportunities. *Id.* ¶ 2 (describing Congress's intent in promoting opportunities for legitimate SDVOSBs).

*Linus Holding Corp. v. Mark Line Indus., LLC* does not support Vertical Source's argument either. Moving Br. at 17-18 (citing *Linus Holding Corp. v. Mark Line Indus., LLC*, 376 F. Supp. 3d 417 (D.N.J. 2019)). In that diversity case, this Court dismissed an alter ego claim based upon a discrete series of transactions during which time the defendant Mark Line transferred $1.5 million in assets to affiliated entities "without reasonable or adequate consideration," resulting in Mark Line's undercapitalization and insolvency. 376 F. Supp. 3d at 424. The plaintiff cast a broad net in that complaint, asserting alter ego claims against eight entities and five corporate officials, and did so "in conclusory fashion." *Id.* at 426-27. The Court also characterized plaintiff's allegations regarding the overlap in management between the affiliated entities and the transfers of funds between the organizations as inadequate to pierce the veil, concluding that the allegations did not adequately

demonstrate that Mark Line functioned as a dummy or shell corporation. *Id.* at 427-28.

The Government's allegations here are far more developed. Whereas *Linus Holding Corp.* involved "a misuse or mismanagement of corporate funds," the allegations against Vertical Source involve a years-long pattern of taking money from VE Source without any business justification whatsoever and with a complete disregard for corporate formalities and on unreasonably favorable terms (i.e., interest-free, unsecured, and without fixed repayment terms). *Id.* ¶ 97-110. And whereas *Linus Holding Corp.* involved some aspects of "common ownership and common management," 376 F. Supp. 3d at 427, the Complaint here alleges that (i) Neary owned 100% of Vertical Source and he controlled VE Source (in addition to owning 49% of VE Source); (ii) Vertical Source managed all aspects of VE Source's primary government contract and was paid more than $350,000 for that work without any written agreement; (iii) the companies shared office space, equipment, employees, vendors, and certain Vertical Source employees worked for VE Source free of charge; (iv) Vertical Source obligated VE Source to guarantee a substantial debt (without Barton's knowledge or consent); and (v) as noted above, Vertical Source took hundreds of thousands of dollars from VE Source as "loans" leaving VE Source insolvent at times. *Id.* ¶¶ 11-12, 96(a-e), 111-33. And where the plaintiff in *Linus Holding Corp.* sought to apply alter ego liability across a broad swath of individuals and entities for purposes of establishing personal jurisdiction, the Government's claim in this case is focused on a single entity and is asserted to

prevent an injustice to the United States. Compl. ¶¶ 191-94. These allegations go beyond the undifferentiated allegations of "common ownership and common management" that this Court held to be insufficient in *Linus Holding Corp.* 376 F. Supp. 3d at 427. Lastly, as a diversity case, the Court in *Linus Holding Corp.* applied the alter ego analysis under New Jersey common law, which requires a showing that one company dominated the other. *Id.* at 425-26 ("Plaintiff does not specifically allege facts as to each of the defendants that demonstrate how each entity or individual purportedly controlled or dominated Mark Line such that it failed to assume a separate corporate identity."). The federal common law governing alter ego claims, as articulated by *Pisani*, does not require a showing of "dominance." *See Pisani*, 646 F.2d at 88.

In sum, accepting the factual allegations as true and drawing all reasonable inferences in the Government's favor, the Complaint states a claim for alter ego liability. The Complaint alleges facts sufficient to satisfy enough of the *Pisani* factors to show a basis for alter ego liability. Accordingly, the United States respectfully requests that the Court deny Vertical Source's motion to dismiss.

## II. The Court Should Reject Vertical Source's Attempt to Expand the Factual Record on this Motion to Dismiss Beyond the Allegations in the Complaint

Vertical Source's opening brief is replete with factual contentions that find no basis in the Complaint. *See, e.g.*, Moving Br. at 5 n.4 (denying the "accuracy of many of the Government's allegations"), *id.* at 6 n.5 (contending that Vertical Source and VE Source co-located "for the wholly innocent, appropriate and prudent decision of austerity"), *id.* at 7 n.6 (contending that the Vertical Source charged VE Source "at

22

or below market rates" to manage VE Source's contract with the Department of Defense), *id.* at 8 n.10 (explaining that a Vertical Source employee worked for VE Source "merely as a favor"), *id.* at 20 n.14 (alluding to extra-complaint information allegedly provided to the Government).

Vertical Source's attempt to expand the record on its motion to dismiss is entirely inappropriate. *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (holding that, on a Rule 12(b)(6) motion, the Court "must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents"); *see also Melendez v. Colorite Plastics Co.*, No. 15-1931 (SDW), 2015 U.S. Dist. LEXIS 150899, at *17 (D.N.J. Oct. 19, 2015) (rejecting as improper a defendant's reliance on an affidavit to dispute factual allegations in a complaint). Accordingly, the Court should disregard any factual contention in Vertical Source's brief that is not found directly in the Complaint, or that fails to fall in one of the specifically enumerated, permissible categories of facts which courts have held may be relied upon in evaluating a 12(b)(6) motion to dismiss.[7]

---

[7]     The Third Circuit has held that district courts can only convert a motion dismiss to a motion for summary judgment if the court "provides notice of its intention to convert the motion and allows [the parties] an opportunity to submit materials admissible in a summary judgment proceeding." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 361 (3d Cir. 2016) (citing *Rose v. Bartle*, 871 F.2d 331, 339-40 (3d Cir. 1989)). In such event, the defendant could only prevail on its motion if it is able to demonstrate, in accordance with the requirements of Rule 56, that there exists no genuine issue as to any material fact and that the movant is entitled to the entry of a judgment as a matter of law. Fed. R. Civ. P. 12(d), 56(a); *see also* 5C Charles Alan Wright et al., *Fed. Prac. & Proc. Civ.* § 1366 (3d ed. 2020). To do so, it

### III.    Regardless of the Alter Ego Analysis, Vertical Source Has Not Challenged Any of the Remaining Claims Brought Against It

Vertical Source incorrectly contends that the alter ego claim is the "lone claim" asserted against it. Moving Br. at 1. In fact, the Government has brought numerous counts against all of the Defendants, including Vertical Source: submission of, or causing the submission of, false claims (Count One); creation or use of, or causing the creation of use of, false statements material to false claims (County Two); Common Law Fraud (Count Four); Unjust Enrichment (Count Five); and Payment by Mistake (Count Six). Vertical Source could be liable under any of these counts in its own right or based upon its vicarious liability for the conduct of Neary or other Vertical Source employees that acted with apparent authority or within the scope of their employment in perpetuating the fraudulent scheme. *See Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) (principal liable for agent's fraud if agent acted with apparent authority). Vertical Source's failure to seek dismissal of these other counts requires that it answer the Complaint, regardless of how this Court adjudicates its alter ego liability.

### CONCLUSION

For the reasons set forth above, the United States respectfully submits that the Court should deny Vertical Source's motion. If, however, the Court grants the motion, the Vertical Source should remain in the action to face the remaining

---

would need to provide actual evidentiary support such as declarations, rather than unsupported attorney contentions in a brief.

claims asserted against it, and the United States requests leave to amend the

Complaint to cure any deficiencies.

Dated:       Newark, New Jersey
             February 2, 2021

                                        Respectfully submitted,

                                        RACHAEL A. HONIG
                                        Acting United States Attorney

                              By:    _/s/ David V. Simunovich_____
                                        DAVID V. SIMUNOVICH
                                        MARK C. ORLOWSKI
                                        Assistant United States Attorneys
                                        *Attorneys for Plaintiff*