RACHAEL A. HONIG
Acting United States Attorney
DAVID V. SIMUNOVICH
MARK C. ORLOWSKI
Assistant United States Attorneys
970 Broad Street, Suite 700
Newark, NJ 07102
Tel. (973) 645-2736
david.simunovich@usdoj.gov

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> *Plaintiff*, <br><br> v. <br><br> CHRISTOPHER NEARY, SHERMAN BARTON, VE SOURCE, LLC, and VERTICAL SOURCE, INC., <br><br> *Defendants.* | Civil Action No. 20-14167 (FLW) (DEA) <br><br> Motion Day: March 15, 2021 |

*Plaintiff's Brief in Opposition to the Motion to Dismiss*
*Filed by Christopher Neary, Sherman Barton, and VE Source, LLC*

RACHAEL A. HONIG
ACTING UNITED STATES ATTORNEY
*Attorney for Plaintiff*

*On the brief:*

DAVID V. SIMUNOVICH
MARK C. ORLOWSKI
Assistant United States Attorneys

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

   I.   Neary, Pao, and Norton form VE Source to obtain set-aside
      contracts and recruit Barton to serve as a figurehead owner .......................... 2

   II.  VE Source co-locates with Neary's other companies; Neary and
      Pao take the lead in operating VE Source ........................................................ 3

   III. Defendants falsely self-certify VE Source, or cause VE Source
      to be falsely self-certified, as an SDVOSB .................................................... 4

   IV. Citing Barton's lack of control, the VA CVE denies VE Source's
      application for SDVOSB status three times in 2012 and 2013 ....................... 5

   V.   Just weeks after the VA CVE's first denial letter, VE Source
      represents itself to the USDA as an SDVOSB ............................................... 6

   VI. After the VA CVE issues three SDVOSB denials, VE Source
      represents itself to the DLA as an SDVOSB ................................................. 7

   VII. Neary continues to control VE Source after obtaining the USDA
      and DLA Contracts .......................................................................................... 8

STANDARD OF REVIEW .................................................................................. 9

THE FALSE CLAIMS ACT ................................................................................ 10

ARGUMENT ........................................................................................................ 11

   I.   Defendants' false self-certifications as to VE Source's SDVOSB status
      do not immunize them from FCA liability ...................................................... 11

   II.  The Complaint adequately alleges that Defendants falsely self-certified
      VE Source's status as an SDVOSB ................................................................ 14

   III. The Complaint adequately alleges that, at a minimum, Defendants
      recklessly disregarded the truth of their certifications as to VE Source's
      SDVOSB status ............................................................................................... 17

A. The Complaint's allegations are sufficient to meet the FCA's "knowledge" requirement ........................................................... 17

B. Defendants' reliance on the "government knowledge inference" is misguided because the Complaint does not allege that the DLA or the USDA knew that VE Source's self-certifications were false .................................................................................... 20

IV. The Complaint adequately alleges that VE Source's purported SDVOSB status was material to the contracting officers' decisions to award SDVOSB set-aside contracts ............................................. 23

V. The Complaint sufficiently states facts to support common law claims for fraud, unjust enrichment, and payment by mistake ..................... 28

CONCLUSION ........................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Ali-Bocas v. Ashcroft,*
   67 F. App'x 83 (3d Cir. 2003) ................................................................ 13

*Allstate N.J. Ins. Co. v. Lajara,*
   222 N.J. 129 (2015) .............................................................................. 28

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ................................................................................ 9

*Baycol Products Litig. v. Bayer Healthcare,*
   732 F.3d 869 (8th Cir. 2013) ........................................................... 10, 11

*Cook Cnty. v. United States ex rel. Chandler,*
   538 U.S. 119 (2003) .............................................................................. 14

*Heckler v. Chaney,*
   470 U.S. 821 (1985) .............................................................................. 13

*In re Plavix Marketing v. Bristol-Myers Squibb Co.,*
   332 F. Supp. 3d 927 (D.N.J. 2017)........................................................ 10

*Laymon v. Bombardier Transp. USA, Inc.,* No. 05-169,
   2009 U.S. Dist. LEXIS 24403 (W.D. Pa. Mar. 23, 2009)........................ 17

*Mayer v. Belichick,*
   605 F.3d 223 (3d Cir. 2010) ............................................................. 9, 21

*Melendez v. Colorite Plastics Co.,* No. 15-1931 (SDW),
   2015 U.S. Dist. LEXIS 150899 (D.N.J. Oct. 19, 2015)............................. 9

*Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.,*
   967 F.3d 218 (3d Cir. 2020)................................................................... 29

*Scollick ex rel. United States v. Narula,* No. 14-1339 (RCL),
   2020 U.S. Dist. LEXIS 208604 (D.D.C. Nov. 6, 2020) ........................... 23

*Smith v. Carolina Med. Ctr.,*
   274 F. Supp. 3d 300 (E.D. Pa. 2017)..................................................... 21

*Thieme v. Aucoin-Thieme,*
   227 N.J. 269 (2016) .............................................................................. 29

*United States ex rel. Brown v. Pfizer, Inc.*, No. 05-6795,
   2017 WL 1344365 (E.D. Pa. Apr. 12, 2017) ............................................. 11

*United States ex rel. Burblaw v. Orenduff*,
   548 F.3d 931 (10th Cir. 2008) ...................................................... 21, 22

*United States ex rel. Doe v. Heart Sol., PC*,
   923 F.3d 308 (3d Cir. 2019) ...................................................... 28, 29

*United States ex rel. Gohil v. Sanofi U.S. Servs., Inc.*, No. 02-2964,
   2020 WL 4260797 (E.D. Pa. July 24, 2020) ..................................... 25

*United States ex rel. Feldman v. van Gorp*,
   697 F.3d 78 (2d Cir. 2012) ............................................................. 23

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
   575 F.3d 458 (5th Cir. 2009) .................................................... 11, 23

*United States ex rel. Marcus v. Hess*,
   317 U.S. 537 (1943) ...................................................................... 10

*United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231 (RCL),
   2007 U.S. Dist. LEXIS 21854 (D.D.C. Mar. 27, 2007) .......................... 11

*United States ex rel. Miller v. Weston Educ., Inc.*,
   840 F.3d 494 (8th Cir. 2016) .................................................... 11, 24

*United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, No. 02-5702,
   2009 U.S. Dist. LEXIS 38898 (D.N.J. May 7, 2009) .............................. 29

*United States ex rel. Petratos v. Genentech, Inc.*, No. 11-3691 (SDW),
   2014 U.S. Dist. LEXIS 175223 (D.N.J. Dec. 18, 2014) .......................... 10

*United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*,
   892 F.3d 822 (6th Cir. 2018) ......................................................... 25

*United States ex rel. Spay v. CVS Caremark Corp.*,
   875 F.3d 746 (3d Cir. 2017) ................................................. 17, 20, 21

*United States ex rel. Streck v. Bristol-Meyers Squibb Co.*, No. 13-7547,
   2018 U.S. Dist. LEXIS 202104 (E.D. Pa. Nov. 29, 2019) ...................... 21

*United States ex rel. Thomas v. Siemens AG*,
   593 F. App'x 139 (3d Cir. 2014) ..................................................... 10

