**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEW JERSEY**

---

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 20-14167 (FLW) (TJB) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CHRISTOPHER R. NEARY, SHERMAN | : | |
| BARTON, VE SOURCE, LLC, and | : | |
| VERTICAL SOURCE, INC., | : | |
| | : | |
| Defendants. | : | |

---

**WOLFSON, Chief Judge:**

The United States of America (the "Government") has filed suit against Christopher R. Neary ("Neary"), Sherman Barton ("Barton"), VE Source, LLC ("VE Source"), and Vertical Source, Inc. ("Vertical Source") (together, "Defendants") to recover damages under the False Claims Act ("FCA") for allegedly fraudulently obtaining government contracts intended for legitimate service-disabled, veteran-owned small businesses ("SDVOSBs"). Before the Court are two separate motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Neary, Barton, and VE Source (the "VE Source Defendants"), and by Vertical Source. The VE Source Defendants argue that the Government cannot state a claim under the FCA because VE Source is a legitimate SDVOSB. Vertical Source moves to dismiss the Complaint on the grounds that the Complaint does not include sufficient allegations to show that VE Source is the alter ego and mere instrumentality of Vertical Source. For the reasons set forth herein, the Motions to

1

Dismiss filed by both the VE Source Defendants and Vertical Source are **DENIED.**

I.      **BACKGROUND AND PROCEDURAL HISTORY**

      A.   *The Regulatory Framework*

The Small Business Act provides that the Government shall establish an annual goal that "not less than 3 percent of the total value of all prime contract and subcontract awards for each fiscal year" shall be awarded to "small business concerns owned and controlled by service-disabled veterans." 15 U.S.C. § 644(g)(1)(A)(ii). The Small Business Act requires all federal agencies to report to the U.S. Small Business Administration ("SBA") whether they have accomplished their annual goal for SDVOSBs. *Id.* § 644(h). Thereafter, the SBA reports to the President and Congress, as well as the public, whether the government met the goal to award contracts to firms owned and controlled by service-disabled veterans. *Id.* The Small Business Act further authorizes federal agencies to set aside the award of certain federal contracts to eligible SDVOSBs either (1) on a sole-source basis for contracts of $5 million or less for manufacturing contracts, and $3 million or less for other contracts, and (2) through competitions limited to SDVOSBs. 15 U.S.C. § 657f(a)–(b).

To implement the provisions of the Small Business Act, SBA regulations and the Federal Acquisition Regulations ("FAR") establish regulatory criteria that companies must meet to obtain contracts reserved for SDVOSBs. These regulations define an SDVOSB as a small business concern[1] "[n]ot less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock of which is

---

[1]      A "small business concern" is defined as "a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government, and qualified as a small business under the criteria and size standards in 13 CFR part 121." 48 C.F.R. § 2.101. There is no dispute that VE Source is a "small business concern" as defined.

owned by one or more service-disabled veterans; and (ii) [t]he management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a service-disabled veteran with permanent and severe disability, the spouse or permanent caregiver of such veteran."  48 C.F.R. §§ 2.101, 52.212–3 (defining service-disabled veteran-owned small business concern); *see also* 15 U.S.C. § 632 (q)(2) (same).  Under SBA regulations, "[c]ontrol by one or more service-disabled veterans means that both the long-term decisions making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans."  13 C.F.R. § 125.13(a).  Relevant here, "[i]n the case of a limited liability company, one or more service-disabled veterans . . . must serve as managing members, with control over all decisions of the limited liability company."  *Id.* § 125.13(d).

The Small Business Act provides that firms that misrepresent their status as an SDVOSB "shall be subject to" civil prosecution under the False Claims Act.  15 U.S.C. §§ 657f(d), 637(m)(5)(C).  SBA regulations require a contractor to "self-certify" that it meets the criteria of an SDVOSB.  *See* 13 C.F.R. § 125.18; 48 C.F.R. §§ 19.1403(b), 52.519-1(c)(7).  From 2009 to 2012, businesses were required to enter an annual certification as to their eligibility for SDVOSB contracts in a government database known as the Online Representations and Certifications Application ("ORCA").  From July 2012 to the present, businesses enter these certifications in the online System for Award Management ("SAM").  13 C.F.R. § 125.33(a); 48 C.F.R. §§ 4.1201, 4.1202.  They are then "are incorporated by reference into the contract."  48 C.F.R. § 52.204–19.  A contractor's self-certified status may be challenged by the contracting officer, the SBA, another bidder, or any other interested party.  *See* 13 C.F.R. § 125.27; 48 C.F.R. §§ 19.302(b), 19.307(b)(1).

While the SBA's regulations regarding SDVOSB contracting apply to most federal

agencies, the VA, in 2010, changed its process and no longer permitted its businesses to self-certify as to SDVOSB status. (Compl. ¶ 44.) As opposed to permitting self-certification, the VA requires entities to submit documentation to show their eligibility for SDVOSB status as part of an application to the VA's Center for Verification and Evaluation ("VA CVE"). 38 C.F.R. § 74.2(a). The VA CVE then reviews a company's submissions to determine whether it meets the VA's requirements for SDVOSB status. *Id.* The VA defines an SDVOSB the same as do the FAR and SBA regulations. 38 C.F.R. § 74.1. While the VA maintains this separate certification procedure, its process intersects with the SBA in several aspects. For example, the VA requires that any contractor applying for SDVOSB verification be registered in SAM, which will show the contractor's self-certification as an SDVOSB for non-VA contracts. *See* 28 C.F.R. § 74.2(f). Additionally, if the SBA determines that a contractor does not qualify as an SDVOSB, VA regulations provide that the contractor "may be immediately removed" from the VA's database of verified SDVOSBs. *See* 38 C.F.R. § 74.2(e).

### B. *Formation of VE Source*[2]

Barton is a veteran with a service-connected disability. (Compl. ¶ 14.) According to the Government, in 2009, Neary, Robert Pao ("Pao"), who at the time worked for Neary's company Vertical Source, and Ron Norton ("Norton"), a salesman for a company selling outdoor sports products to retailers, discussed options to create a business that could take advantage of government contracting opportunities, in particular those set aside for SDVOSBs. (*Id.* ¶¶ 22–23.) Because neither Neary, Pao, nor Norton were service-disabled veterans, Norton proposed forming an SDVOSB with Barton, who he knew from an auto club. (*Id.* ¶¶ 23–24.) In the summer of 2009,

---

[2]      The following facts are taken from the Complaint and assumed as true for the purposes of these Motions.

Neary, Norton, and Pao met with Barton to discuss forming an SDVOSB.  (*Id.* ¶ 25.)  At that time, Barton was employed at the VA and was nearing retirement.  (*Id.* ¶¶ 25–26.)  As such, Barton expressed that he did not want to play an active role in the proposed business.  (*Id.* ¶ 26.)  Barton was allegedly told that he would not need to take an active role in the business and would only need to be a 51% owner on paper.  (*Id.*)  Barton agreed to the arrangement.  (*Id.*)  However, Barton purportedly did not take any steps to form the business.  (*Id.* ¶ 27.)  Rather, as alleged, Norton prepared the paperwork to incorporate the business and registered VE Source as a limited liability company in Delaware in July 2009.  (*Id.* ¶¶ 27–28.)  At the time VE Source was formed, Barton was still employed by the VA and held a 51% ownership position in VE Source and the remaining 49% was split equally between Neary, Pao, and Norton with each holding a 16.33% share.  (*Id.* ¶¶ 27–28, 32.)  Shortly thereafter, Norton began registering VE Source in various government databases to begin pursuing SDVOSB set-aside contracts.[3]  (*Id.* ¶ 32.)

Once formed, VE Source and Vertical Source began sharing an office and employees.  (*Id.* ¶ 34.)  Norton apparently expressed concern to Neary, Barton, and Pao about these arrangements and suggested separating the companies.  (*Id.*)  At the time VE Source was formed, Pao was a full-time employee of Neary's company, Vertical Source.  (*Id.* ¶ 36.)  In that role, Pao was responsible for product sourcing, manufacturing, and production for both Vertical Source and VE Source and, additionally, was the main point of contact between VE Source and the Government.  (*Id.*)  In particular, Pao was responsible for identifying government business opportunities and determining if they were worth bidding, drafting proposals, and submitting them on behalf of VE Source.  (*Id.*

---

[3]     For example, on November 5, 2009, Norton filed a certification on ORCA, in which he allegedly falsely "attest[ed] to the accuracy of the representations and certifications contained [therein]," including certifying that a service-disabled veteran controlled the management and daily business operations of VE Source.  (*Id.* ¶ 33.)