*United States ex rel. Tutanes-Luster v. Broker Solutions, Inc.*, No. 19-130,
   2019 U.S. Dist. LEXIS 155163 (C.D. Cal. July 8, 2019) ......................... 23

*United States ex rel. Wilkins v. United Health Group, Inc.,*
   659 F.3d 295 (3d Cir. 2011) ....................................................................... 10

*United States v. Krizek,*
   111 F.3d 934 (D.C. Cir. 1997) ................................................................... 18

*United States v. Luce,*
   873 F.3d 999 (7th Cir. 2017) ..................................................................... 24

*United States v. Strock,*
   982 F.3d 51 (2d Cir. 2020)................................................... 18, 24, 26, 27

*United States v. Veneziale,*
   268 F.2d 504 (3d Cir. 1959) ...................................................................... 10

*United States v. Wavefront LLC,* No. 20-5094 (AET),
   2021 U.S. Dist. LEXIS 912 (D.N.J. Jan. 5, 2021) ...................... 11, 24, 29

*Universal Health Servs. v. United States ex rel. Escobar,*
   136 S. Ct. 1989 (2016) ................................................................... 23, 25, 26

*Veridyne Corp. v. United States,*
   758 F.3d 1371 (Fed. Cir. 2014) ................................................................ 11

*Yang v. INS,*
   574 F.2d 171 (3d Cir. 1978)....................................................................... 13

## STATUTES

31 U.S.C. § 3729(b)(1) .......................................................................................... 17

31 U.S.C. § 3729(b)(1)(B) .................................................................................... 17

31 U.S.C. § 637(m)(5)(C) ...................................................................................... 26

31 U.S.C. § 657(d) .................................................................................................. 26

## RULES

Fed. R. Civ. P. 9(b) ........................................................................................... 9, 18

Fed. R. Civ. P. 12 ..................................................................................................... 9

Fed. R. Evid. 801.................................................................................................... 22

Fed. R. Evid. 802.................................................................................................... 22

## <u>REGULATIONS</u>

13 C.F.R. § 125.18 ................................................................................................ 12

13 C.F.R. § 125.18(e) .......................................................................................... 16

13 C.F.R. § 125.27 ................................................................................................ 12

13 C.F.R. § 125.32(a) ........................................................................................... 29

38 C.F.R. § 74.1 ..................................................................................................... 5

48 C.F.R. § 19.1403(b) ........................................................................................ 12

48 C.F.R. § 19.307(b)(1) ..................................................................................... 12

48 C.F.R. §§ 19.1408 ........................................................................................... 25

## PRELIMINARY STATEMENT

This case concerns Defendants' scheme to defraud the United States by wrongfully obtaining millions of dollars in government contracts. Through materially false statements, VE Source obtained more than $16.5 million from two government contracts intended for legitimate service-disabled, veteran-owned small businesses ("SDVOSBs"). Though it represented itself as an SDVOSB, VE Source was not a legitimate SDVOSB because Sherman Barton, a service-disabled veteran, did not "control" it; he was a mere figurehead, allowing the business to be controlled in all respects by his partner, Christopher Neary, who is not a veteran.

Defendants' motion to dismiss advances three core arguments. First, they contend that the False Claims Act ("FCA") claims should be dismissed because "VE Source was certified . . . as an SDVOSB." Moving Brief, ECF Doc. No. 14-1 ("Moving Br.") at 14. But this entire defense is self-fulfilling sophistry as it is premised on the fact that VE Source falsely self-certified itself as an eligible SDVOSB. Put differently, Defendants are asking this Court to declare VE Source a legitimate SDVOSB based on their self-certifications and in direct contradiction to the Government's well-pleaded factual allegations that those certifications were false.

Second, Defendants argue that the FCA claims fail because the Complaint does not allege falsity, scienter, or materiality. With respect to falsity, the Complaint alleges that, before VE Source successfully bid on the two contracts at issue in this case, Defendants' representations concerning VE Source's SDVOSB status were false because Barton did not control the business. With respect to scienter, the Complaint alleges that, despite Barton's lack of control, Defendants

repeatedly certified VE Source as an SDVOSB even though Neary and Barton knew that to qualify as one, Barton had to control VE Source's management and daily business operations. The Complaint also alleges that in 2012 and 2013, Defendants were told three times by a federal agency that VE Source did not qualify as an SDVOSB; Defendants ignored those findings and bid on two government contracts that were set aside for SDVOSBs. The Complaint also sufficiently alleges the materiality of Defendants' false statements because VE Source's putative status as an SDVOSB was a precondition for the award of the contracts at issue.

Third, Defendants' seek to dismiss the claims for fraud, unjust enrichment, and payment by mistake. The Court should reject these arguments because the allegations supporting the FCA claims are also sufficient to support those claims. Accordingly, the United States respectfully submits that the Court should deny the motion to dismiss in its entirety.

## BACKGROUND

### I.      Neary, Pao, and Norton form VE Source to obtain set-aside contracts and recruit Barton to serve as a figurehead owner

In 2009, Neary and one of his employees, Robert Pao, along with an acquaintance, Ron Norton, decided to form an SDVOSB to seek government contracts in the apparel sector. *Id.* ¶¶ 22-23. Neary and Pao had long careers in the apparel industry but could not form an SDVOSB on their own because they are not service-disabled veterans. *Id.* ¶ 23. To fill that void, they recruited Barton, a serviced-disabled veteran close to retiring from the Veterans Administration ("VA"). *Id.* ¶¶ 24-25. Though he lacked experience in the apparel industry, Barton

agreed to serve as the nominal majority owner of the company on the condition that he would not have an active role in managing the business. *Id.* ¶ 26. At the time, Neary, Pao, Norton and Barton knew that a service-disabled veteran needed to both own and control VE Source to qualify as an SDVOSB *Id.* ¶¶ 29-31.

With Barton on board, Norton prepared the paperwork to incorporate the business. *Id.* ¶¶ 27-28. Barton's 51% ownership interest was just enough to qualify him as the majority owner; the remaining 49% was split equally between Neary, Pao, and Norton. *Id.* ¶ 32.

## II.    VE Source co-locates with Neary's other companies; Neary and Pao take the lead in operating VE Source

Once formed, Defendants operated VE Source out of the same office space that Neary rented for several of his other apparel-related companies. *Id.* ¶¶ 34, 111-13. Notably, this office was located more than 60 miles from Barton's home but just 6 miles from Neary's home. *Id.* ¶ 113. VE Source adopted both a name and corporate logo similar to Vertical Source. *Id.* ¶ 35. VE Source also benefitted from labor paid for by Vertical Source. *Id.* ¶ 34, 36. Norton expressed his concern to Neary, Barton, and Pao about VE Source's reliance on Neary's other companies and unsuccessfully sought more separation between them. *Id.* ¶ 34.

In the early years of VE Source's formation, Pao and Neary were responsible for VE Source's core function, namely, finding and bidding on government contracts. *Id.* ¶¶ 37-38. Pao identified government contracting opportunities, determined if they were worth bidding on, drafted proposals, and submitted them on behalf of VE Source. *Id.* ¶ 37. Neary was heavily involved in

VE Source's day-to-day business operations, controlled the company's books and records, and developed the cost analyses for the company's contract bids. *Id.* ¶ 38.