¶ 37.)  Neary was heavily involved in VE Source's day-to-day business operations and controlled the company's books and records.  (*Id.* ¶ 38.)  For example, Neary handled all the bills and finances until VE Source began paying Charles Moran, a Vertical Source employee, to serve as VE Source's bookkeeper.  (*Id.*)

### C.  *SDVOSB Certification*

In 2010, VE Source began the process to obtain SDVOSB set-aside contracts from the VA.  (*Id.* ¶ 42.)  In that connection, on June 2, 2010, VE Source self-certified as an SDVOSB with the VA.  (*Id.* ¶ 43.)  That status was valid for one year.  (*Id.*)  In late 2010, the VA changed its process and no longer permitted businesses to self-certify their SDVOSB status.  (*Id.* ¶ 44.)  Instead, the VA began requiring entities to submit documentation to show their eligibility for SDVOSB status as part of an application to the VA CVE.  (*Id.* (citing 38 C.F.R. § 74.2(a) (2010–2018).)  On March 2, 2012, VE Source applied to the VA CVE to be verified as an SDVOSB.  (*Id.* ¶ 46.)  Neary and Barton were primarily involved in submitting the application to the VA CVE.  (*Id.*)

By letter dated May 18, 2012, the VA CVE denied VE Source's application for verification as an SDVOSB, concluding that while Barton was a service-disabled veteran, he did not control the business.  (*Id.* ¶ 47.)  Specifically, the VA CVE pointed to the following findings to support its denial of VE Source's application:

> *First*, the VA CVE observed that VE Source's Operating Agreement imposed restrictions on Barton's ability to freely transfer his ownership interest because Article IV, Section 2 of that agreement required unanimous consent of all other owners of the business in order to effectuate that transfer.
>
> *Second*, VE Source's 2010 K-1 documents . . . showed that Barton did not receive 51% of the profits and that, in fact, the four owners received equal distributions.
>
> *Third*, the VA CVE noted that both Pao and Neary each had

extensive experience in the management of clothing businesses, whereas Barton lacked any experience.

*Fourth*, the VA CVE noted that VE Source's Operating Agreement required attendance of all owners of the business, meaning that Barton was unable to hold a meeting and take a vote without the consent of the non-veteran minority owners.

*Fifth*, the VA CVE observed that VE Source was co-located with Vertical Source, and that Neary was both an owner of VE Source and a founder and president of Vertical Source.

(*Id.* ¶ 48.)  On June 12, 2012, VE Source submitted a request to the VA CVE for reconsideration of its denial of verification.  In that request, VE Source responded to each of the VA CVE's five findings, explaining that (1) restrictions on Barton's control of the company in the Operating Agreement were standard provisions to protect minority shareholders, (2) there were errors in the K-1 forms which had been corrected, (3) although he lacked experience in the apparel industry, Barton did have some additional managerial experience that was not previously disclosed, (4) the requirement of full attendance at a VE Source shareholder meeting could be overturned by Barton if the other owners skipped two or more meetings, and (5) the VA CVE placed too much weight on the fact that VE Source and Vertical Source shared office space.  (*Id.* ¶ 51.)

On December 4, 2012, the VA CVE denied VE Source's request for reconsideration based on "a review and evaluation of the original file, the Request for Reconsideration and accompanying documents submitted to CVE."  (*Id.* ¶ 53.)  Specifically, the VA CVE found that while the new information provided showed that Barton was capable of managing VE Source, VE Source had failed to show that Barton was its "managing member," that he "holds the highest position" in the company, or what his role and responsibility was within the company.  (*Id.* ¶ 54.)  On January 2, 2013, VE Source filed a second request for reconsideration, which explained that VE Source amended its operating agreement to address the issues identified in the December 4, 2012 denial.

(*Id.* ¶ 54.)  On April 3, 2013, the VA CVE denied the second request for reconsideration based on the control that Neary appeared to exert over VE Source, pointing to the fact that VE Source and Vertical Source shared office space, were in the same line of business, used similar logos, and that the two non-service-disabled veteran members of VE Source (Neary and Pao) were also Vertical Source employees and performed the same functions for Vertical Source as for VE Source.  (*Id.* ¶ 55.)

In order to bid on set-aside contracts offered by federal agencies other than the VA, VE Source apparently accessed online certification programs to certify that it was an eligible SDVOSB.  Specifically, between 2009 and January 2012, VE Source certified its SDVOSB status on ORCA 4 times.  (*Id.* ¶¶ 58–59.)  Thereafter, GSA migrated its online certification from ORCA to SAM.  (*Id.* ¶ 59.)  Accordingly, Pao self-certified VE Source as an SDVOSB on SAM on April 9, 2013.  (*Id.* ¶ 60.)  Confirmation of that certification was sent to Pao's email address which ended in "@verticalapparel.com" and was the same email address he used for Vertical Source business. (*Id.*)  Although Pao logged into SAM to complete that certification, he included Barton's name on the certification, allegedly making it appear as if Barton certified the company's SDVOSB status. (*Id.*)  According to the Government, Pao was the only person who, on behalf of VE Source, logged into SAM between 2011 and February 2015 to certify VE Source as an SDVOSB.  (*Id.* ¶ 60.)  The Government alleges that both Barton and Neary were aware of these certifications prior to 2015. (*Id.* ¶¶ 61–62.)  SAM records demonstrate that Barton logged in to certify VE Source as an SDVOSB for the first time on July 5, 2016.  (*Id.* ¶ 63.)

According to the Government, Pao and Barton falsely certified on SAM that VE Source qualifies as a "service-disabled veteran-owned small business concern."  (*Id.* ¶ 64.)  That term is defined by the SAM certification form as "a small business concern – (i) [n]ot less than 51% of

which is owned by one or more service-disabled veterans . . . and (ii) [t]he management and daily business operations of which are controlled by one or more service-disabled veterans." (*Id.*) With the exception of a lapse between December 12, 2019 and January 29, 2020, VE Source continuously maintained its SDVOSB self-certification on SAM. (*Id.*)

### D. *The USDA and DLA Contracts*

As a result of VE Source's self-certification as a SDVOSB, it applied for, and received, two set-aside contracts with federal agencies. First, in August 2012, VE Source was awarded a contract with the U.S. Department of Agriculture ("USDA"), Food Safety and Inspection Service, Procurement Management Branch, in Beltville, Maryland, for provision of aprons and apron strings (the "USDA Contract"). (*Id.* ¶ 65.) The solicitation expressly provided that the procurement was set aside for award only to SDVOSBs. (*Id.*) Pao was primarily responsible for submitting the USDA bid, and he received permission from Barton and Neary to do so. (*Id.* ¶ 66.) Neary allegedly prepared the cost analysis, *i.e.*, the analysis of how much it would cost VE Source to deliver the products, and Pao prepared the rest of the response. (*Id.*) As alleged, Barton and Neary knew that the USDA contract was set aside for SDVOSB entities and that Pao had represented VE Source to be an SDVOSB in order to obtain the contract. (*Id.* ¶ 67.) Notably, however, VE Source submitted its bid on the USDA contract as a self-certified SDVOSB in ORCA weeks after receiving the VA CVE's May 2012 decision denying SDVOSB status to VE Source. (*Id.* ¶ 68.) The USDA Contract was a one-year contract, with 4 one-year renewal options. (*Id.*) The USDA exercised its option to extend the contract each year from 2013 to 2016. (*Id.*) Between 2012 to 2017, VE Source submitted 14 invoices to the USDA for payment, causing the USDA to pay VE Source $227,470 in connection with the USDA Contract.