### III.   Defendants falsely self-certify VE Source, or cause VE Source to be falsely self-certified, as an SDVOSB

Between 2009 and July 2012, VE Source entered annual certifications as to its SDVOSB status in a government database known as ORCA. *Id.* ¶ 20. In so doing, Norton and Pao certified that VE Source was a valid SDVOSB, a term that was defined to mean that a service-disabled veteran controlled VE Source's "[t]he management and daily business operations." *Id.* ¶¶ 33, 57-58.

Beginning in January 2012, Pao certified VE Source as an SDVOSB on the System for Award Management ("SAM") database, which replaced ORCA. *Id.* ¶¶ 20, 59. Through 2015, Pao continued filing VE Source's self-certifications with Neary's and Barton's knowledge and consent in SAM. *Id.* ¶¶ 57-62. At least once (in 2013), Pao, using the same e-mail he used for his Vertical Source work, made VE Source's self-certification under Barton's name, making it appear as if Barton was personally certifying VE Source's SDVOSB status. *Id.* ¶ 60.[1] Consistent with the relevant regulations, the SAM certification form defined an SDVOSB to be a company in which the service-disabled veteran is the majority owner and controls the "management and daily business operations." *Id.* ¶ 64. After Pao left VE Source in 2015, Barton, for the first time, certified the company's SDVOSB status. *Id.* ¶ 63.

---

[1]   Neary also used his Vertical Source email address for VE Source work. Compl. ¶ 149.

IV.     **Citing Barton's lack of control, the VA CVE denies VE Source's application for SDVOSB status three times in 2012 and 2013**

At the same time Defendants self-certified as an SDVOSB in ORCA and SAM, VE Source was pursuing SDVOSB certification with the VA. *Id.* ¶ 42. Prior to 2010, the VA followed a self-certification process similar to ORCA and SAM; beginning in 2010, however, the VA shifted to a process by which firms would be required to submit documentation to the VA Center for Verification and Evaluation ("the VA CVE") to substantiate their SDVOSB status for purposes of bidding on VA contracts. *Id.* ¶ 44 (citing 38 C.F.R. § 74.2(a) (2010-2018)).[2] The VA's change in process did not impact the self-certification process for contracts from agencies other than the VA (*i.e.*, the DLA and the USDA). *See id.* ¶¶ 20, 56-57, 59-60.

On or about March 2, 2012, VE Source applied to the VA CVE for SDVOSB verification for VA contracts. *Id.* ¶ 46. By letter dated May 18, 2012, the VA CVE denied VE Source's application, explaining that VE Source failed to show that Barton controlled the company. *Id.* ¶¶ 47-49 (describing the contents of the VA CVE's denial letter). Thereafter, VE Source twice sought reconsideration and the VA CVE issued two more denials—one on December 4, 2012 and the second on April 3, 2013. *Id.* ¶¶ 51-55. In those denials, the VA CVE pointed to extensive evidence

---

[2]     VA regulations in effect between 2011 and 2018 established similar criteria for a company to be eligible as an SDVOSB as the criteria in Small Business Administration ("SBA") regulations and the Federal Acquisition Regulation, namely, the service-disabled veteran must be the majority owner and must control the management and daily business operations of the firm. Compl. ¶ 45 (citing 38 C.F.R. § 74.1 (2011–2018) (adopting SBA regulations for purposes of setting SDVOSB requirements)).

that Barton lacked control over VE Source, including: (i) restrictions on Barton's ability to freely transfer his ownership in the company or to take other unilateral actions on VE Source's behalf; (ii) evidence that Barton received less compensation than Neary; (iii) Barton's inexperience in the apparel industry compared to Neary's and Pao's extensive experience; (iv) VE Source's co-location with Neary's company, Vertical Source; (v) evidence indicating the Barton did not "hold[] the highest position in the company" and that his role was ill-defined; and (vi) other evidence of VE Source's reliance on Vertical Source (*i.e.*, VE Source and Vertical Source were in the same line of business, shared similar logos, and Neary and Pao performed the same functions for VE Source as they did for Vertical Source). *Id.* ¶¶ 48, 53, 55.

## V.   Just weeks after the VA CVE's first denial letter, VE Source represents itself to the USDA as an SDVOSB

Although on May 18, 2012 the VA CVE refused to verify VE Source's SDVOSB status based on Barton's lack of control, VE Source on June 15, 2012 bid on a USDA contract solicitation set aside for SDVOSBs. *Id.* ¶ 65. Pao was primarily responsible for finding the USDA's solicitation and preparing the response, but he obtained Barton's and Neary's consent to submit VE Source's proposal. *Id.* ¶ 66. Pao, Barton and Neary knew that the VA had denied VE Source's application for SDVOSB verification on May 18, 2012, that the USDA's June 15, 2012 solicitation was set aside for SDVOSB entities, and that Pao had represented to the USDA that VE Source was an SDVOSB. *Id.* ¶¶ 67-70.

After the USDA contracting officer determined that VE Source had self-certified as an SDVOSB, the USDA awarded the contract (the "USDA Contract")

6

to VE Source. *Id.* ¶ 71. Between 2012 and 2017, VE Source submitted invoices to USDA and USDA made 14 payments to VE Source totaling $227,470. *Id.* ¶ 73. The USDA would not have awarded the contract to VE Source, nor would it have paid VE Source, had it known that VE Source was not a legitimate SDVOSB. *Id.* ¶ 75.

## VI.    After the VA CVE issues three SDVOSB denials, VE Source represents itself to the DLA as an SDVOSB

Even though the VA CVE denied VE Source's SDVOSB application three times between May 18, 2012 and April 3, 2013, VE Source self-certified as an SDVOSB on the SAM database on April 9, 2013. *Id.* ¶¶ 47, 53, 55 & 60. And on May 14, 2014, Pao prepared and submitted a proposal on behalf of VE Source in response to a DLA contract solicitation set aside for SDVOSBs. *Id.* ¶ 80. Pao, Barton and Neary knew that the DLA solicitation was set aside for SDVOSBs, that the VA CVE had denied VE Source's SDVOSB certification three times, and that there were no intervening material changes to VE Source's managerial structure that would have addressed the reasons the VA CVE cited in denying VE Source's application. *Id.* ¶¶ 80-85.

After the DLA contracting officer determined that VE Source self-certified as an SDVOSB in SAM, DLA awarded the contract (the "DLA Contract") to VE Source. *Id.* ¶ 81. Under the DLA Contract, VE Source submitted 166 invoices between 2015 and 2019 and was paid approximately $16.3 million. *Id.* ¶¶ 87-88. The DLA would not have awarded the contract to VE Source, nor would it have made payments to VE Source, had it known that VE Source was not a legitimate SDVOSB. *Id.* ¶ 89.

7

**VII.      Neary continues to control VE Source after obtaining the USDA and DLA Contracts**

Additional allegations in the Complaint show that Neary continued to exert control over VE Source once it began receiving funds under the two contracts at issue. For instance, even though Barton nominally owned and controlled VE Source, Neary received twice as much in compensation from the company. *Id.* ¶¶ 97-100. Neary and his wholly-owned company, Vertical Source, also took excessive cash transfers from VE Source which they booked as "loans," even though the "loans" were interest-free, undocumented, and unsecured. *Id.* ¶¶ 101-10. At times, these "loans" resulted in VE Source's insolvency. *Id.* ¶¶ 101-04, 131.