In April 2014, the Defense Logistics Agency Troop Support office ("DLA") issued a

solicitation for bids for flame-retardant coveralls for the U.S. Navy, the procurement of which was set aside for award only to SDVOSBs. (*Id.* ¶ 78.) After allegedly obtaining Barton's and Neary's consent to bid, Pao prepared a submission in response to the DLA's solicitation. (*Id.* ¶ 79.) After the contracting officer determined that VE Source self-certified its eligibility as an SDVOSB in SAM, DLA awarded the contract to VE Source on September 19, 2014 (the "DLA Contract"). (*Id.* ¶ 81.) The DLA Contract was a one-year contract with 4 one-year extensions. (*Id.* ¶ 86.) DLA exercised its option to extend the contract each year between 2015 and 2019. (*Id.*) With respect to the DLA Contract, Pao and a VE Source contractor working in Puerto Rico requested payment on behalf of VE Source by presenting 166 invoices through the Department of Defense's "Wide Area Workflow" website. (*Id.* ¶ 87.) As a result of these invoices, the Department of Defense made more than 3,000 separate payments to VE Source between February 3, 2015 and October 28, 2019, totaling approximately $16,367,503.15 for work performed in connection with the DLA Contract. (*Id.*)

### E.  *Neary's Ownership Interest Increases*

In 2011, Norton exited VE Source and relinquished his ownership interest in the company. (*Id.* ¶ 92.) Pao and Neary equally split Norton's share, with each increasing their ownership shares from 16.33% to 24.5%. (*Id.*) Norton was not paid for his shares of the company when he left the business, and Barton did not receive any part of Norton's ownership interest in the company. (*Id.*) Thereafter, in 2015, Pao exited the business, leaving Neary and Barton as the two remaining owners. (*Id.* ¶ 93.) Upon his departure, Pao received $85,000 in compensation from VE Source. (*Id.*) Neary received all of Pao's ownership interest in VE Source, increasing his ownership interest to 49%. (*Id.* ¶ 94.) Barton did not receive any of Pao's ownership interest, nor did Neary pay Barton for those shares upon Pao's departure. (*Id.*)

### F.  *Neary's Control of VE Source*

A fundamental part of the Government's FCA claims is the theory that Neary, in fact, exerted control over VE Source.  In support, the Government highlights the following, which it alleges demonstrates Neary's "excessive control" over VE Source:

      a.      Neary earned far more in compensation than Barton and took unreasonable "loans from VE Source.  Between 2015 and 2019, Neary took substantially more in total compensation from VE Source than Barton.  Furthermore, Neary and Vertical Source took excessive "loans" from VE Source, with the balance of those loans at times approaching $1 million.  Neary and Vertical Source took these "loans" from VE Source without any written agreement, security, interest obligations, or defined repayment terms.

      b.      VE Source co-located with the Neary Companies and then operated out of Neary's home: Between 2010 and 2017, VE Source was co-located with the Neary Companies.  And between 2017 and 2019, VE Source moved into space at Neary's personal residence.

      c.      VE Source paid Vertical Source to manage the DLA Contract, shared office equipment, employees and vendors with the Neary Companies, and Neary created a holding company to manage VE Source: Beginning in 2015, VE Source paid Vertical Source to manage the day-to-day aspects of its work under the DLA contract. Employees of the Neary Companies also occasionally performed work for VE Source without being compensated by VE Source.  VE Source and Vertical Source used the same professional services providers and consultants and also shared office equipment.  In or around 2016, Neary created a holding company owned by him, Moran and a third party that was intended to control VE Source as well as the Neary Companies.

      d.      Neary signed virtually all important corporate documents for VE Source, made other important business decisions, and led substantive communications with manufacturers with little or no input or oversight from Barton: Neary was responsible for signing virtually all significant, legally binding documents on behalf of VE Source. On at least two occasions, Neary signed written agreements that pledged all or a substantial amount of VE Source's assets without Barton's pre-approval.  Representatives from VE Source's most important business partners (i.e., the companies who

manufactured the apparel that VE Source sold to the Government) uniformly describe Neary as their primary point of contact and the person they understood to be in control of VE Source.

e.   Neary placed Limits on Barton's Corporate Spending power: Concerned with Barton's potential to spend too much of VE Source's capital, Neary asked Barton to sign an agreement limiting Barton's ability to spend VE Source funds.  This limited Barton's "authority to make unilateral decisions" on behalf of VE Source to issues involving less than $1,000.

(*Id.* ¶ 96.)

### G.  *2017 Application to the VA CVE*

In 2017, VE Source again applied to the VA CVE to become certified as a SDVOSB with the VA.  (*Id.* ¶ 154.)  On July, 27, 2017, the VA CVE again denied VE Source's application for recertification as an SDVOSB entity because there was an appearance of undue reliance by VE Source on Neary and Vertical Source.  (*Id.*)  VE Source requested reconsideration of that decision and submitted documentation to the VA CVE.  (*Id.* ¶ 155.)  Specifically, Neary submitted a letter stating that there is no relationship between VE Source and Vertical Source, and Barton submitted a statement explaining that "VE Source is capable and does operate completely on its own" and that Vertical Source does not support VE Source in any way.  (*Id.*)  However, according to the Government, at the time Barton and Neary submitted these affirmations, VE Source had hired Vertical Source to manage all aspects of the DLA Contract, employees of Vertical Source provided services to VE Source free of charge, and Neary had create the Vertical Holdings company to control VE Source.  (*Id.*)  Nevertheless, on September 21, 2017, the VA CVE certified VE Source as a SDVOSB for purposes of bidding on VA set-aside contracts.  (*Id.* ¶ 156.)

### H.  *The Complaint*

The Government filed the instant Complaint on October 9, 2020, asserting seven claims

and naming Neary, Barton, VE Source and Vertical Source as Defendants.  In Counts One and Two, the Government asserts that each Defendant is liable for violating the FCA, 31 U.S.C. §§ 3729(a)(1)(A), 3729(a)(1)(B).  Count Three alleges that Neary and Barton conspired to defraud the Department of Defense and the USDA by obtaining government contracts set-aside for SDVOSBs, and by submitting invoices for payment to those agencies for reimbursement, despite their knowledge that VE Source was not eligible as an SDVOSB, in violation of 31 U.S.C. § 3729(a)(1)(C).  (*Id.* ¶¶ 174–78.)  In Counts Four, Five, and Six, the Government asserts claims of common law fraud, unjust enrichment, and payment by mistake against all Defendants.  (*Id.* ¶¶ 179–90.)  Finally, in Count Seven, the Government asserts a claim of alter ego against Vertical Source.  (*Id.* ¶¶ 191–92.)

## II.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss on the pleadings, courts "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quotations omitted).  Under such a standard, the factual allegations set forth in a complaint "must be enough to raise a right to relief above the speculative level."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

13

However, Rule 12(b)(6) only requires a "short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. The complaint must include "enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips*, 515 F.3d at 234 (citation and quotations omitted); *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) ("[A] claimant does not have to set out in detail the facts upon which he bases his claim. The pleading standard is not akin to a probability requirement; to survive a motion to dismiss, a complaint merely has to state a plausible claim for relief." (citation and quotations omitted)).

In sum, under the current pleading regime, when a court considers a dismissal motion, three sequential steps must be taken: first, "it must take note of the elements the plaintiff must plead to state a claim." *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quotations omitted). Next, the court "should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quotations omitted). Lastly, "when there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quotations and brackets omitted).

An FCA complaint must also meet Fed. R. Civ. P. 9(b)'s heightened pleading standard. *See United States. ex rel. Petras v. Simparel, Inc.*, 857 F.3d 497, 502 (3d Cir. 2017). In general, Rule 9(b) requires a plaintiff "to plead fraud with particularity, specifying the time, place and substance of the defendant's alleged conduct." *United States ex rel. LaCorte v. SmithKline*

*Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998); *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (holding that a plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud) (citation omitted).  In the FCA context, however, a plaintiff must provide only "particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted."  *Foglia v. Renal, Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014).  A plaintiff need not show "the exact content of the false claims in question," as "requiring this sort of detail at the pleading stage would be one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates."  *Foglia*, 754 F.3d at 156 (quotations and citation omitted).