Concerned about Barton's ability to spend company funds, Neary had Barton sign an agreement that restricted Barton's ability to make "unilateral decisions" for VE Source to issues involving less than $1,000. *Id.* ¶¶ 150-53. Neary signed virtually all of VE Source's significant corporate agreements and made important business decisions for VE Source with little or no input or oversight from Barton. *Id.* ¶¶ 96(d), 134-49. Neary was the primary point of contact with VE Source's business partners, including when disputes arose between VE Source and the companies that manufactured the coveralls for the DLA Contract. *Id.* ¶¶ 135-44. And in attempting to resolve a $300,000 debt that VE Source owed, Neary offered to have Vertical Source pay the debt. *Id.* ¶ 131.[3]

VE Source also relied heavily on Vertical Source staff to execute the DLA

---

[3]      Without first obtaining Barton's approval, Neary resolved the dispute by signing a promissory note on VE Source's behalf. Compl. ¶¶ 143-44.

Contract. After Pao left in or about 2015, VE Source began paying Vertical Source to manage the day-to-day aspects of the DLA Contract. *Id.* ¶ 123. Under this arrangement, which was never reduced to writing, VE Source paid Vertical Source more than $350,000. *Id.*; *see also id.* ¶ 124-26 (naming Neary's other employees who worked for VE Source for free). And Neary alone was empowered to make compensation decisions for the only employee VE Source ever hired. *Id.* ¶ 133.

## STANDARD OF REVIEW

When faced with a motion to dismiss under Rule 12(b)(6), the Court accepts factual allegations in the Complaint as true and evaluates whether those allegations "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted); *see also Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (explaining that on Rule 12(b)(6) motions, courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint"). As set forth below, the Complaint plainly alleges the "who, what, when, where and how" to satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b).

In their motion, Defendants repeatedly rely on and assert factual allegations that fall outside the Complaint, such as the "Certification" by Brian O'Neill. *See* ECF No. 14-2. The Government respectfully asks the Court to disregard these improper assertions. *See Mayer*, 605 F.3d at 230 (explaining that on Rule 12(b)(6) motions, courts "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the

complainant's claims are based upon these documents"); *Melendez v. Colorite Plastics Co.*, No. 15-1931 (SDW), 2015 U.S. Dist. LEXIS 150899, at *17 (D.N.J. Oct. 19, 2015) (rejecting improper reliance on affidavit to dispute allegations).

## THE FALSE CLAIMS ACT

The FCA authorizes hefty civil penalties and treble damages for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A-B); *see also United States ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (discussing § 3729(a)(1)(A) claims); *United States ex rel. Petratos v. Genentech, Inc.*, No. 11-3691 (SDW), 2014 U.S. Dist. LEXIS 175223, at *6-8 (D.N.J. Dec. 18, 2014) (discussing § 3729(a)(1)(B) claims). Conspiring to violate § 3729(a)(1)(A) or (a)(1)(B) constitutes a separate violation of the FCA. *Id.* § 3729(a)(1)(C).

After the Supreme Court's decision in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), courts have recognized fraud in the inducement as a viable theory of FCA liability. *See Baycol Products Litig. v. Bayer Healthcare*, 732 F.3d 869, 876 (8th Cir. 2013); *In re Plavix Marketing v. Bristol-Myers Squibb Co.*, 332 F. Supp. 3d 927, 939 (D.N.J. 2017) (citing *United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959)). To establish a fraudulent inducement claim for purposes of the FCA, a plaintiff must demonstrate that "(1) there was a knowingly false or fraudulent statement; (2) that the statement was material; and (3) that it caused the government to pay out money or to forfeit moneys due (*i.e.*, a 'claim')." *United States*

10

*ex rel. Thomas v. Siemens AG*, 593 F. App'x 139, 143 (3d Cir. 2014).

If a contract is fraudulently induced, all of the invoices submitted under that contract constitute false claims because the "very existence of a fraudulent contract taints the submission of each subsequent claim for payments thereunder." *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, No. 95-1231, 2007 U.S. Dist. LEXIS 21854, at *9 (D.D.C. Mar. 27, 2007); *see also Baycol Prods. Litig.*, 732 F.3d at 876 (holding that under the fraudulent inducement theory, FCA liability attaches to "each and every claim submitted under [the] contract"); *United States ex rel. Brown v. Pfizer, Inc.*, No. 05-6795, 2017 WL 1344365, at *2 (E.D. Pa. Apr. 12, 2017) (same). Even if claims for payment are not "false," they remain actionable under the FCA because they derive directly from the original fraudulent inducement. *See, e.g., United States ex rel. Miller v. Weston Educ., Inc.*, 840 F.3d 494, 504 (8th Cir. 2016); *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 468 (5th Cir. 2009); *Veridyne Corp. v. United States*, 758 F.3d 1371, 1379 (Fed. Cir. 2014); *United States v. Wavefront LLC*, No. 20-5094 (AET), 2021 U.S. Dist. LEXIS 912, at *13 (D.N.J. Jan. 5, 2021).

## **ARGUMENT**

### I.   **Defendants' false self-certifications as to VE Source's SDVOSB status do not immunize them from FCA liability**

Defendants' primary argument for dismissal is their misleading contention that "[f]rom 2010 through 2020, VE Source *was certified by* the SBA as an SDVOSB," and that neither the "SBA, the USDA, [n]or the DLA" challenged that certification. Moving Br. at 14 (emphasis added). This argument is meritless.

11

The Court should disregard Defendants' assertion that VE Source was "certified by the SBA as an SDVOSB" as it attempts to rely on factual allegations that are outside the Complaint. The Complaint never alleges that the SBA (or any agency) "certified" VE Source as an SDVOSB prior to the USDA or DLA contract awards.[4] To the contrary, the Complaint alleges Defendants *self-certified* VE Source's eligibility for SDVOSB contracts from 2009 through at least 2016. Compl. ¶ 20 (citing 13 C.F.R. § 125.18; 48 C.F.R. § 19.1403(b)); *see also id.* ¶¶ 33, 58-64, 67-68, 80 (alleging that between 2009 and 2016, VE Source, through Norton, Pao, or Barton, self-certified its SDVOSB status in ORCA and SAM). And although the VA CVE verified VE Source's SDVOSB status for purposes of VA contracts in September 2017, that verification occurred several years after the USDA and DLA contracts were awarded and was predicated on Neary's and Barton's false statements. *Id.* ¶¶ 154-56.

Defendants also rely on two regulations that empower agency contracting officers ("COs") to challenge an SDVOSB entity's status. Moving Br. at 14. (citing 13 C.F.R. § 125.27 and 48 C.F.R. § 19.307(b)(1)). But these regulations have no bearing on whether the Complaint states a claim. And once again, Defendants improperly rely on matters outside of the Complaint with respect to whether the COs took or failed to take action. In any event, there is no information (in the Complaint or otherwise) to suggest that the COs knew or had reason to know of VE Source's

---

[4]     Defendants erroneously contend that the SBA operates the SAM database for contractor self-certifications. The General Services Administration ("GSA") operates the website. Compl. ¶¶ 20 n.4, 33 & 59.