## III.   DISCUSSION

### A.   *The VE Source Defendants' Motion to Dismiss*

#### 1.   <u>*The False Claims Act*</u>

"[T]he FCA makes it unlawful to knowingly submit a fraudulent claim to the government." *United States ex rel. Schumann v. Astrazeneca Pharm. L.P.*, 769 F.3d 837, 840 (3d Cir. 2014). Relevant here, it is unlawful for any person to "knowingly present[] or cause[] to be presented, a false or fraudulent claim for payment or approval"; "knowingly make[], use[], or cause[] to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)–(B).  Conspiring to violate section 3729(a)(1)(A) or (a)(1)(B) constitutes a separate violation of the FCA.  31 U.S.C. § 3729(a)(1)(C).  "Although the focus of the False Claims Act is on false 'claims,' courts have employed a fraudulent inducement theory to establish liability under the Act for each claim submitted to the government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves."  *United States ex*

15

*rel. Thomas v. Siemens AG*, 593 F. App'x 139, 143 (3d Cir. 2014); *see also United States v. Veneziale*, 268 F.2d 504, 505 (3d Cir. 1959) (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943) ("[A] fraudulently induced contract may create liability under the False Claims Act when the contract later results in payment thereunder by the government, whether to the wrongdoer or someone else.") (superseded by statute)).

Here, the Government's FCA claims against the VE Source Defendants are premised on a fraudulent inducement theory of liability. To state a claim for fraudulent inducement under the FCA, a plaintiff must allege that "(1) there was a knowingly false or fraudulent statement; (2) that the statement was material; and (3) that it caused the government to pay out money or to forfeit moneys due (*i.e.*, a "claim")." *Siemens AG*, 593 F. App'x at 143; *see also United States. ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir. 2004); *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001). I address each element in turn.

## 1. *Falsity*

The VE Source Defendants begin by arguing that the Government fails to plead falsity because it does not allege that the VE Source Defendants falsely represented VE Source to be an SDVOSB to either the USDA or the DLA.[4]

---

[4]     The VE Source Defendants additionally contend that the Complaint should be dismissed because VE Source is, and always has been, an SDVOSB, according to both the Small Business Administration ("the SBA") and the VA. The VE Source Defendants highlight that from 2010 to 2020, VE Source self-certified itself as an SDVOSB; and its status was never challenged by the SBA, the USDA, or the DLA. In that connection, the VE Source Defendants maintain that "[t]he refusal of the SBA (and the USDA and DLA) to challenge VE Source's SDVOSB status when its regulations permitted a challenge is evidence that the SBA (and the USDA and the DLA) believed VE Source to be an SDVOSB." (VE Source Br., at 15.) As a matter of law, there is no merit to this position. First, while the VE Source Defendants maintain that the SBA certified VE Source as an SDVOSB, it did not. Rather, the VE Source Defendants *self-certified* VE Source as an SDVOSB from 2009 through 2016. (*See* Compl. ¶¶ 20, 33, 58–64.) The VE Source Defendants cannot rely on these self-certifications, which the Government contends were false, to insulate themselves from liability under the FCA. Nor can the VE Source Defendants be immune from

"Under the theory of fraudulent inducement, either express false statements or fraudulent omissions in [bids] can constitute false or fraudulent statements under the FCA." *Smith v. Carolina Med. Ctr.*, 274 F. Supp. 3d 300, 312 (E.D. Pa. 2017); *see also United States ex rel. Morsell v. Symantec Corp.*, 471 F. Supp. 3d 257, 296 (D.D.C. 2020) (explaining that liability may arise under the FCA where "false statements induced the government to make the initial contract or caused it to agree on particular contract terms or modifications." (quoting *United States v. DynCorp Int'l, LLC*, 253 F. Supp. 3d 89, 105 (D.D.C. 2017))); *see also Scollick ex rel. United States v. Narula*, No. 14-1339, 2020 WL 6544734, at *9 (D.D.C. Nov. 6, 2020).  Thus, in assessing the Complaint's allegations of falsity, the Court's analysis must focus on the representations made by the VE Source Defendants when they applied for the USDA and DLA contracts.  In other words, I must determine whether the Complaint plausibly alleges that the VE Source Defendants falsely certified to the USDA and DLA  that VE Source was an SDVOSB in the Summer of 2012 and May 2014, respectively.[5]

The VE Source Defendants argue that the Complaint contains only two factual allegations which challenge VE Source's SDVOSB status prior to 2015: (1) the reasons cited by the VA to

---

liability under the FCA simply because the SBA, USDA, and DLA did not previously detect, suspect, or investigate whether the Individual Defendants had made false statements in their self-certifications.  Indeed, to accept this line of argument would undermine the Government's ability to bring FCA claims under a theory of fraudulent inducement in this context.

[5]     The Government does not dispute that Barton is, in fact, a majority owner of VE Source. The Government, however, alleges that Barton did not control the management or daily operations of VE Source, as required under 13 C.F.R. § 125.13(a).  Accordingly, to determine if the Complaint sufficiently alleges falsity, I must examine whether the allegations contained in the Complaint plausibly allege that, at the time VE Source submitted its bid for the USDA and DLA contracts, Barton did not control the management or day to day operations of VE Source.

support its denial of VE Source's application for SDVOSB certification in 2012 and 2013[6] and (2) the fact that VE Source was co-located with Vertical Source.  (VE Source Defs.' Br., at 19–20.) The VE Source Defendants, however, take a far too narrow reading of the Complaint.  The Complaint alleges a scheme between Neary and Pao, which began in 2009, to form an SDVOSB to take advantage of set-aside contracts for which they recruited Barton, a service-disabled veteran, to serve as the nominal majority owner—on the condition that he need not actively control the business.  (Compl. ¶¶ 22–23.)  Once VE Source was formed, the Complaint alleges that Neary retained control over the business, prepared the paperwork to incorporate the business, registered VE Source as a limited liability company in Delaware, and filed a self-certification on ORCA as to VE Source's SDVOSB status.  (Id. ¶¶ 27–33.)  The Complaint alleges that Pao, a Vertical Source employee, "was responsible for product sourcing, manufacturing and production for both Vertical Source and VE Source," and was the main point of contact between VE Source and the Government."  (Id. ¶ 36.)  Moreover, Neary controlled the company's books and records and

---

[6]     The VE Source Defendants argue that the VA's findings should not bear upon VE Source's status as an SDVOSB in the eyes of the SBA.  I disagree.  First, in support of this position, the VE Source Defendants rely on *Veterans Contracting Group, Inc. v. United States*, 135 Fed. Cl. 610, 618–19 (Fed. Cl. 2017), *aff'd* 920 F.3d 801 (Fed. Cir. 2019).  There, the plaintiff, a business that had been certified by the VA as an SDVOSB, was disqualified by the SBA as an SDVOSB.  *Id.* at 612.  Following the issuance of the SBA's decision, the VA removed plaintiff from the VA database of SDVOSBs that were eligible to compete for VA procurement set-asides.  *Id.*  The plaintiff challenged that determination in the Court of Federal Claims.  *Id.*  In finding that the VA erroneously removed plaintiff from the SDVOSB database, the court reasoned that because the VA and SBA regulations contain distinct definitions of the term "unconditional ownership," which was relevant to whether plaintiff qualified as an SDVOSB, the VA was required to "look beyond the fact of a ruling by SBA" and determine whether plaintiff qualified as an SDVOSB under VA regulations.  *Id.* at 618–19.  In other words, the court found that the VA acted arbitrarily and capriciously in removing plaintiff from its database without considering the specific question of whether plaintiff was an SDVOSB under VA's own regulations. *See id.*  That is not the situation here.  Here, the Government relies on the factual grounds for the VA's denial of VE Source's application as additional *factual* support for its claim that VE Source did not, at the time it bid on the USDA and DLA contracts, qualify as an SDVOSB.

handled all the bills and finances until VE Source began paying a Vertical Source employee, Charles Moran, to serve as VE Source's bookkeeper.  (*Id.* ¶ 38.)  Further evidencing the lack of control exercised by Barton is the Complaint's allegation that both Pao and Neary had extensive experience in the management of clothing businesses, whereas Barton lacked any such experience. (*Id.* ¶ 48.)  These factual allegations all support falsity, as they plausibly allege that Barton lacked control over VE Source and, therefore, the company could not qualify as an SDVOSB.