SDVOSB ineligibility. In essence, then, Defendants ask this Court to block the United States from asserting FCA claims that are predicated on Defendants' false statements because the USDA and DLA COs did not previously detect or suspect Defendants' false statements. There is no basis in law to accept this argument and, if accepted, it could thwart nearly any FCA prosecution premised on a fraudulent inducement theory.[5]

Furthermore, the Court should reject this argument because it amounts to an equitable estoppel defense and, assuming that is even a viable defense against a claim asserted by the United States, Defendants cannot point to any facts in the Complaint or elsewhere that could satisfy the high burden of asserting equitable estoppel against the government. *See Ali-Bocas v. Ashcroft*, 67 F. App'x 83, 88 (3d Cir. 2003) (explaining that "[t]he Supreme Court has never upheld equitable estoppel against the government," but has suggested that "some type of 'affirmative misconduct' [by] the government, combined with the traditional elements of equitable estoppel" would be required); *Yang v. INS*, 574 F.2d 171, 175 (3d Cir. 1978) (same).

---

[5]    Defendants cite *Heckler v. Chaney*, 470 U.S. 821 (1985), to argue that an agency's decision to not challenge VE Source's SDVOSB status "is entitled to deference." Moving Br. at 15. This argument is misguided. *Heckler* held that the FDA's decision not to take enforcement action concerning the use of certain drugs in executions was not reviewable under the Administrative Procedure Act. *Id.* at 823-27, 832-35. Aside from the fact that *Heckler* is wholly inapposite because, here, there was no actual "decision" by the COs not to protest VE Source's status, nothing in *Heckler* supports the notion that the United States is prohibited from enforcing the FCA because an agency employee, vested with discretion to act, has not done so. Furthermore, *Heckler* did not address the level of deference owed, if any, where agency inaction is predicated on a party's false statements. *Id.* at 823-25.

13

At its core, Defendants' argument is that VE Source is an SDVOSB because Defendants say it is and because they have not previously been subject to an enforcement action or administrative challenge. Accepting that argument would not only run afoul of the standard of review on a motion to dismiss, but would also frustrate Congressional intent behind the FCA, namely, to root out government fraud wherever it may be found. *See Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 128-29 (2003).

## II.    The Complaint adequately alleges that Defendants falsely self-certified VE Source's status as an SDVOSB

In arguing that the Complaint fails to allege facts showing that Defendants' falsely certified VE Source's SDVOSB status before the USDA and DLA awarded the contracts, Defendants gloss over all of the allegations establishing that VE Source's SDVOSB status was, from the outset, a fiction created to allow Neary to obtain contracts for which he was otherwise ineligible. Moving Br. at 19-20. The Complaint makes clear that Barton did not come up with the idea to form VE Source. Neary and Pao (both with long careers in the apparel industry), along with Norton, decided to form an SDVOSB. *See* Compl. ¶¶ 22-23. They recruited Barton, a service-disabled veteran lacking any experience in the apparel industry who agreed to serve as VE Source's nominal majority owner on the condition that he need not actively control the business. *Id.* ¶¶ 25-26. With Barton on board, Norton filed the paperwork to create VE Source as a legal entity. *Id.* ¶¶ 26-28.

Once formed, the Complaint alleges that Neary immediately exercised control over the company. Rather than operate out of Barton's home or in office space close

to his home, VE Source co-located with Neary's other companies in an office more than 60 miles from Barton's home, but only 6 miles from Neary's residence. *Id.* ¶¶ 34, 111-13. VE Source's name and corporate logo bear striking similarities to Vertical Source's, and at least one Vertical Source employee was paid by Vertical Source to perform work for VE Source before the USDA and DLA contract awards. *Id.* ¶¶ 34-36. Before the contract awards, Pao and Neary were responsible for VE Source's core function, namely, finding and bidding on government set-aside contracts and self-certifying VE Source as an SDVOSB. *Id.* ¶¶ 33, 37-38, 57-62. What is more, between May 18, 2012 and April 3, 2013, the VA CVE provided three detailed letters to VE Source denying VE Source's SDVOSB application to bid on VA contracts based on Barton's lack of control. *Id.* ¶¶ 47-55.

The Complaint also shows that Neary continued to exert control over VE Source after the USDA and DLA contracts were awarded: (i) Neary received substantially more in compensation from VE Source as compared to Barton, *id.* ¶¶ 97-100; (ii) Neary (individually and by and through Vertical Source) took hundreds of thousands of dollars from VE Source in the form of "loans" without any written agreement, security, interest obligations, or defined repayment terms, *id.* ¶¶ 101-10; (iii) Neary's company, Vertical Source, received hundreds of thousands of dollars from VE Source pursuant to an unwritten agreement to manage the day-to-day aspects of the DLA Contract, *id.* ¶ 123; (iv) Neary signed virtually all of the important corporate documents for VE Source and led substantive communications with VE Source's vendors and business partners, often with little or no input from

Barton, *id.* ¶¶ 134-48; (v) Neary placed substantial limitations on Barton's ability to spend VE Source's funds, *id.* ¶¶ 150-53; (vi) Neary pledged VE Source's assets without Barton's knowledge or approval and also offered up Vertical Source assets to pay VE Source's debts, *id.* ¶¶ 131, 134(g, h); and (vii) VE Source purportedly operated out of a carriage house on Neary's personal residence between 2017-2019, benefited from the free labor of other Neary employees, and shared office equipment and vendors, *id.* ¶¶ 114-20, 124-33.[6]

In sum, the Complaint shows that VE Source was formed as part of a scheme to take advantage of the SDVOSB contracting program, and that Barton did not exercise sufficient control over the day-to-day or long-term management of VE Source for it to meet the standards needed to be an SDVOSB. These allegations show that Defendants submitted or caused to be submitted false certifications regarding VE Source's SDVOSB eligibility that induced the USDA and DLA to award VE Source set-aside contracts. As established by the cases cited above, these certifications and all claims for payment resulting from the fraudulently induced contract awards, are actionable under the FCA. *See supra* at 10-11.

---

[6]     Defendants mistakenly rely on 13 C.F.R. § 125.18(e) for the proposition that the Court must "disregard" allegations concerning Defendants' post-award conduct. Moving Br. at 18-19. But that regulation does not relate to what evidence is properly considered on a motion to dismiss; rather, it ensures that an SDVOSB awarded a contract does not become ineligible by virtue of, for instance, the veteran's death or the growth of the company as a result of the contract. Notably, that regulation is also conditioned on the SDVOSB having submitted "appropriate representations and certifications" as to its status; the Complaint here alleges that those certifications were false. *Id.* § 125.18(a). Furthermore, Defendants' post-award conduct is relevant circumstantial evidence of Barton's lack of control and Neary's improper enrichment at Barton's expense.

III.     **The Complaint adequately alleges that, at a minimum, Defendants recklessly disregarded the truth of their certifications as to VE Source's SDVOSB status**

Defendants assert two arguments attacking the "knowledge" component of the Government's FCA claims. First, they argue that the Complaint does not sufficiently allege that Defendants knew that their self-certifications were false. Moving Br. at 20-22. Second, they argue that, even if the Complaint alleges Defendants' knowledge, the FCA claims are barred under the "government knowledge inference." *Id.* at 22 (citing *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 756 (3d Cir. 2017)). Both arguments are unavailing.