Moreover, the Government's allegations regarding the co-location of VE Source with Vertical are relevant to the issue of falsity.  The Government alleges that VE Source was co-located with Vertical Source, at a location more than 60 miles from Barton's residence.  (*Id.* ¶¶ 111–13.) The SBA regulations create a "rebuttable presumption that a service-disabled veteran does not control the firm if that individual is not located within a reasonable commute to firm's headquarters and/or job-sites locations, regardless of the firm's industry.  The service-disabled veteran's ability to answer emails, communicate by telephone, or to communicate at a distance by other technological means, while delegating the responsibility of managing the concern to others is not by itself a reasonable rebuttal."[7]  13 C.F.R. § 125.13(l).  The VE Source Defendants attempt to minimize this particular allegation by arguing that this condition was "deemed immaterial to VE Source's SDVOSB status when the [VA] later certified the company."  (Reply Br., at 6.)  While the VA, in 2017, may have discounted the co-location of VE Source and Vertical Source, that determination is not dispositive of VE Source's status as an SDVOSB when it bid on the USDA

---

[7]      13 C.F.R. § 125.13(i) further provides creates a "rebuttable presumption that non-service-disabled veteran individuals or entities control or have the power to control a firm in any of the following circumstances," including "[i]n circumstances where the concern is co-located with another firm in the same or similar line of business, and that firm or an owner, director, officer, or manager, or a direct relative of an owner, director, officer, or manager of that firm owns an equity interest in the concern."  13 C.F.R. § 125.13(i)(3).  Those circumstances are alleged here.

and DLA contracts in 2012 and 2014, respectively.

Taking these allegations as true, I find that the Government has plausibly alleged that the VE Source Defendants falsely self-certified VE Source as an SDVOSB with the SBA in 2012 and 2014. The Complaint alleges that Neary and Pao formed VE Source with Barton to take advantage of the SDVOSB contracting program and that Barton did not exercise control over the day-to-day management of VE Source for it to meet the requirements of an SDVOSB. The VE Source Defendants, nevertheless, continued to submit certifications to the SBA, as well as the USDA and DLA, that VE Source qualified as an SDVOSB. This is sufficient to allege falsity.

## 2. *Knowledge*

The VE Source Defendants next contend that the Complaint fails to allege that they knowingly submitted false claims to the Government. The FCA defines "knowingly" as "acting with actual knowledge, deliberate ignorance, or reckless disregard of information's truth or falsity." *U.S. Dep't of Transp. ex rel. Arnold v. CMC Engineering*, 567 F. App'x 166, 169–70 (3d Cir. 2014) (citing 31 U.S.C. § 3729(b)(1)(A)). The Act does not, however, require specific intent to defraud. *Id.* (citing 31 U.S.C. § 3729(b)(1)(B)). Moreover, "[c]onsistent with the need for a knowing violation, the FCA does not reach an innocent, good-faith mistake about the meaning of an applicable rule or regulation. Nor does it reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *United States v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018) (quoting *United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287–88 (D.C. Cir. 2015)). While Rule 9(b) permits "knowledge . . . and other conditions of a person's mind [to be] alleged generally," Fed. R. Civ. P. 9(b), plaintiffs "still must plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (citation omitted). Thus, "[t]he requisite strong inference of fraud

may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (citation omitted).

Taking the allegations set forth in the Complaint as true, I find that the Government has sufficiently alleged that, at a minimum, the VE Source Defendants acted with reckless disregard for the truth when they repeatedly self-certified their SDVOSB status to the SBA. Specifically, the Government alleges that Neary, Pao, and Norton approached Barton to serve as a nominal owner of VE Source in order to obtain government contracts set-aside for SDVOSBs. (Compl. ¶¶ 22–25.) According to the Government, Barton agreed to the scheme only on the condition that he would not need to manage the company. (*See id.* ¶ 26.) However, at the time VE Source was formed and bid on the USDA and DLA contracts, both Barton and Neary allegedly were aware that for VE Source to qualify as an SDVOSB, Barton had to both own at least 51% of the business and control it. (*Id.* ¶¶ 29–31.) Moreover, in 2012 and 2013, the VA CVE repeatedly explained to the VE Source Defendants that VE Source did not qualify as an SDVOSB because of Barton's lack of control over the business. (*See id.* ¶¶ 42–55.) One of the letters setting forth in detail why VE Source did not qualify as an SDVOSB was received by the VE Source Defendants on June 12, 2012, shortly before VE Source represented itself to the USDA as an SDVOSB. (*Id.* ¶¶ 65–70.) By the time VE Source submitted its bid for the DLA Contract, the VA had denied its application for SDVOSB status three times. (*Id.* ¶¶ 48 (May 18, 2012 denial), 53 (December 4, 2012 denial), 55 (April 3, 2013 denial).) These allegations demonstrate that the VE Source Defendants, at the very least, recklessly disregarded that VE Source did not qualify as an SDVOSB and continued to hold itself out as an SDVOSB to the SBA. Courts have found similar allegations sufficient to meet the reckless disregard standard. For example, in *United States v. Strock*, 982 F.3d 51 (2d Cir.

2020), the Second Circuit reversed the District Court's dismissal of an FCA complaint against a purported SDVOSB, finding that the Government sufficiently alleged the requisite scienter by pointing to "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at 66–67.  Specifically, the *Strock* court held that the complaint met the reckless disregard standard because, *inter alia*, it alleged that the non-veteran defendant recruited a service-disabled veteran to make it appear as though the business was an SDVOSB and set up an email address in the service-disabled veteran's name to be managed by other employees. *Id.*  Further, the Second Circuit highlighted that the non-veteran defendant had "motive and opportunity to commit fraud" as he stood to benefit directly from VECO's success, and had the wherewithal to do so." *Id.* at 67.  Here, the same types of allegations are lodged in the Complaint.

Defendants, nonetheless, submit that the Government's allegations of scienter are insufficient.  Specifically, Defendants submit that VE Source's history with the VA reflects that the VE Defendants "truly believed that the company was an SDVOSB."  (VE Source Defs.' Br., at 21.)  Defendant's argument, however, merely raises a dispute of fact that cannot be resolved on a motion to dismiss.  *See United States ex rel. Perri v. Novartis Pharms. Corp.*, No. 15-6547, 2019 WL 6880006, at *18 n.21 (D.N.J. Feb. 21, 2019) ("Courts generally avoid scienter determinations at the pleading stage.").  In other words, by alleging that the VE Source Defendants always believed the company was an SDVOSB, they simply present an alternative theory of the facts presented by the Government.  The Court cannot make such a factual determination at this time.

In a final attempt to challenge the Government's allegations of scienter, the VE Source Defendants contend that the government knowledge inference negates scienter here.  The Third Circuit has explained that "[t]he government knowledge inference may arise 'when the government knows and approves of the facts underlying an allegedly false claim prior to

presentment' and the defendant knows that the government is aware of the false information in a claim.'"  *United States ex rel. Spay v. CVS Caremark Corp.*, 875 F.3d 746, 756 (3d Cir. 2017) (quoting *United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 (10th Cir. 2008)).  In other words, the "government knowledge inference" can preclude liability where "(1) the government agency knew about the alleged false statements, and (2) the defendant knew the government knew."  *Id.*  Importantly, however, "'mere awareness of allegations concerning noncompliance with regulations is different from knowledge of actual noncompliance,' and even actual knowledge that certain requirements were violated 'is not dispositive.'"  *Smith*, 274 F. Supp. 3d at 319 (quoting *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 110–12 (1st Cir. 2016)); *see also Spay*, 875 F.3d at 757 (noting that "knowledge alone on the part of the government is insufficient to establish an FCA defense").