A.     *The Complaint's allegations are sufficient to meet the FCA's "knowledge" requirement*

Proving that a defendant acted "knowingly" under the FCA "require[s] no proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B); *accord CVS Caremark Corp.*, 875 F.3d at 760. Under the FCA, "knowledge" means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1). The FCA's legislative history shows that "reckless disregard" was intended as an extension of gross negligence to apply to the "'ostrich-like'" situations where a party "bur[ied] [its] head in the sand and refus[ed] to learn information that an individual exercising reasonable judgment would have reason to know" or where a defendant "'turned a blind eye' to the false claim." *Laymon v. Bombardier Transp. (Holdings) USA, Inc.*, No. 05-169, 2009 U.S. Dist. LEXIS 24403, at *38-40 (W.D. Pa. Mar. 23, 2009) (quoting S. Rep. No. 99-345 at 20-

17

21, and citing *United States v. Krizek*, 111 F.3d 934, 941 (D.C. Cir. 1997)). And

under Rule 9, "knowledge . . . may be alleged generally." Fed. R. Civ. P. 9(b).

Contrary to Defendants' mischaracterization that the Complaint contains

"only one, non-conclusory allegation to establish scienter," Moving Br. at 21-22, the

Complaint is replete with factual allegations showing that, at a minimum,

Defendants recklessly disregarded the truth when they repeatedly self-certified VE

Source as an SDVOSB. Although Defendants rely on *United States v. Strock*, 982

F.3d 51 (2d Cir. 2020), that case provides helpful context for assessing scienter here.

As is the case here, *Strock* involved a motion to dismiss FCA claims against a

purported SDVOSB. *Id.* at 56-57. In reversing the District Court's dismissal of that

complaint, the Second Circuit held that the Government sufficiently alleged the

requisite scienter by pointing to "facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." *Id.* at 66-67. Specifically, the

Second Circuit held that the complaint met the reckless disregard standard

because, *inter alia*, it alleged that the defendants recruited a service-disabled

veteran, provided the veteran with the necessary 51% ownership, and set up e-mail

addresses in the veteran's name to be managed by others. *Id.* at 66. In addition, the

court observed that the complaint alleged the company was set up to pursue federal

contracting opportunities, the non-veteran defendant owned the office and leased

office space to the alleged SDVOSB, and the SDVOSB made several questionable

payments to the non-veteran's other company. *Id.* at 66-67.

The scienter allegations are even stronger here than they were in *Strock*. The

18

Complaint alleges that Neary, Pao, and Norton decided to form VE Source to obtain government contracts set-aside for SDVOSBs for which Neary's other businesses were ineligible; only afterwards did they recruit Barton to serve as a nominal owner. Compl. ¶¶ 22-25. Barton agreed to participate in the scheme on the condition that he would not need to actively manage the company. *Id.* ¶ 26. When they formed VE Source, Barton and Neary knew that, for VE Source to qualify as an SDVOSB, Barton had to both own at least 51% of the business and control it. *Id.* ¶¶ 29-31. The Complaint also alleges that after VE Source co-located with Neary's other businesses and began drawing support from Neary's other businesses, one of VE Source's owners (Norton) raised concerns with Neary and Barton about VE Source's heavy reliance on Vertical Source and encouraged more separation between the companies. *Id.* ¶ 34. And each time Norton, Pao or Barton certified VE Source's SDVOSB status, they affirmatively (and falsely) represented that Barton controlled the management and daily business operations of VE Source. *Id.* ¶¶ 33, 64. On at least one such certification, on April 9, 2013, Pao certified VE Source's SDOVSB status but made it falsely appear as if Barton had personally certified the business's status. *Id.* ¶ 60.

The Complaint also alleges that between 2012 and 2013, the VA CVE explained to Defendants in three detailed letters that the firm did not qualify as an SDVOSB because of Barton's lack of control. *Id.* ¶¶ 42-55; *see supra* at 5-6 (describing the substance of the VA CVE's denial letters). VE Source received one of these letters just days before it represented itself to the USDA as an SDVOSB. *Id.*

19

¶¶ 65-70. And VE Source received all three letters before representing itself as an SDVOSB to bid on the DLA Contract. *Id.* ¶¶ 78-84. Because Defendants were on notice that VE Source was ineligible as an SDVOSB before bidding on the USDA and DLA contracts, Defendants clearly exhibited, at a minimum, reckless disregard when they falsely certified VE Source's SDVOSB status.[7]

> B. *Defendants' reliance on the "government knowledge inference" is misguided because the Complaint does not allege that the DLA or the USDA knew that VE Source's self-certifications were false*

Defendants' mistakenly assert the "government knowledge inference" to argue that, because the VA CVE denied VE Source's SDVOSB applications in 2013 and 2014, the Complaint is self-defeating on the scienter issue. Moving Br. at 22-23. The "government knowledge inference" can, in certain circumstances, be a defense to scienter allegations. It is rooted in the common-sense proposition that false statements to the government are not actionable if the government (i) had actual knowledge of the falsity from the outset and (ii) defendants were aware of the governmental knowledge. *CVS Caremark Corp.*, 875 F.3d at 756 (explaining that the inference may be asserted "when the government, with knowledge of the facts underlying an allegedly false claim, authorizes a contractor to make that claim") (quotations omitted)). But to properly assert this defense, Defendants must show that the agencies issuing the contracts (the DLA and USDA) actually knew that VE

---

[7]    As noted above, the Complaint also includes allegations concerning conduct that occurred after the contract awards but that nevertheless constitutes circumstantial evidence of Defendants' knowledge. For instance, Neary and Barton took steps to conceal the disparity in compensation paid to Neary, Compl. ¶¶ 97-110, and to misrepresent VE Source's reliance on Vertical Source. *Id.* ¶¶ 123, 155.

Source's certifications were false. *See id.* at 758-59 (discussing CMS's knowledge of certain facts and its payment of claims notwithstanding that knowledge).

Any contention that the DLA and the USDA contracting officers knew that the VA CVE denied VE Source's application for SDVOSB status for purposes of seeking VA set-aside contracts would directly contradict the allegations in the Complaint that the DLA and USDA did not know that VE Source was ineligible as an SDVOSB, Compl. ¶¶ 75-77, 89-91, and, therefore, cannot be considered in determining the adequacy of the Complaint. *Belichick*, 605 F.3d at 229 (explaining that courts "must accept all factual allegations in the complaint as true"). Further, in the absence of any allegations in the Complaint suggesting the DLA or USAD contracting officers actually knew VE Source was ineligible as an SDVOSB, it would be inappropriate to consider Defendants' extraneous and improper contentions or engage in an evaluation of government knowledge at a motion to dismiss stage. *See id.; United States ex rel. Streck v. Bristol-Meyers Squibb Co.*, No. 13-7547, 2018 U.S. Dist. LEXIS 202104, at *39-42 (E.D. Pa. Nov. 29, 2019) (rejecting government knowledge inference on a motion to dismiss where defendants relied on matters outside the complaint); *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 319 (E.D. Pa. 2017) (refusing to consider defendants' allegations of government knowledge that were not found in the complaint because "a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings").[8] To the extent