The VE Source Defendants argue that because the VA CVE denied VE Source's SDVOSB applications in 2012 and 2013, the Government was in possession of all the facts underlying VE Source's allegedly false claims.  Specifically, the VE Source Defendants highlight that they were required to provide extensive documentation to the VA as part of VE Source's application for SDVOSB status.[8]  In that connection, the VE Source Defendants maintain that "it is immaterial

---

[8]      The VE Source Defendants further submit that the VA was not the only agency with extensive knowledge of VE Source's operations, claiming that a Defense Contract Management Agency ("DCMA") compliance officer performed a site visit to VE Source in 2017 and was "totally satisfied with the working arrangement that they found VE Source performing under." (O'Neill Cert., Ex. B.)  At the outset, the Court cannot consider this contention as it relies on information not set forth in the complaint.  *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (explaining that on a Rule 12(b)(6) motion, courts "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents"); *Smith*, 274 F. Supp. 3d at 319 (declining to dismiss complaint under government knowledge doctrine based on "the fundamental procedural rule that 'a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings'").  Moreover, even if the Court were to consider this fact, the VE

that the VA was the immediate possessor of the information while VE Source's self-certifications went to the SBA and its claims to the USDA and DLA."[9]  (VE Source Defs.' Br., at 23.)  However, in order for the government knowledge doctrine to apply, the agency that accepts the allegedly false claims must be the one to have knowledge of the claims' falsity.  *See CVS Caremark*, 875 F.3d at 758–59 (discussing evidence that showed that the Center for Medicaid Services knew that defendant submitted false claims).  Here, there are no allegations in the Complaint which would suggest that the SBA, USDA, or DLA knew that VE Source had allegedly fraudulently certified its SDVOSB status or included allegedly false information.   Indeed, to accept VE Source's argument—that the Government knew it falsely certified its SDVOSB status and that the VE Source Defendants knew of the Government's knowledge—would require the Court to draw inferences against the Government.  *See Smith*, 274 F. Supp. 3d at 319.  Such is not permitted on a motion to dismiss.  Rather, taking the allegations of the Complaint as true and making all reasonable inferences in the Government's favor, I cannot at this time find that the government knowledge doctrine negates scienter.  *See id.*

---

Source Defendants fail to explain how a DCMA site visit in 2017 relates to, or impacts, VE Source's SDVOSB status when the USDA and DLA contracts were awarded.

[9]     The VE Source Defendants rely on the Tenth Circuit's decision in *Burlbaw*, 548 F.3d at 952, to support this position.  That case, however, is easily distinguished.  In *Burlbaw*, the Tenth Circuit affirmed the district court's grant of summary judgment based on its finding that the government knowledge doctrine negated scienter.  There, it was undisputed that the defendants were completely forthcoming with the Department of Education ("DOE") and repeatedly disclosed information that should have rendered defendants ineligible for status as a minority institution.  *Id.* at 953.  The DOE, however, certified the university's status notwithstanding these disclosures and the Department of Defense "uncritically relied" on that certification to award certain contacts to the university.  *Id.* at 953–57.  Here, by contrast, there are no allegations that the USDA or DLA relied on the VA's decision to deny VE Source's application for SDVOSB certification; nor is there any indication that the USDA or DLA should have known of the VA's denial.

### 3. *Materiality*

Finally, the VE Defendants contend that the Complaint fails to allege that any misrepresentation made by VE Source was material to the Government's payment decisions. Indeed, not all false or fraudulent statements are actionable under the FCA. *See United States v. Board of Educ. of City of Union City*, 697 F. Supp. 167, 174 (D.N.J. 1988); *United States v. Greenberg*, 237 F. Supp. 439, 442 (S.D.N.Y. 1965). False statements must also be material, meaning they must "hav[e] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

The Supreme Court clarified the FCA's materiality requirement in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016), in the context of the implied false certification theory liability. Under that theory of liability, a plaintiff must demonstrate that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement [is] material to the Government's payment decision." *Id.* at 2002. As such, the *Escobar* court explained that "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* (citation omitted)). This standard, the Court explained, is demanding as the FCA is not "an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* (citation omitted) (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 662 (2008)). In other words, a misrepresentation is not material "merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* at 2003. Nor is it sufficient that the Government "would have the option to decline to pay if it knew of the defendant's noncompliance." *Id.*

*Escobar* "makes clear that courts are to conduct a holistic approach to determining

materiality in connection with a payment decision, with no one fact being necessarily dispositive." *United States ex rel. Escobar v. Universal Health Servs., Inc.*, 842 F.3d 103, 109 (1st Cir. 2016); *Escobar*, 136 S. Ct. at 2001 ("[M]ateriality cannot rest 'on a single fact or occurrence as always determinative.'").  Based on the flexible nature of the materiality inquiry, courts have generally distilled the teachings of *Escobar* to the following factors: "(1) whether compliance with a particular statute is a 'condition of payment,' (2) whether the violation goes to 'the essence of the bargain' or is 'minor or insubstantial,' and (3) whether the government pays or declines to pay similar claims when it has 'actual knowledge' that the claims are tainted by the same kind of violation."  *United States ex rel. Gohil v. Sanofi U.S. Servs. Inc.*, No. 02-2964, 2020 WL 4260797, at *14 (E.D. Pa. July 24, 2020).

While *Escobar* addressed materiality only in the context of false certification claims, courts have found certain of *Escobar*'s principles to apply equally to claims under a fraudulent inducement theory.  *See United States v. Wavefront, LLC*, No. 20-5094, 2021 WL 37539, at *7 (D.N.J. Jan. 5, 2021); *see also Strock*, 982 F.3d at 60–62 (applying *Escobar* to determine whether plaintiff pleaded materiality on fraudulent inducement claim under the FCA).  For example, as I explained in *Wavefront*, "the principle that "minor or insubstantial" false or fraudulent statements are not material could reasonably apply across different theories of FCA liability."  *Wavefront*, 2021 WL 37539, at *7.  As could "past government actions in response to similar false or fraudulent statements."  *Id.*  However, "*Escobar*'s reference to noncompliance with statutory, regulatory, or contractual requirements . . . do not apply as logically to the Government's fraudulent inducement theory."  *Id.*  That is because, "under the fraudulent inducement theory, courts have based FCA liability on false statements, not otherwise in contravention of any express 'requirement,' that amount to fraudulent inducement of a contract."  *Id.*; *see also United States ex*

26

*rel. Longhi v. Lithium Power Techs., Inc.*, 575 F.3d 458, 471–72 (5th Cir. 2009) (holding that defendants violated the FCA under a theory of fraudulent inducement where the defendants submitted false documents in SBIR proposals).  Critically, however, as the United States District Court for the District of Columbia recently observed, ""the fraud in the inducement theory . . . has a strict materiality requirement baked in" as "[f]or a claim to be 'false or fraudulent' under the fraud in the inducement theory, the contract must have been 'procured by fraud.'"  *Narula*, 2020 WL 6544734, at *9.  In other words, "while a contractor's undisclosed noncompliance with a statutory, regulatory, or contractual requirement could be immaterial to the government's decision to pay that contactor, a fraudulent statement that secures a government contract *will always be material* to the government's decision to pay the contractor under that agreement.  *Id.* (emphasis in original) (citing *Escobar*, 136 S. Ct. at 2002–03).

Armed with these principles, I turn to the parties' arguments with respect to materiality. While the VE Source Defendants contend that *Escobar* controls the Court's analysis of materiality, their arguments do not fit within the *Escobar* framework.  Rather, the VE Source Defendants contend that the Complaint generally lacks any non-conclusory allegations "that show that VE Source's SDVOSB status was material to the USDA and DLA's decisions to pay the VE Source's claims."  The VE Source's argument in this regard, however, improperly focuses on the agency's decisions to pay VE Source's *claims.*  However, as explained above, the relevant question on a fraudulent inducement theory of liability, is whether VE Source's allegedly fraudulent statement that it qualified as an SDVOSB was material to the USDA and DLA's decisions to award VE Source the contracts.  *See Strock*, 982 F.3d at 62–66; *Narula*, 2020 WL 6544734, at *9.  The Complaint contains sufficient factual allegations to meet this requirement.  The Complaint sets forth the federal regulations that specifically provide that companies can only obtain SDVOSB

27

set-aside contracts if they meet the requirement of being owned and controlled by service-disabled veterans.  (Compl. ¶¶ 17–18.)  In that regard, the Complaint alleges that the solicitation documents for the USDA and DLA Contracts stated that "any award resulting from this solicitation shall be made to [an SDVOSB]," in compliance with 48 C.F.R. §§ 19.1408, 52.219-27(c).  (*Id.* ¶¶ 27, 65, 78.)  Further, prior to awarding the USDA and DLA Contracts, the Complaint alleges that contracting officers confirmed VE Source was a certified SDVOSB and that neither agency would have awarded the contracts, nor made any payments thereunder, had they known VE Source was not a legitimate SDVOSB.  (*See* Compl. ¶¶ 65, 71, 75, 78, 81, 89.)  This is sufficient to show materiality on a fraudulent inducement claim.  *See, e.g.*, *Strock*, 982 F.3d at 65[10]; *United States v. Luce*, 873 F.3d 999, 1007 (7th Cir. 2017) (applying *Escobar* and finding that government sufficiently alleged materiality where defendant misrepresented his criminal history on Department of Housing and Urban Development Yearly Verification Report in order to for his company to participate in the Fair Housing Act's insurance program); *Wavefront*, 2021 WL 37539, at *8.