---

[8]    Defendants principally rely on *United States ex rel. Burblaw v. Orenduff*, 548 F.3d 931 (10th Cir. 2008). But that case is distinguishable because it was decided on summary judgment and was based upon "undisputed" evidence that the defendants

Defendants assert some type of constructive knowledge argument, such an expansive view of "government knowledge" lacks legal precedent and could profoundly and unjustly constrain the United States' ability to combat fraudulent conduct that spans numerous government contracts and agencies.[9]

In yet another instance of Defendants' reliance on matters outside the Complaint, Defendants seek exoneration based on a supposed on-site review purportedly conducted by the Defense Contract Management Agency ("DCMA") in 2017. Moving Br. at 10-11. As discussed above, the Court should not consider these contentions because they are not alleged in the Complaint. *Supra* at 9-10. Even so, Defendants fail to specify what the DCMA allegedly reviewed or how that review relates to VE Source's SDVOSB status when the USDA and DLA contracts were awarded; Defendants also fail to offer any competent evidence concerning the DCMA's supposed findings, relying exclusively on inadmissible hearsay. Fed. R. Evid. 801, 802; Moving Br. at 10-11.

---

were "completely forthcoming" in repeatedly disclosing "accurate" data to the U.S. Department of Education ("DoE") that should have rendered defendants ineligible for status as a minority institution, that DoE certified defendants' status notwithstanding these disclosures, and that a second agency "uncritically relied" on that certification to award certain contracts to the institution. *Id.* at 953-57. Here, by contrast, there are no allegations that (i) the USDA or the DLA knew of, or should have known of, the VA CVE's denials or that (ii) the USDA or the DLA relied (uncritically or otherwise) the VA CVE's decisions.

[9]    Defendants point to the VA CVE's September 2017 ver0ification of VE Source's SDOVSB status for VA contracts as relevant to evaluating scienter. Moving Br. at 22. But Defendants fail to mention that the Complaint alleges that Defendants procured that verification through false statements. Compl. ¶¶ 154-56 (alleging that Neary and Barton denied any reliance by VE Source on Vertical Source despite that, *inter alia*, Vertical Source managed the day-to-day aspects of the DLA Contract).

**IV.     The Complaint adequately alleges that VE Source's purported SDVOSB status was material to the contracting officers' decisions to award SDVOSB set-aside contracts**

Defendants also argue that the Complaint does not meet the *Escobar* materiality standard and consists of little more than "formulaic" and conclusory allegations. Moving Br. at 24-27 (citing *Universal Health Servs. v. United States ex rel. Escobar,* 136 S. Ct. 1989 (2016)).[10] Defendants' characterization of the Government's allegations is misguided.

Courts have long held that false statements that induce a federal agency to award a contract or grant are material for FCA purposes. *See, e.g., United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 98-99 (2d Cir. 2012) (finding false statements material to grant renewals); *Longhi*, 575 F.3d at 471-72. Although the Supreme Court refined the materiality analysis in *Escobar* with respect to implied false certification claims, courts have held that this analysis does not apply to fraudulent inducement claims. *See, e.g.*, *Scollick ex rel. United States v. Narula*, No. 14-1339, 2020 U.S. Dist. LEXIS 208604, at *28 (D.D.C. Nov. 6, 2020) ("[W]hile a contractor's undisclosed noncompliance . . . could be immaterial to the government's decision to pay that contractor, *see Escobar*, 136 S. Ct. at 2003, a fraudulent statement that secures a government contract will always be material to the government's decision to pay the contractor . . . ."); *United States ex rel. Tutanes-*

---

[10]     Defendants also assert a government knowledge inference argument here. Moving Br. at 26-27. The argument fails on this point for the same reason it fails in the context of the knowledge element, namely, there is nothing in the Complaint (or in documents properly considered on a Rule 12(b)(6) motion) to show that anyone at the USDA or the DLA knew of, or had reason to know of, the VA CVE denials.

23

*Luster v. Broker Solutions, Inc.*, No. 19-130, 2019 U.S. Dist. LEXIS 155163, at \*25-26 (C.D. Cal. July 8, 2019) ("*Escobar* speaks only to liability on an implied false characterization theory and has no obvious relevance to a promissory fraud claim that alleges false statements during the contract process, not the claim process." (quotation omitted)).[11]

Even assuming *Escobar* applies here, multiple courts have held that fraudulent statements that induce the Government to award a grant or contract satisfy the materiality analysis. *See Strock*, 982 F.3d at 65 (holding, in an SDVOSB fraudulent inducement case, "that two [*Escobar*] factors—the express nature of the eligibility condition and the substantiality of the defendants' alleged noncompliance—weigh firmly in favor of materiality"); *see also United States v. Luce*, 873 F.3d 999, 1007, 1009 (7th Cir. 2017) (holding that the Government alleged materiality for FCA purposes where defendants' false statements "were lies that addressed a foundational part of the Government's mortgage insurance regime"); *see also Miller*, 840 F.3d at 503-05; *Wavefront*, 2021 U.S. Dist. LEXIS 912, at \*21-22. The same result is warranted here.

When evaluating materiality under the *Escobar* framework, the court "look[s] to the effect on the likely or actual behavior of the recipient of the alleged

---

[11]    Applying the *Escobar* analysis to specific payment decisions in the context of a fraudulent inducement-FCA claim is also inconsistent with Congressional intent when it amended the FCA in 1986. *See* S. Rep. No. 99-345, at 9 (1986) ("[C]laims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program."); *see also id.* ("[E]ach and every claim submitted under a contract . . . was originally obtained by means of false statements or other corrupt or fraudulent conduct . . . constitutes a false claim.").

misrepresentation," 136 S. Ct. at 2002 (quotation omitted), and should conduct a "holistic" analysis "with no one factor being necessarily dispositive." *United States ex rel. Gohil v. Sanofi U.S. Servs., Inc.*, No. 02-2964, 2020 WL 4260797, at *14 (E.D. Pa. July 24, 2020) (quotation omitted); *accord United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.*, 892 F.3d 822, 831 (6th Cir. 2018) (describing *Escobar*'s materiality requirement as "holistic"). Ultimately, *Escobar*'s materiality analysis can be distilled into four factors: "(1) whether compliance with a particular statute is a condition of payment, (2) whether the violation goes to the essence of the bargain or is minor or insubstantial, and (3) whether the government pays or declines to pay similar claims when it has actual knowledge that the claims are tainted by the same kind of violation." *Gohil*, 2020 WL 4260797, at *14 (quotations omitted).

Here, the Complaint alleges that federal regulations specifically provide that companies can only obtain SDVOSB set-aside contracts if they meet the requirement of being owned and controlled by service-disabled veterans. Compl. ¶¶ 17-18. The Complaint also alleges that these regulations require that solicitations and contracts must state that "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered" and that "[a]ny award resulting from this solicitation shall be made to [an SDVOSB]." *Id.* at ¶ 21 (citing 48 C.F.R. §§ 19.1408, 52.219-27(c)). As alleged in the Complaint, (i) these provisions were included in the relevant solicitation documents, *id.* ¶¶ 65, 78; (ii) before awarding those contracts, USDA and DLA contracting officers confirmed VE Source was a certified SDVOSB,

25

*id.* ¶¶ 71, 81; and (iii) neither agency would have awarded the contracts, nor made any payments thereunder, had they known that VE Source was not a legitimate SDVOSB, *id.* ¶¶ 65, 71, 75, 78, 81, 89.