Finally, the VE Source Defendants argue that the Government's allegation that it regularly prosecutes parties that fraudulently obtain SDVOSB set-aside contracts does not demonstrate materiality.  The Complaint highlights several Office of Inspector General ("OIG") reports to Congress regarding prosecutions for submitting such false certifications.  (*See* Compl. ¶ 165.)  The

---

[10]    The VE Source Defendants argue that the showing of materiality is weaker here than it was in *Strock* because, there, the complaint outlined various steps the government takes to confirm that an applicant is an SDVOSB before awarding a contract and identified contracting officers who would not have awarded contracts to the *Strock* defendants had they been aware it was not an SDVOSB.  982 F.3d at 64.  While such facts may bolster allegations of materiality, they are not dispositive of the issue.  Here, the Complaint plainly alleges the VE Source would not have been awarded the USDA and DLA Contracts had those agencies known that it was not an SDVOSB.  That is more than sufficient to show materiality at the motion to dismiss stage.

VE Source Defendants contend that reference to these OIG reports is irrelevant to materiality, because, relying on the Second Circuit's observation in *Strock*, "*Escobar* indirectly indicates that allegations of post hoc prosecutions or other enforcement actions do not carry the same probative weight as allegations of nonpayment." (Defs.' Br., at 25–26 (quoting *Strock*, 982 F.3d at 62).) While the VE Source Defendants are correct that "the government's alleged post-award conduct in response to noncompliance," alone, may not be especially probative of materiality, it does not undermine the Complaint's other allegations. Plainly, the Complaint as a whole supports the inference that "it does not award contracts to entities it knows not to be SDVOSBs." *Strock*, 982 F.3d at 64.

In sum, the Complaint's allegations suggest with particularity that the VE Source Defendants' misrepresentations that VE Source was an SDVOSB had a "natural tendency to influence, or [were] capable of influencing," the Government's award of contracts set-aside for SDVOSBs and remittance of payments on those contracts. *See* 31 U.S.C § 3729(b)(4). Indeed, the false certification of VE Source as a SDVOSB was not "minor or insubstantial," *see Escobar*, 136 S. Ct. at 2003, rather, it is plausible that those false certifications were consequential in the Government's decision to award the USDA and DLA Contracts to VE Source.

### 2. *State Law Claims*

The VE Source Defendants additionally move to dismiss the Complaint's common law tagalong claims for fraud, unjust enrichment, and payment by mistake. I address each claim in turn.

### 1. *Fraud*

Under New Jersey law, the elements of common-law fraud are "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of

its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate N.J. Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) (citation omitted).  The VE Source Defendants contend that the Government's fraud claim fails for the same reasons as its FCA claim.  Namely, they argue that the Government has not alleged a material misrepresentation, knowledge of its falsity, or reliance.  However, as set forth in detail above, I find that the Complaint sufficiently alleges that the VE Source Defendants falsely certified VE Source to be an SDVOSB when they knew it did not qualify as such and that, in awarding the USDA and DLA Contracts, the Government relied on those misrepresentations. *See Smith*, 274 F. Supp. 3d at 327 ("Where a party has pled FCA liability, it will also have pled common law fraud, except that common law fraud also requires allegations of reliance or damages.").

Separately, however, the parties disagree whether the Government has plausibly alleged that it suffered damages as a result of the alleged misrepresentations.  The VE Source Defendants maintain that the Government has suffered no damages because VE Source fully performed under both the USDA and DLA Contracts and nowhere does the Complaint allege that any of the goods received under those contracts were defective.  The crux of the Government's claim, however, is not that the goods produced by the VE Defendants were defective but, rather, that the VE Defendants fraudulently induced the Government to enter into the USDA and DLA Contracts in the first instance.  In  that regard, the Government alleges that it suffered damages in the amount it paid in claims to VE Source under the USDA and DLA Contracts, for a total amount of $16,594,973.  These allegations, which also underlie the Government's FCA claims and which I have found to be sufficient, are sufficient to state a claim for common law fraud. *See, e.g.*, *United States ex rel. Doe v. Heart Sol.*, PC, 923 F.3d 308, 318 (3d Cir. 2019) (affirming district court's

30

denial of motion to dismiss common law fraud claim "for the same reasons" it denied an accompanying FCA claim).

### 2. *Unjust Enrichment*

In New Jersey, "[t]o prove a claim for unjust enrichment, a party must demonstrate that the opposing party received a benefit and that retention of that benefit without payment would be unjust." *Thieme v. Aucoin-Thieme*, 151 A.3d 545, 557 (N.J. 2016) (citation and internal quotations omitted). Unjust enrichment also "requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *Id.* A plaintiff may state a claim for unjust enrichment where "the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider." *United States ex rel. Monahan v. Robert Wood Johnson Univ. Hosp. at Hamilton*, No. 02-5702, 2009 WL 1288962, at *9 (D.N.J. May 7, 2009) (quoting *Ankerstjerne v. Schlumberger, Ltd.*, 155 F. App'x 48, 52 (3d Cir. 2005)).

The VE Source Defendants contend that the Government cannot state a claim for unjust enrichment because both VE Source and the Government received what they bargained for—the USDA and DLA received the merchantable aprons and coveralls and VE Source was paid the contract price. (VE Source Defs.' Br., at 29.) However, the Complaint plausibly alleges that VE Source wrongfully secured the USDA and DLA Contracts. The Court of Federal Claims has explained, "[w]hether and to what extent [defendant] performed on the contract does not automatically invalidate the government's allegation that [defendant] was unjustly enriched on the [contract]." *LW Constr. Of Charleston, LLC v. United States*, 139 Fed. Cl. 254, 259 (Fed. Cl. 2018). Indeed, it is well accepted that "[t]he government has a right to try to recover the amounts

31

paid to a contractor . . . on a contract if it was allegedly fraudulently obtained." *Id.*; *see also Longhi*, 575 F.3d at 473. Here, the Government alleges that as a result of the false certifications made by the VE Source Defendants, it was deprived the benefit of its bargain: contract performance by an SDVOSB. This is sufficient to state a claim for unjust enrichment. *See Monahan*, 2009 WL 1288962, at *9 ("The Government has adequately stated a claim for fraud under the FCA and therefore can state properly a claim for unjust enrichment by alleging that the payments it made to Defendant were 'wrongfully secured' by Defendant as a result of Defendant's fraud.").[11]

### 3. *Payment by Mistake*

The Third Circuit has explained that a claim for "payment by mistake of fact allows the United States to recover money from a defendant that 'its agents have wrongfully, erroneously, or illegally paid.'" *United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 319 (3d Cir. 2019). The VE Source Defendants contend that this claim must be dismissed because there was no mistake. As set forth in detail above, however, the Complaint plausibly alleges that the VE Source Defendants falsely certified VE Source to be a SDVOSB in order to obtain the USDA and DLA Contracts. This is sufficient to state a claim for payment by mistake. *See, e.g.*, *Smith*, 274 F. Supp. 3d at 327 (denying motion to dismiss payment by mistake claim where complaint adequately pleaded a claim for fraud under the FCA); *Monahan*, 2009 WL 1288962, at *9 (concluding that the government stated a claim for payment by mistake where "[t]he Government ha[d] stated a claim for fraud under the [FCA]").

---

[11]    The VE Source Defendants do not argue that the economic loss doctrine bars the Government's claim for unjust enrichment. Indeed, because the government essentially seeks to invalidate the USDA and DLA contracts, it is not barred from seeking other alternative forms of relief.