In *Strock*, the court considered similar allegations in determining whether the complaint sufficiently addressed the *Escobar* materiality factor by examining "whether the government 'expressly identif[ied] a provision as a condition of payment.'" 982 F.3d at 61 (quoting 136 S. Ct. at 2003). Noting that "materiality must also be assessed with regard to the government's decision to award contracts to [the SDVOSB] in the first instance," *Strock* found that "[b]ecause the government alleges that it expressly designated SDVOSB compliance a condition of contract eligibility, . . . this factor weighs in favor of a finding of materiality." *Id.* at 62. The Complaint here also shows the agencies' track record in pursuing civil and criminal actions against individuals and companies who defraud the SDVOSB set-aside programs. *Id.* ¶ 165; *see also id.* ¶ 19 (citing 15 U.S.C. §§ 657(d), 637(m)(5)(C), which provide that firms misrepresenting their SDVOSB status "shall be subject to" civil prosecution under the FCA).

The Complaint also alleges how Congress "established a program to promote the award of federal contracts to SDVOSBs through procurement actions that are specifically limited to firms owned and controlled by service-disabled veterans." Compl. ¶¶ 2,16. It goes on to explain that "[b]y diverting contracts and benefits intended for service-disabled veterans towards an ineligible company, Defendants undercut the express congressional purpose in enacting laws intended to encourage

26

the awards of federal contracts to SDVOSBs." *Id.* ¶ 2. *Strock* looked at similar allegations in assessing the *Escobar* materiality factor that noncompliance must be substantial, and held that they "indicate that [defendant's] noncompliance [with SDVOSB rules] was substantial from the very inception of its contracts with the government through their completion," and that "[t]he substantiality factor thus weighs strongly in favor of materiality." 982 F.3d at 65.

Defendants' attempt to distinguish *Strock* is unpersuasive. Their principal attempted distinction is that the Government allegedly knew of VE Source's noncompliance but paid VE Source anyway. Moving Br. at 26-27. Just as the Second Circuit repeatedly held in *Strock*, these contentions, which find no basis in the Complaint, should be disregarded for purposes of deciding the instant motion. *See* 982 F.3d at 63, 64, 65. To reiterate the points made above, there is no allegation in the Complaint that the USDA or DLA contractor officers knew that the VA CVE had denied the company's SDVOSB applications on three occasions or, for that matter, that anyone at VA CVE knew that VE Source had obtained DLA or USDA set-aside contracts. In short, Defendants' assertions concerning knowledge should not be considered but are in any event unavailing.

The Complaint's materiality allegations are neither "formulaic" nor conclusory, and they plainly show the importance of VE Source's false certifications to the agencies' decisions to both award the contracts and to make payments thereunder. The Court should, thus, reject Defendants' arguments on this point.

## V.      The Complaint sufficiently states facts to support common law claims for fraud, unjust enrichment, and payment by mistake

The Court should reject Defendants' arguments to dismiss the three common law claims for relief. Moving Br. at 27-30.[12] The elements of the claims for fraud, unjust enrichment, and payment by mistake are adequately pled in the Complaint.

Turning first to the claim for fraud, the Complaint alleges with particularity that Defendants knowingly misrepresented the material fact of VE Source's SDVOSB status with the intention that the agency contracting officers would rely on those misrepresentations. *See Allstate N.J. Ins. Co. v. Lajara*, 222 N.J. 129, 147 (2015); *see supra* at 4-8. The contracting officers reasonably relied on those misrepresentations. *See Allstate N.J. Ins. Co.*, 222 N.J. at 147; *see supra* at 4-8. As a result of Defendants' false statements, the USDA paid VE Source $227,470 and the DLA paid VE Source approximately $16,367,503. *See Allstate N.J. Ins. Co.*, 222 N.J. at 147; Compl. ¶¶ 73, 87. These allegations suffice to state a claim for common law fraud. *See, e.g.*, *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 318 (3d Cir. 2019) (affirming district court's decision denying motion to dismiss common law fraud claim "for the same reasons" it denied an accompanying FCA claim); *see also*

_____

[12]      The Complaint asserts a seventh claim, for alter ego liability, as between VE Source and Vertical Source. As the Defendants here have not moved to dismiss that claim in their opening brief, the Government does not address it here. But we note that the remaining Defendant, Vertical Source, Inc., separately moved to dismiss only the alter ego claim. Dkt. Entry No. 12-2. In its reply brief, Vertical Source argued, for the first time, that it would adopt all of the arguments for dismissal asserted by the Defendants here. Dkt. Entry No. 17 at 2-3. To the extent the Court allows Vertical Source to adopt these in its reply brief, the Government respectfully requests that the Court apply the arguments in this opposition brief with equal force as against Vertical Source.

*Wavefront LLC*, 2021 U.S. Dist. LEXIS 912, at *30-31.

The Complaint also states a claim for unjust enrichment. Defendants received more than $16.5 million from the USDA and the DLA to which they were not entitled. *Plastic Surgery Ctr., P.A. v. Aetna Life Ins. Co.*, 967 F.3d 218, 240 (3d Cir. 2020) (quoting *Thieme v. Aucoin-Thieme*, 227 N.J. 269 (2016)); *see also* Compl. ¶¶ 73, 87. Allowing Defendants to retain those funds would be "unjust" because the contracts at issue were set-aside for legitimate SDVOSBs and Defendants obtained them only by falsely claiming that VE Source was a bona fide SDVOSB. *Plastic Surgery Ctr., P.A.*, 967 F.3d at 240; *see also supra* at 4-8. Defendants' argument that the DLA and USDA "got what their contracts required," Moving Br. at 29, ignores the fact that those agencies bargained for contract performance by an SDVOSB and were deprived of the opportunity to award the contracts to legitimate SDVOSBs. *See* 13 C.F.R. § 125.32(a) (providing that, where a company obtains an SDVOSB set-aside contract by means of false representations, "there shall be a presumption of loss to the United States based on the total amount expended on the contract").

Lastly, the Court should allow the Government to pursue its claim for payment by mistake because the USDA and DLA "erroneously" paid VE Source based on VE Source's false certifications. *Heart Sol., PC*, 923 F.3d at 319; *see also United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp.*, No. 02-5702, 2009 U.S. Dist. LEXIS 38898, at *26-27 (D.N.J. May 7, 2009) ("The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid, and no statute is necessary to authorize the United States to sue in

such a case." (quotations and alterations omitted)).

## **CONCLUSION**

For the reasons set forth above, the United States respectfully submits that the Court should deny Defendants' motion to dismiss in its entirety. If, however, the Court grants all or part of the motion, the United States respectfully requests leave to amend the Complaint to cure any deficiencies.

Dated:        Newark, New Jersey
              March 1, 2021

Respectfully submitted,

RACHAEL A. HONIG
Acting United States Attorney

By:    */s/ David V. Simunovich*
       DAVID V. SIMUNOVICH
       MARK C. ORLOWSKI
       Assistant United States Attorneys
       *Attorneys for Plaintiff*

30