### B. *Vertical Source's Motion to Dismiss*

Vertical Source separately moves to dismiss Count Seven of the Complaint for alter ego liability. (VS Br., at 1.) Before addressing the merits of Vertical Source's motion, however, I note that the parties dispute precisely what claims are asserted against Vertical Source. While Vertical Source maintains that Count Seven is the lone claim asserted against it; the Government contends that it brings all claims against *all defendants*, including Vertical Source. Specifically, the Government argues, in cursory fashion, that "Vertical Source could be liable under any of [the] counts in its own right or based upon its vicarious liability for the conduct of Neary or other Vertical Source employees that acted with apparent authority or within the scope of their employment in perpetuating the fraudulent scheme." (Gov't Opp. to VS, at 24.) Both parties' arguments on this issue miss the mark. Alter ego is an equitable theory of liability that permits a plaintiff to pierce the corporate form to hold an entity, here Vertical Source, liable for the conduct of its alter ego. In other words, if the Court finds that the Government has adequately pleaded alter ego, Vertical Source and VE Source must be treated as the same entity and, thus, any claim that could be brought against VE Source may be brought against Vertical Source. *See, e.g., United Food & Commercial Workers Union v. Fleming Foods East, Inc.*, 105 F. Supp. 2d 379, 388 (D.N.J. 2000) ("[A] contention that A is B's 'alter ego' asserts that A and B are the same entity." (quoting *Bd. of Trs., Sheet Metal Workers Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000)); *N.L.R.B. v. Omnitest Inspection Servs., Inc.*, 937 F.3d 112, 114 (3d Cir. 1991) ("[Once] the other employer is held to be the 'alter ego' of the old employer, [it] is 'subject to all the legal and contractual obligations of the predecessor."). Next, I turn to whether the Complaint states a claim for alter ego liability against Vertical Source.

Generally, the corporate form "allow[s] shareholders to invest without incurring personal

liability for the acts of the corporation." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485

(3d Cir. 2001)  Where the corporate form is abuse, federal common law[12] arms courts with an

equitable remedy known as alter-ego liability, which permits the court to "disregard the corporate

entity and impose liability on the corporation's shareholders or parent corporation." *Recom Corp.*

*v. Miller Bros.*, 2018 WL 3930090, at *6 (D.N.J. Aug. 16, 2018).  "A party seeking to pierce the

corporate veil must 'essentially demonstrate that in all aspects of the business, the two corporations

actually functioned as a single entity and should be treated as such.'" *Kindred Healthcare, Inc.*,

469 F. Supp. 3d at 454. (quoting *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 485 (3d Cir.

2001)).  The Third Circuit in *Pisani* articulated several factors courts should consider when

evaluating an alter ego claim:

> First is whether the corporation is grossly undercapitalized for its
> purposes.   Other factors are "failure to observe corporate
> formalities, non-payment of dividends, the insolvency of the debtor
> corporation at the time, siphoning of funds of the corporation by the
> dominant stockholder, non-functioning of other officers or directors,
> absence of corporate records, and the fact that the corporation is
> merely a facade for the operations of the dominant stockholder or
> stockholders."

*Pisani*, 646 F.2d at 88 (quoting *Dewitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d

681, 686–87 (4th Cir. 1976)).  These factors are nonexclusive and not all the *Pisani* factors need

to be present to pierce the corporate veil.  *See Trustees of the Nat'l Elevator Indus. Pension, Health*

*Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194–96 (3d Cir. 2003).  However, in order to

demonstrate alter ego, the facts alleged must also "present an element of injustice or fundamental

---

[12]     In an FCA case, "[f]ederal common law (rather than the law of the state where a corporation is incorporated), governs the veil-piercing question." *United States v. Kindred Healthcare, Inc.*, 469 F. Supp. 3d 431, 454 (E.D. Pa. 2020) (citation omitted); *see also United States v. Pisani*, 646 F.2d 83, 85–86 (3d Cir. 1981).  Accordingly, I apply federal common law to the Government's alter ego claim.

unfairness." *Pisani*, 646 F.2d at 88.

Here, the Government provides the following allegations in support of the *Pisani* factors. First, with respect to insolvency, the Government alleges that Vertical Source and Neary "took excessive 'loans' from VE Source," the balance of which approached $1 million, without any written agreement, security, interest obligations, or defined repayment terms.  (Compl. ¶ 96(a).) According to the Complaint, these "loans" caused VE Source to incur a $300,000 debt to one of its main vendors, American Apparel.  (*See id.* ¶ 135.)  The Government further relies on the "loans" between VE Source and Vertical Source as evidence that the companies failed to observe corporate formalities based on the absence of documentation or other terms and conditions for the loans.  (*Id.* ¶ 96(a).)  Next, the Complaint alleges that Barton, while ostensibly VE Source's CEO, did not function as its CEO.  In support of this allegations, the Government highlights the limits placed on Barton's corporate spending power and, notably, in October 2016, Barton and Neary signed the "Shared Management Agreement of VE Source, LLC," which required Barton to obtained Neary's consent for all matters involving more than $1000.  (*Id.* ¶ 152.)  The Government further alleges that Neary controlled the day-to-day operations of VE Source, including signing corporate documents for VE Source, making important business decisions, and leading communications with manufacturing vendors.  (*See id.* ¶ 96(d).)

The Government additionally highlights other circumstances that it contends show a lack of corporate separateness between Vertical Source and VE Source.  Specifically, the Government alleges that while Neary and Barton have continuously espoused that VE Source and Vertical Source are not related, the failure to observe corporate formalities between the allegedly unrelated companies supports the conclusion that Vertical Source is VE Source's alter ego.  And, finally, underlying the entire Complaint is the allegation that VE Source was a mere façade for Vertical

Source to obtain government contracts that would otherwise not have been available to Vertical Source. (*See* Compl. ¶¶ 22–153.)  In other words, the Government contends that it has shown "an element of injustice or fundamental unfairness" because, it alleges, that VE Source was formed solely to defraud the Government and benefit Neary and his companies.

Vertical Source attempts to challenge these allegations by arguing that "a subsidiary corporations' use of the trade name of the parent, acceptance of administrative support or having a significant economic relationship with the parent are wholly insufficient to support alter ego liability." (VS Br., at 15–16.)  Vertical Source, however, is not alleged to be VE Source's parent company and, as set forth in the Complaint, Barton and Neary have represented to the VA that there is no relationship between VE Source and Vertical Source.  (*See* Compl. ¶ 155.)  Moreover, on this dismissal motion, Vertical Source disputes the veracity of certain facts alleged by the Government and the inferences to be made from those allegations, (*see* VS Br., at 19–21); however, such factual disputes are not for resolution on a motion to dismiss.  Rather, the Court must take the Government's allegations in the Complaint as true, and make all reasonable inferences in the Government's favor.[13]  In that connection, at the pleadings stage, the Government

---

[13]      Vertical Source additionally compares this case to *Stone v. Winter Enterprises., P.C.*, No. 12-465, 2012 WL 6155606 (D.N.J. Dec. 11, 2012), and *Linus Holding Corp. v. Mark Line Industries, LLC*, 376 F. Supp. 3d 417 (D.N.J. 2019).  Neither case supports its position.  First, in *Stone*, the court declined to weigh the *Pisani* factors because, it determined that the complaint was devoid of any allegation of any element of injustice or fundamental unfairness.  *Stone*, 2012 WL 6155606, at *5.  While Vertical Source states, in conclusory fashion, that there is no element of injustice here, as explained above, the Complaint alleges that VE Source was formed as part of a fraudulent scheme to obtain government contracts, reserved for service-disabled veterans, that Vertical Source could not.  Vertical Source's reliance on *Linus Holdings* is similarly unpersuasive.  There, I determined that the plaintiff had not alleged sufficient factual matter to support a claim for piercing the corporate veil because plaintiff's allegations demonstrated "a misuse or mismanagement of corporate funds," as opposed to an abuse of the corporate form.  *Linus Holdings*, 376 F. Supp. 3d at 428–29.  Here, as detailed above, the Government has alleged significant factual matter to support its contention that VE Source is an alter ego for Vertical Source.

has alleged sufficient facts to support a claim of alter ego liability against Vertical Source.  The Complaint alleges detailed facts that plausibly allege that Vertical Source and Neary used VE Source as a façade for Vertical Source's operations and, in doing so, abused the corporate form. The façade provided by VE Source permitted Neary to take advantage of a government program intended to provide opportunities for small business owned by service-disabled veterans. Accordingly, because I find that the Government has stated a claim against Vertical Source for alter ego, its motion to dismiss Count Seven is denied.

## IV.    CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed by both the VE Source Defendants and Vertical Source are **DENIED.**

DATED: August 24, 2021                                    /s/ Freda L. Wolfson
                                                         Freda L. Wolfson
                                                         U.S. Chief District Judge